EXHIBIT 17 -
MOTION TO SET ASIDE WAKE COUNTY ORDER

STATE OF NORTH CAROLINA      IN THE GENERAL
COURT OF JUSTICE
SUPERIOR COURT DIVISION

COUNTIES OF SCOTLAND
AND IREDELL
(HEARD IN WAKE)

FILE NOS: 85 CRS 4084,4085
83 CRS 10621

STATE OF N. CAROLINA,    )
                      )
                      )
                      )
          v.            )
JEROME MURPHY,        )
      AND           )
BRETT ABRAMS,         )
     DEFENDANTS    )
                      )

IREDELL COUNTY
FILED
AUG 3 1 2022
_____ O'CLOCK _____ M
CLERK OF SUPERIOR COURT

**MOTION FOR RELIEF
FROM ORDERS**

NOW COMES Willis J. Fowler, in his official capacity, as the Chairman of the North Carolina Post-Release Supervision and Parole Commission ("Commission"), by and through the undersigned, Sonya Calloway-Durham, Special Deputy Attorney General with the North Carolina Department of Justice, without waiving either subject matter or personal jurisdiction, moving this Court pursuant to Rule 60(b)(4) and (b)(6) of the North Carolina Rules of Civil Procedure, for an order for relief from orders issued in the above-referenced matters in Wake County Superior Court on July 15, 2022 and June 28, 2022, respectively. In support thereof, the Commission shows the Wake County Superior Court ["this Court" or "the Court"] the following:

# I. PROCEDURAL HISTORY

A.

1. Defendant Murphy ["Murphy"], OPUS # 029609, having previously been indicted for first-degree rape and first-degree burglary, and found guilty of first-degree burglary, a Class C felony, on the basis of an underlying felony, in Scotland County Superior Court, 85 CRS 4084 and 4085, and having been sentenced under Fair Sentencing, to life with the possibility of parole, currently is eligible for parole; and as a result, the Commission has been conducting proceedings to evaluate him for the possibility of parole. *See* Attach. Q ¶3; and Attach. F at 1-6.

2. Defendant Abrams ["Abrams"], OPUS #400, having previously pled guilty in Iredell Superior Court, 83 CRS 10721, to a lesser offense of second degree murder, a Class C felony, and having been sentenced under Fair Sentencing to life with the possibility of parole, currently is eligible for parole; and as a result, the Commission has been conducting parole proceedings to evaluate him for the possibility of parole. *See* Attach. Q ¶3; Attach. E at 1, 2, 5-6.

3. As of the date of this filing, the Commission has not granted parole to either Murphy or Abrams. *See* Attach. R; Attach Q at 3.

2

4. On July 15, 2022, this Court, by and through the Honorable C. Paul Ridgeway, Senior Resident Superior Court Judge of Judicial District X, signed an *ex parte* order ["Murphy Order"] finding that "[b]ecause the [Commission] maintains its central offices within Wake County, the above-captioned matter is within this Court's jurisdiction." *See* Attach. C at 1, ¶5 (Findings of Fact).

5. On June 28, 2022, this Court, by and through the Honorable C. Paul Ridgeway, Senior Resident Superior Court Judge of Judicial District X, signed what appears to the undersigned also to be an *ex parte* order ["Abrams Order"] finding that "[b]ecause the [Commission] maintains its central offices within Wake County, the above-captioned matter is within this Court's jurisdiction." *See* Attach. B ¶7 (Findings of Fact).

6. In Murphy's Order, this Court also made findings that "[u]ndersigned counsel represents Mr. Murphy and is in the process of investigating and preparing a post-conviction Motion for Appropriate Relief [MAR];" "[i]t is in the interest of justice, and within this Court's discretion to manage discovery in criminal proceedings, to grant the motion;" and "[b]ecause the disclosure of the motion for production of records and this order to prosecutorial agencies would impair Mr. Murphy's ability to

3

work with his attorneys to make strategic decisions in confidence, Mr. Murphy is entitled to file the motion and have it resolved ex parte." Attach. C at 1, ¶¶3,4,6 (Findings of Fact).

7. In Abrams Order, this Court also made findings that "[u]ndersigned counsel represent Mr. Abrams for purposes of preparing evidence in support of parole and clemency;" "this request is consistent with *Franklin* [*v. Shields*, 569 F.2d 784 (4th Cir. 1977);" and "[i]t is in the interest of justice, and within this Court's discretion to manage discovery in criminal proceedings, to grant the motion." Attach. B ¶¶4,5,6 (Findings of Fact).

8. In Murphy Order, this Court ordered in particular part that "[u]pon representation of this order to the appropriate custodian, the [Commission] and/or its other agents shall furnish to counsel Mr. Murphy's entire file;" "[i]f maintained by the [Commission], the records shall include, but not be limited to, incarceration records, probation records, post-release supervision records, community corrections records, and all medical and mental health records produced, pursued, or obtained by the Parole Commission. These records shall also include, if maintained, inmate grievances, case-worker reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation

4

reports, raw psychiatric data, records from psychiatric and psychological testing (including IQ scores and dates and names of administrators of IQ or other psychiatric or psychological tests), jackets from each facility in which Mr. Murphy has been housed, and all information contained in the computer systems on Mr. Murphy by the [Commission]." Attach. C at 1, ¶¶1-2 (Conclusions of Law).

9. In Abrams Order, this Court ordered in particular part that "[u]pon representation of this order to the appropriate custodian, the [Commission] and/or its other agents shall furnish records of Brett Abrams, OPUS #400, to Mr. Abrams' counsel;" "[t]hat the [Commission] produce Mr. Abrams entire file, including but not limited to, incarceration records, post-release supervision, and parole records. These records may include case-worker reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation reports, raw psychiatric data, records from psychiatric and psychological testing (including IQ scores and dates and names of administrators of IQ or other psychiatric or psychological tests), and all information contained in the computer systems on Mr. Abrams by the [Commission]. Mr. Abrams also seeks also medical and mental health records

5

produced, pursued, or obtained by the Commission." Attach. B
¶¶1-2 (Conclusions of Law).

## II. CRIMINAL PROCEEDINGS

The above paragraphs are incorporated by reference as if
realleged herein.

"It is now well settled in North Carolina that the right to
discovery is a statutory right." *State v. Sharkeem Jammarcus Foushee*,
234 N.C. App. 71, 77, 758 S.E.2d 47, 52 (2014). Under common law:

> neither the State nor the defendant had a right of discovery
> in criminal cases under the common law. *State v. Goldberg*,
> 261 N.C. 181, 134 S.E.2d 334, *cert. denied*, 377 U.S. 978, 12
> L. Ed. 2d 747 (1964). Presently, **limited rights of
> discovery** for the defendant and the State exist under the
> Constitution of the United States or by statute. E.g., *Brady
> v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963)
> (constitutional requirement that State disclose certain
> information favorable to defendant. . .); N.C.G.S. §§ 15A-
> 901 to -910 (1988) (statutory rights of discovery for
> defendant and State).

*State v. Taylor*, 327 N.C. 147, 153, 393 S.E.2d 801, 806 (1990)(emphasis
added).

A.   Brady

> Brady held 'that the suppression by the prosecution of
> evidence favorable to an accused upon request violates due
> process where the evidence is material either to guilt or to
> punishment.' 373 U.S. at 87.. . . Evidence is 'material'
> under Brady 'when there is a reasonable probability that,
> had the evidence been disclosed, the result of the
> proceeding would have been different.' *Cone*, 556 U.S. at

6

469-70. Put another way, evidence must be disclosed when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

*Warren v. Polk*, 2017 U.S. Dist. LEXIS 7871, *30 (M.D.N.C. Jan. 20, 2017)(unpublished).

In holding that a criminal defendant's rights under *Brady* were not violated, the Federal District Court ruled:

Mr. Warren has come forward with no support for his allegation about the purported mitigating evidence. **He has not produced evidence that his own statements were unavailable to him in any way and thus has not satisfied the first prong of Brady**. For that matter, **he has produced no evidence to show that these statements were material during his sentencing proceeding, also failing the second prong of Brady**.

*Warren v. Polk*, 2017 U.S. Dist. LEXIS 7871, *33 (M.D.N.C. Jan. 20, 2017)(unpublished)(emphasis added).

B.     Inherent Authority

This Court relied upon the decision in *State v. Taylor* in its finding that "[i] it is in the interest of justice . . . to manage discovery in criminal proceedings, to grant" Murphy Motion. *See* Attach. C at 1, ¶4. *See also* Attach. B ¶6. "Inherent authority has been described as essential to the existence of the court and the orderly and efficient exercise of the administration of justice. It empowers courts to do those

7

things which are reasonably necessary for the **administration of justice within the scope of their jurisdiction.**" *MetLife Grp., Inc. v. Scholten*, 273 N.C. App. 443, 450, 849 S.E.2d 61, 66 (2020) (emphasis added), quoting *Beard v. North Carolina State Bar*, 320 N.C. 126, 129, 357 S.E.2d 694, 696 (1987)(citations and quotations omitted). Thus, one of the critical factors for this Court's inherent authority and therefore its right to find that something is in the "interest" of justice, is that this Court have jurisdiction.

Years after the decision in *State v. Taylor*, the State Supreme Court relied upon *State v. Taylor* in holding that "[t]he trial court possesses **'inherent authority'** to compel discovery **in certain instances** in the **interest of justice.**" *State v. Warren*, 347 N.C. 309, 325, 492 S.E.2d 609, 617-618 (1997)(citations and quotations omitted)(emphasis added), citing *State v. Taylor* at 153-54, 393 S.E.2d at 806. *Warren* made clear that a trial court's inherent authority is not relevant to every motion for discovery.

This Court also relied upon the decision in *State v. Buckner*, 351 N.C. 401, 527 S.E.2d 307 (2000), to support its finding in Murphy Order ¶4 and also Abrams Order ¶6. However, in *State v. Buckner*, the Court held, "A court uses its **inherent power** when constitutional provisions,

8

statutes, or court rules **fail to supply answers to problems.**" *State v. Buckner*, 351 N.C. at 411, 527 S.E.2d at 313 (emphasis added).

Likewise, in *State v. Taylor*, the Court reasoned:

> it is not necessary for us to reach the question of whether North Carolina trial judges have **the inherent power** to order pretrial discovery **in the absence of a statute prohibiting discovery**. Instead, we must decide whether, on the facts before us, the Superior Court had the inherent authority to order disclosure of **facts relevant to the defendant's motion for appropriate relief, which was made** after the trial and direct appeal of these cases.

*State v. Taylor* at 153, 393 S.E.2d at 806 (citations and quotations omitted)(emphasis added). In other words, the point of *Taylor* was the Court's inherent authority during **post-conviction** and **after an MAR had been filed**. It also was not in a scenario such as Murphy's when an MAR had not been filed; or when there was **a statute prohibiting disclosure**, as is the case of inmate records. *See* N.C.G.S. § 148-76. Thus, *State v. Taylor* clearly is distinguishable in that the Court's intent regarding inherent power involved a scenario unlike that in Murphy Order.

For instance, in ruling on an issue involving juror affidavits a defendant alleged he was unable to obtain, the Fourth Circuit relied upon *State v. Buckner*, and reasoned that as the State had argued, the defendant, "had the ability to seek a deposition or other discovery **at**

9

the time he filed his MAR, **thus providing him with a way of**

**presenting evidence in support of his MAR.** *See State v. Buckner,*

351 N.C. 401, 527 S.E. 2d 307 (N.C. 2000) (holding that a party has the

right to seek discovery upon **filing** of an MAR)." *McNeill v. Polk,* 476

F.3d 206, 214 (4th Cir. 2007)(emphasis added). Thus, it is the filing of

the MAR that grants the trial court jurisdiction over an MAR and its

discovery.

As an aside, it is noteworthy that the premise of Murphy's need

for discovery is his "intent" to file an MAR, when the Superior Court in

the jurisdiction for his MAR already has issued an order dated

November 15, 2001, regarding an MAR previously filed on October 16,

2001:

> The Court, having considered the allegations contained in
> the motion and the case file, finds as a fact that the motion
> sets forth no probable grounds for the relief requested,
> either in law or in fact.. . . THE COURT CONCLUDES that
> there are no probable grounds for relief, and IT IS
> THEREFORE ORDERED that
> 1. The Motion is denied;
> 2. The defendant/petitioner's failure to assert any other
> grounds in his motion **shall be subject to being treated**
> **in the future as BAR to any other claims, assertions,**
> **petitions, or motions that he/she might hereafter file**
> **in this case, pursuant to G. S. 15A-1419.**

10

Attach. I (emphasis added). The fact the Court already has concluded that Murphy's intended MAR is procedurally barred, minimizes if not renders moot, his need for the discovery he now seeks.

Regardless, absent statutory authority under N.C.G.S. § 15A-1411 *et al.* (Article 89, "Motion for Appropriate Relief and Other Post-Trial Relief") Murphy is not entitled to discovery for an unfiled MAR, let alone privileged records contained in inmate records in the possession of the Commission, especially when our highest courts have interpreted G.S. 148-74 and 148-76 to prohibit such dissemination. *See Paine v. Baker*, 595 F.2d 197, 199-200 (4th Cir. 1979)

> (holding "the [lower] court's interpretation of North Carolina's statutory scheme directly contradicts the interpretation of the State's highest court. In *Goble v. Bounds*, 13 N.C. App. 579, 186 S.E.2d 638 (1972), the Court of Appeals of North Carolina held that **prison records are confidential** and are **not subject to inspection by the inmate concerned,** but **only by those persons specifically named in** [G.S. 148-76]")

(emphasis added); N.C.G.S. § 148-76 (mandating that inmate files only be "made available to law-enforcement agencies, courts, correctional agencies, or other officials requiring criminal identification, crime statistics, and other information respecting crimes and criminals.").

Given both the language of G.S. 148-76 and the interpretations of both our highest state court and the Fourth Circuit, this Court was

11

without jurisdiction to exercise its inherent authority for the purposes of Murphy Motion. The plain language of G.S. 148-76 does **not** include an inmate's counsel.

As this Court's inherent authority is dictated by its jurisdiction. Its jurisdiction is thereby contingent upon a pending action, which in Murphy Order, should have been a filed MAR. In both Abrams and Murphy Orders, the jurisdiction was dependent upon a statute allowing dissemination of inmate records, as an exception to our highest court's interpretation of G.S. 148-76 and its plain language identifying individuals entitled to inmate records. Murphy Order simply did not invoke the purpose of this Court's inherent authority. Likewise, neither did Abrams Order.

The findings in the Murphy Order reference disclosure to "prosecutorial agencies," as a basis for the *ex parte* nature of the order. *See* Attach. C at 1, ¶6. However, the disclosure of inmate records did not involve files of a law enforcement agency, an investigatory agency, or the prosecutor's office; and it did not involve the **investigation of the underlying crimes committed** or the **prosecution of the defendant**. The Commission is neither a law enforcement agency, an investigatory agency, nor a prosecutor's office. *See* Attach. Q ¶*2;* N.C.G.S. § 15A-101(7)("Prosecutor. – The district attorney, any

12

assistant district attorney or any other attorney designated by the district attorney to act for the State or on behalf of the district attorney."). Thus, for yet another reason, the matter brought before this Court in Murphy Order, was not within the purview of matters intended by the General Assembly.

Furthermore, even if the statutes applied, they do not afford *ex parte* motions, such as were entertained for the attached orders, as they must be in writing, filed and served. Moreover, this Court heard both matters *ex parte*. *See* Attach. C at 1, ¶6; Attach. A at 1.

Both attached orders, not simply Murphy Order, only speak to ordering the dissemination of inmate records to prepare "evidence in support of parole" and clemency (Abrams Order ¶4), and investigating and preparing post-conviction MAR (Murphy Order ¶3); in that both are "in the interest of justice . . . to manage discovery in criminal proceedings, to grant the motion." *See* Attach. C at 1, ¶4; Attach. B ¶6.

However, **barring statutory authority** stating otherwise, the fact an underlying case is criminal, does not in and of itself, create a criminal right to criminal procedures, e.g. this Court's jurisdiction over a matter as a criminal proceeding, and therefore Defendants' alleged rights to discovery, in matters **stemming from** the underlying criminal cases. The Criminal Procedure Act (Chapter 15A of the

13

General Statutes) does not give statutory authority to an inmate or his counsel to discover his own inmate records in a criminal procedure, and in particular, does not give statutory authority to do so for an unfiled MAR, a parole review hearing or a clemency procedure.

C.    Trial Strategy

One of the findings this Court made to justify granting Murphy Order was counsel's need to make "strategic decisions in confidence," such that he is "entitled to file [Murphy Motion] and have it resolved ex parte. *See State v. Ballard*, 333 N. C. 515, 522, 428 S.E.2d 178, 182 (1993)." *See* Attach. C at 1-2, ¶6.

However, the case upon which the Court based its finding is distinguishable from Murphy's circumstances. *State v. Ballard* is about a pre-trial motion the defendant sought to have heard *ex parte* in order for the trial court to determine if his counsel should have the assistance of an expert psychiatrist. It is **not** about an *ex parte* motion to order the Parole Commission to turn over confidential inmate records for the purpose of filing a post-conviction motion, e.g. an MAR.

For instance, the Court explained:

> Only in the relative freedom of a nonadversarial atmosphere can the defense drop inhibitions regarding its strategies and put **before the trial court** all available evidence **of a need for psychiatric assistance**. Only in such an atmosphere can the defendant's privilege against

14

self-incrimination and his right to the effective assistance of counsel not be subject to potential violation by the presence of the State.

We thus hold that the trial court erred in denying defendant an *ex parte* hearing on his **timely request for the appointment of a psychiatrist** in violation of rights guaranteed him under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

*State v. Ballard* at 522-523, 428 S.E.2d at 183.

As *Ballard* is distinguishable from Murphy's matter, the Commission believes this Court's finding was not supported by an analysis of competent facts or law that in turn supported this Court's order, that the Commission hand over its confidential inmate records. The fact the motion was *ex parte* speaks to what the Commission believes were facts that were inaccurate or incomplete, and argument by Murphy's current counsel that misapplied the law.

Unless and until Murphy files an MAR alleging relief on the basis of his mental state or ineffective assistance of counsel, he maintains his right not to have the prosecution (which is not the Parole Commission) discover information that is attorney-client privileged with his trial counsel, or that is protected by a doctor-patient privilege. *See* N.C.G.S. § 15A-101(7).

Furthermore, in *Buckner*, the Court clarified that by filing his MAR and alleging ineffective assistance of counsel, Buckner had

Case 5:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 15 of 210

waived his right to claim attorney-client privilege, such that the State was entitled discovery from him about his trial counsel. *See also* N.C.G.S. § 15A-1415(e)

> (Where a defendant alleges ineffective assistance of prior trial or appellate counsel as a ground for the illegality of his conviction or sentence, he shall be deemed to waive the attorney-client privilege with respect to both oral and written communications between such counsel and the defendant to the extent the defendant's prior counsel reasonably believes such communications are necessary to defend against the allegations of ineffectiveness. This waiver of the attorney-client privilege shall be automatic upon the filing of the motion for appropriate relief alleging ineffective assistance of prior counsel, and the superior court need not enter an order waiving the privilege.).

Thus, Murphy's current counsel's strategies only would be an issue should he file a future claim alleging that his counsel was ineffective, and even then he would waive that privilege. *But see Pa. v. Finley*, 481 U.S. 551, 555 (1987)("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today."); *Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014)(holding that with few exceptions, a criminal defendant cannot claim constitutionally ineffective assistance of counsel in North Carolina post-conviction matters). Thus, Murphy's apparent argument in support of his order that he needed not only an *ex parte* process, but also that he feared not

16

being able to make "strategic decisions in confidence" does not comport with either North Carolina or federal law.

## D.     Civil or Criminal

With the exception of the administrative forum, parole review proceedings are no different from any other matter arising out of a criminal proceeding, captioned as the criminal proceeding, but addressed as a civil matter.  For example, satellite-based monitoring ["SBM"] proceedings are considered civil, but are captioned as criminal, as they arise from an underlying criminal case.  *See State v. Williams*, 207 N.C. App. 499, 501, 700 S.E.2d 774, 775 (2010)("This Court has held that SBM hearings and **proceedings are not criminal actions**, but are instead a civil regulatory scheme.")(quotations omitted)(emphasis added).

Whereas federal *habeas* proceedings normally must arise out of exhausted rights in an MAR in the original criminal matter.  However, federal *habeas* proceedings are neither civil nor criminal.  *See O'Brien v. Moore*, 395 F.3d 499, 506 (4th Cir. 2005) ("Although a *habeas* proceeding is considered a civil action for some purposes, it is more accurately regarded as being *sui generis*.);  *McQueen v. United States*, 2016 U.S. Dist. LEXIS 12195, *71 (E.D.N.C. Feb. 2, 2016)("Pursuant to Rule 6(a) of the Rules Governing Section 2255 Proceedings, '[a] judge

17

may, for good cause, authorize a party to conduct discovery under the Federal Rules of **Criminal Procedure or Civil Procedure**, or in accordance with the practices and principles of law.'")(emphasis added); *Hall v. Daniels*, 2018 U.S. Dist. LEXIS 206997 *4 (W.D.N.C. Dec. 7, 2018). *But see Riddle v. Dyche*, 262 U.S. 333, 335-336 (1923)("The writ of *habeas corpus* is not a proceeding in the original criminal prosecution but an **independent civil suit**.")(emphasis added); *Chapman v. United States*, 2016 U.S. Dist. LEXIS 62392, *10 (E.D.N.C. May 11, 2016)("Unlike the ordinary civil litigant in federal court, a *habeas* petitioner is **not entitled to discovery** as a matter of course.")(emphasis added).

Likewise, contempt proceedings are not considered criminal, even when the underlying court in which the contempt occurred, is criminal. *See Myers v. United States*, 264 U.S. 95, 100 (1924)("There is no right of trial by jury, save as specifically provided by statute. Contempts are not 'crimes' within Art. 3, § 2, cl. 3 of the Constitution, which provides that [t]he trial of all crimes, except in cases of impeachment, shall be by jury. Nor are they 'criminal prosecutions' within the meaning of the Sixth Amendment.")(citations and quotations omitted); *Id.*, 264 U.S. at 100 ("[T]his Court, while recognizing their criminal aspects, has held that contempt proceedings are neither civil nor criminal, but are *sui*

18

*generis*."). *See* N.C.G.S. §15A-1035 ("[A] presiding judge may maintain courtroom order through the use of his contempt powers as provided in Chapter 5A."); Chapter 5A "Contempt," N.C.G.S. § 5A-11 (defining criminal contempt); N.C.G.S. § 5A-21 (defining civil contempt). *But see* Article I, "Criminal Contempt," N.C.G.S. § 5A-15 (e)-(g) (mandating that for criminal contempt, "[t]he person charged with contempt may not be **compelled to be a witness against himself** in the hearing. At the conclusion of the hearing, the judge must enter a **finding of guilty or not guilty**.. . . The facts must be established **beyond a reasonable doubt**. The judge presiding over the hearing **may appoint a prosecutor** . . . to represent the court in hearings for **criminal contempt**.")(emphasis added).

Indeed, the Criminal Procedure Act (Chapter 15A of the General Statutes) as promulgated by the General Assembly, lacks of **any** provision giving rise to parole proceedings, and in particular those involving a sentence of life with the possibility of parole, except Subchapter XIII, Article 81B, Part 2A, 15A-1340.19A-15A-1340.19D, specifically 15A-1340.19D (Incidents of Parole); and Article 85, 15A-1370.1 – 15A-1376. None of the excepted provisions provide a remedy for a criminal defendant, currently incarcerated in the custody of the Secretary of the Department of Public Safety, by and through the

19

Division of Prisons, and the individual warden at the facility in which the inmate is housed, to have the right to move a Superior Court judge to mandate that the Post-Release and Supervision and Parole Commission ["Parole Commission" or "Commission"] release to an inmate or his counsel, either the entirety or any portion, of the inmate's prison or parole files.

However, Subchapter IX, "Pretrial Procedure," Article 48 "Discovery in Superior Court" mandates in G.S. 15A-901 that "This article applies to cases within the original jurisdiction of the superior court." N.C.G.S. § 15A-901. While not exclusive to the pretrial phase of a criminal matter, G.S. 15A-903(a)(1) mandates that "[U]pon motion of the defendant, the court **must** order [t]he State to make available to the defendant the complete files of **all law enforcement agencies, investigatory agencies**, and **prosecutor's offices** involved in the **investigation of the crimes** committed or **the prosecution of the defendant**." N.C.G.S. § 15A-903(a)(1)(emphasis added). *See* Official Commentary N.C.G.S. 15A, Art. 52 "Motions Practice" ("This Article attempts to bring together for the first time a number of provisions related to motions practice in criminal cases.. . . Even as to pretrial motions, of course, this Article does not purport to be exclusive.").

20

Subchapter XIV "Correction of Errors and Appeal", Article 88 "Post-trial Motions and Appeal," G.S. 15A-1401 allows relief from errors in criminal proceedings and other post-trial relief via motions for appropriate relief. *See* N.C.G.S. § 15A-1401. Article 89, G.S. 15A-1411 makes clear that an MAR is a motion **in the original cause**. *See* N.C.G.S. § 15A-1411(b).

Prior to its repeal in 1977, the Post-Conviction Hearing Act made clear that hearings on what are now MAR's were a culmination of several **criminal proceedings** by which a criminal defendant could collaterally attack his sentence. *See State v. White*, 274 N.C. 220, 228, 162 S.E.2d 473, 477 (1968)("holding that the Act incorporated *habeas corpus, coram nobis*, and any other common law or statutory remedy under which a prisoner may collaterally attack his sentence.")(overruled by statute). While an MAR is indeed a criminal proceeding, no such right to discover exists prior to filing the motion, and even if it does, like all criminal matters, it mandates service upon "the State" and is limited to prosecutorial agencies and investigative or law enforcement agencies involved in the **investigation of the crimes committed**.

Furthermore, parole review proceedings have little or no bearing on the bases for an MAR, because "[i]n North Carolina, a writ of *habeas*

*corpus* is an extremely limited remedy that **only challenges the jurisdiction of the court of conviction** and **allows no determination of the merits of any other claim**." *Hall v. Daniels*, at \*4-5 (emphasis added), citing *Broughton v. North Carolina*, 717 F.2d 147 (4th Cir. 1983); *Matter of Imprisonment of Stevens*, 28 N.C. App. 471, 221 S.E.2d 839, 840 (1976) ("[T]he writ is considered an extraordinary process and jurisdictional mechanism under which . . . '[t]he only questions open to inquiry are whether on the record the court which imposed the sentence had jurisdiction of the matter or had exceeded its powers.'").

Even G.S. 15A-951 mandates that unless made during a hearing or trial, all motions must be **in writing** and **served upon the attorney of record for the opposing party**, and as provided in G.S. 1a-1, Rule 5; and be **filed with the court, along with a certificate of service**. *See* N.C.G.S. § 15A-951(a)-(c). Moreover, G.S. 15A-1415(f) mandates that where a defendant is presented by counsel, "the State, **to the extent allowed by law**, shall make available all **law enforcement and prosecutorial agencies** involved in the **investigation** of the crimes committed **or the prosecution** of the defendant." N.C.G.S. § 15A-1415(f) (emphasis added). G.S. 15A-1420 also requires that unless made in open court, an MAR must be in

22

writing, before the judge who presided at trial; state the grounds for the motion; and filed and served in a manner provided in G.S. 15A-951(c). N.C.G.S. § 15A-1420(a), (b1).

As with SBM hearings, parole review hearings are the quintessential examples of purely civil matters that arise from an underlying criminal case. Unlike state contempt proceedings, which can be either criminal or civil by statutory definition; or federal contempt and federal *habeas*, state parole review hearings are not in a class by themselves as neither civil nor criminal, e.g. *sui generis*.

More importantly, the matters involved in the Murphy and Abrams Orders, do not involve criminal procedures such that the Criminal Procedure Act, be it a regular motion under the Act or an MAR, does not apply. As such, this Court's authority to rule on the issue as a criminal matter, was not invoked.

Indeed parole proceedings are not criminal proceedings. *See Franklin v. Shields*, 569 F.2d at 791 ("[B]ecause **parole release proceedings are not part of a criminal prosecution**, a prisoner is not entitled to the full panoply of rights accorded a defendant at trial.")(emphasis added). *See also Goble v. Bounds*, 281 N.C. 307, 311, 188 S.E.2d 347, 349-350 (1972)(holding that "[t]**he decision [to parole] is not in the nature of an adversary proceeding under**

23

**rules of evidence.**. . . Execution of the United States parole system rests on the discretion of an administrative board.") (citations and quotations omitted)(emphasis added).

In *Hoffman v. Edwards*, 48 N.C. App. 559, 269 S.E.2d 311(1980), the Court made clear, "When the legislature has provided an effective administrative remedy, it is exclusive. The remedy provided by statute for the enforcement of a right created by statute is **exclusive**, and the party asserting such right must pursue the prescribed remedy." *Id.* at 563 (emphasis added). Furthermore, "criminal statutes are not to be extended by implication or equitable construction to include those not within their terms, for the very obvious reason that the power of punishment is vested in the legislative and not in the judicial department. It is the General Assembly which is to define crimes and ordain their punishment." *State v. J.C.*, 372 N.C. 203, 208, 827 S.E.2d 280, 283 (2019).

Chapter 15A, the chapter governing criminal procedure, is completely **silent** on any right of a party in a criminal proceeding, be it post-conviction or otherwise, e.g. parole review proceedings, to obtain records from the Commission. Again, there is no right in North Carolina's criminal procedures, for an inmate or his counsel to discover his own inmate records, in particular from the Parole Commission.

24

E.    Breadth of the Order(s)

*State v. Buckner* also held that the "order of the Superior Court directing the defendant to provide the State access to 'all files relating to these cases' **without limiting the ordered disclosure to matters relevant to issues raised by the defendant's allegations** of ineffective assistance of counsel . . . was **overbroad and exceeded its authority.**" *Buckner* at 408, 527 S.E.2d at 311.  Likewise, assuming *arguendo* as to the unfiled MAR and the prohibitions against disseminating inmate records in the possession of the Commission, the Commission believes that the language of Murphy Order is  overbroad and exceeds both this Court's authority and jurisdiction, if any, over the Commission and its records.

Assuming *arguendo* as to the civil nature of Abrams Order and notwithstanding the confidential nature of the Commission's records, the same argument holds true, in that the language is overbroad and exceeds this Court's authority and jurisdiction over the Commission and its records.   Both orders are open-ended and are not limited to relevant issues for either an MAR (about which the merits are not yet alleged), a clemency proceeding (a confidential matter about which there is no hearing and the governor has exclusive and sole jurisdiction), or a parole review hearing (an administrative non-judicial

matter about which the Commission has sole and exclusive authority).
*See* Attach. J at 3; Attach. Q ¶2.

## III.   RULE 60

The above paragraphs are incorporated by reference as if realleged herein.

As the orders pertain to non-judicial administrative civil matters, e.g. parole review hearings and clemency hearings, and/or discovery of records from the Commission, and are without any authority for such discovery in the Criminal Procedure Act, the **orders are civil**. Thus, the ability for this Court **to review its own orders** is, in effect allowed under Rule 60(b)(4),(6) of the North Carolina Rules of Civil Procedure, in that, "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: the judgment is void . . . [or for] [a]ny other reason justifying relief from the operation of the judgment." N.C.G.S. § 1A-1, Rule 60(b)(4),(6). "The trial courts of this state are endowed with ample power to vacate judgments whenever such action is appropriate to accomplish justice through the operation of Rule 60(b)(6) and are **invited to wield that power** in a judicious manner." *State v. Strudwick*, 379 N.C. 94, 109, P17, 864 S.E.2d 231, 242 (2021)(quotations omitted)(emphasis added).

26

For the reasons noted herein, the *ex parte* orders appear to have been based upon findings supported by inaccurate and/or incomplete factual allegations and legal analyses as argued in the motions. As such, there appear to be grounds to either vacate or grant relief from the orders.

## IV.   LIBERTY INTEREST

The above paragraphs are incorporated by reference as if realleged herein.

In ordering the dissemination of Abrams' inmate records from the Commission, this Court has found that Abrams has procedural due process rights during parole reviews.   *See* Attach. B ¶5. In so doing, this Court relied upon *Franklin v. Shields*, 569 F.2d 784, 788 (4th Cir. 1977).

> In *Franklin v. Shields*, the Court reasoned:
>
> [t]he Supreme Court has held that if state law creates a right which involves a person's liberty, the individual possessing this right is entitled to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.. . . Therefore, we must examine the Virginia statutes governing **release on parole**: first, to ascertain what rights are granted a prisoner by these statutes; and second, to determine **if these rights involve the prisoner's liberty**.

*Franklin v. Shields*, 569 F.2d 784, 788 (4th Cir. 1977)(emphasis added).

While this Court relied upon *Franklin v. Shields*, it should be noted that the entirety of the quote in ¶5, references the Court of Appeals' recitation of the Federal District Court's ruling by stating, "In *Franklin*, the district court concluded that parole proceedings are subject to the due process clause. Specifically, it held [inmates'] . . . files on which the parole decision is based, unless such access would threaten prison security or potentially harm the inmate or others." *Id.*, 569 F.2d at 787.

The Fourth Circuit simply ruled that because Virginia had a statutory regime that included the review of the contents of the inmates' records, the Court concluded that Virginia had created a limited liberty interest for Virginia inmates eligible for parole, in obtaining those records, such that the Court came up with several **suggestions** for how Virginia might handle the quandary. *See Franklin v. Shields* at 790 ("[W]hether the Board's review is full and fair, **as contemplated by the statutes**, may be a determinative factor in the grant or denial of parole. Therefore, we hold that **the statutes** governing the manner in which a prisoner shall be considered for parole **confer on the prisoner an interest in liberty**.")(emphasis added); *Id.* at 788-789 ("The Board is authorized to adopt rules granting release on parole, conduct hearings, issue subpoenas, administer oaths,

28

and take testimony. The statutes direct the Board to investigate the history, the physical and mental condition, and the character of the prisoner, and his conduct, employment and attitude while in prison.")(internal quotations omitted); *Id.* at 795 (Virginia:

> does have an interest in withholding information which could adversely affect rehabilitation and discipline. For example, the disclosure of documents such as psychiatrists' reports might harm the prisoner. Access to other documents, such as critical statements made by members of his family or by other prisoners might cause breaches of discipline and harm to the informants. Therefore, the state may develop procedures for removing such documents from a prisoner's file before allowing him access to it. Moreover, if the Board decides that the burden of allowing all prisoners eligible for parole access to their files is too great, it might consider permitting only those prisoners to whom parole has been denied to have access. Were the prisoner to find a material mistake upon examination of his file, he could petition for rehearing. An alternative procedure would be for the Board to advise the prisoner of all adverse information upon which it will rely in its deliberation, in lieu of allowing him to inspect his file.)

(citations and quotations omitted).

At no point did *Franklin v. Shields* mandate that all inmates in state prisons within the Fourth Circuit, particularly in North Carolina, have a liberty interest in obtaining their inmate records for parole proceedings, clemency proceedings, or to acquire them to prepare for an MAR. Unlike Virginia, **North Carolina** has a specific statute that **prohibits** disclosure of inmate records.

29

Even prior to *Franklin v. Shields*, in *Goble v. Bounds*, 281 N.C. 307, 311, 188 S.E.2d 347, 349-350 (1972), our State Supreme Court held that:

> Of course a prisoner takes with him into the prison certain rights which may not be denied him. *Lee v. Washington*, 390 U.S. 333, 19 L.Ed. 2d 1212. The legal right to the mitigation of his punishment is not one of them. It is contemplated as a part of his rehabilitation that he earn his right to . . . parole.. . . The **due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure.. . .** Appellant has been constitutionally deprived of his right to liberty for the period of his sentence. He does **not qualify for procedural due process in seeking parole.. . .** [An inmate] sought to obtain access to his prison file to learn the source of a derogatory statement which was allegedly made concerning him. **As the District Court held, Prison Records of Inmates Are Confidential and Are Not Subject to Inspection by the Public Nor the Inmate Concerned.**

(citations and quotations omitted)(emphasis added).

So despite the ruling about Virginia's statutory regime, the General Assembly of North Carolina has not created a liberty interest for inmates in its state prisons, to obtain their inmate files. Clearly, quite the opposite is true. "When the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." *State v. J.C.* at 208, 827 S.E.2d at 283.

30

A few years after *Franklin v. Shields*, the Supreme Court

clarified:

> [t]here is *no constitutional* or *inherent right* of a convicted
> person to be conditionally released before the expiration of
> a valid sentence. The natural desire of an individual to be
> released is indistinguishable from the initial resistance to
> being confined. But the conviction, with all its procedural
> safeguards, has extinguished that liberty right: Given a
> valid conviction, the criminal defendant has been
> constitutionally deprived of his liberty.
>
> *Greenholtz* pointedly distinguished parole revocation and
> probation revocation cases, noting that there is a 'critical'
> difference between denial of a prisoner's request for initial
> release on parole and revocation of a parolee's conditional
> liberty. Unlike probation, **pardon and commutation**
> decisions **have not** traditionally been the business of
> courts; as such, they are **rarely, if ever, appropriate**
> **subjects for judicial review**.

*Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)(citations

and quotations omitted)(emphasis in original)(emphasis added), citing

*Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S.

1, 7 (1979).

Decades after *Franklin v. Shields*, North Carolina's parole

procedures were called into question. Our state Supreme Court

reasoned:

> While a prisoner retains basic constitutional rights, the
> Supreme Court has found that an inmate's liberty interests
> derived from the Fourteenth Amendment are limited, given

31

the nature of incarceration, [*Hewitt v.*] *Helms,* 459 U.S. [460,] 467 [(1983) ('[O]ur decisions have consistently refused to recognize more than the most basic liberty interests in prisoners.')[*overruled in part by Sandin v. Conner,* 515 U.S. 472, 481 (1995)("The approach embraced by *Hewitt* discourages this desirable development: States may **avoid** creation of 'liberty' interests by having **scarcely any regulations**, or by conferring **standardless** discretion on **correctional personnel**.")(emphasis added).] Nevertheless, a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. *Id.* at 469.

*Jones v. Keller*, 364 N.C. 249, 256, 698 S.E.2d 49, 55 (2010) (quotations

omitted)(emphasis added), quoting *State v. Primes,* 314 N.C. 202, 208,

333 S.E.2d 278, 281 (1985); *Sandin v. Conner,* 515 U.S. at 483-484.

This State interest in ensuring public safety is particularly pronounced when dealing with those convicted of first-degree murder.. . . [*S*]*ee also Graham v. Florida,* ____ U.S.____,____, 176 L. Ed. 2d 825, 842, 130 S. Ct. 2011 (2010) (stating that 'defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers').. . . The State has a duty to seek to ensure public safety through the orderly release of prisoners who are both under adequate supervision and prepared for resuming life outside of confinement.

*Jones v. Keller* at 257-258, 698 S.E.2d at 56 (citations and quotations

omitted). *See Langley v. Bulter,* 2017 U.S. Dist. LEXIS 200331, *12-13,

(E.D.N.C. Dec. 2, 2017)(unpublished)

([W]e have held that inmates are entitled to no more than minimal procedure and that '[a]t most, we have held that parole authorities **must furnish the prisoner a**

**statement of its reasons for denial of parole.**' *Vann v. Angelone*, 73 F.3d 519, 522 (4th Cir. 1996) (interior citations omitted); *see id.* at 521 ('[i]t is difficult to imagine a context more deserving of federal deference than state parole decisions'). **Beyond furnishing a statement of reasons for denial**, the Fourth Circuit has 'declined to hold that, as a constitutional matter, each prisoner must . . . **have access to his files.**' *Burnette v. Fahey*, 687 F.3d 171, 182 (4th Cir. 2012).)

(emphasis added).

Most recently, the federal courts grappled with allegations of both due process and Eighth Amendment violations by the Commission, as it relates to juvenile offenders subject to life sentences. *See Hayden v. Keller*, 134 F. Supp. 3d 1000, 1006 (E.D.N.C. Sept. 25, 2015)

> (In North Carolina, the Parole Commission has the **exclusive discretionary authority to grant or deny parole**. *See* N.C. Gen. Stat. § 143B-720 (2014) (authority of Parole Commission), and N.C. Gen. Stat. § 15A-1371(d) (indicating that the Parole Commission 'may refuse to release on parole a prisoner it is considering for parole if it believes' the prisoner falls under any of the criteria detailed in the statute); *see also Goble v. Bounds*, 13 N.C. App. 579, 583, 186 S.E.2d 638, 640 ('We conclude that . . . parole [is a] discretionary act of grace . . . extended by the State as a reward for good behavior, **conferring no vested rights upon the convicted person.**'), *aff'd*, 281 N.C. 307, 188 S.E.2d 347 (1972). The Fourth Circuit has determined that due process requires **only** that authorities 'furnish to the prisoner **a statement of [their] reasons for denial of parole.**' *Vann*, 73 F.3d at 522 (quoting *Franklin v. Shields*, 569 F.2d 784, 801 (4th Cir.1977)).

(emphasis added).

33

Presumably, because the Court reasoned, "The Supreme Court in *Graham* viewed the question, not as one of due process, but in terms of the constitutional protections found within the Eighth Amendment," the Court did not find a due process violation, and instead ruled that there were Eighth Amendment implications of North Carolina's parole review of juveniles sentenced to life sentences. *Id.*, 134 F. Supp. 3d at 1006, citing *Graham v. Florida*, 560 U.S. 48 (2010)(holding that:

> This Court now holds that for a juvenile offender **who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.. . . A State is not required** to guarantee eventual freedom to a juvenile offender convicted of a **nonhomicide** crime. What the State must do, however, is give defendants like Graham some **meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation**. It is **for the State**, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does **not require** the State to release that offender during his natural life. **Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives**. The Eighth Amendment **does not foreclose the possibility** that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.)

*Id.*, 560 U.S. at 74-75 (emphasis added).

In addition, presumably because the U.S. Supreme Court holding in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), pertained to sentencing as opposed to parole, in not finding a procedural due process violation, but finding Eighth Amendment irregularities for a juvenile **nonhomicide** offender sentenced to **life with parole**, *Hayden* also relied on *Miller* as follows, "The Supreme Court in *Miller* further **extended the reasoning in Graham** to mandatory sentences of **life without parole** for juveniles convicted of **homicide** offenses. *Miller*, 132 S. Ct. at 2467." *Hayden*, 134 F. Supp. 3d at 1007 (emphasis added).

Thus, it is relevant that after the decision in *Hayden*, the Commission agreed to alter their procedures for juvenile offenders subject to life sentences with parole, so as to give them a "meaningful opportunity to obtain release" on the basis of their maturity and as an edict of the Eighth Amendment. *See Id.* at 1011

> ([T]he court is guided by the mandate of *Graham* which instructs that '[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance.' 560 U.S. at 75. Thus, the court denies without prejudice Hayden's request for the injunctive relief and gives the parties 60 days to present a plan for the means and mechanism for compliance with the mandates of *Graham* to provide a meaningful opportunity to obtain release based on **demonstrated maturity and rehabilitation to juvenile offenders convicted as adults**.)

35

(emphasis added). *See also Hayden v. Keller*, 2017 U.S. Dist. LEXIS 222207, *8 (E.D.N.C. Nov. 2, 2017)(unpublished)("[T]the court finds that the relief provided in the State's proposed plan is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation of the federal right. *See* 18 U.S.C. § 3626(a)(1)(A). Accordingly, the court GRANTS plaintiff's request for injunctive relief and ADOPTS defendant's proposed plan."); Attach. O (stipulating to certain procedures for juvenile offenders subject to parole, none of which include the right to inmate records).

Although Abrams is a juvenile homicide offender serving a life sentence with the possibility of parole, and he has raised *Hayden* as a basis for his motion, his argument in support of his motion is without merit. *See* Attach. A ¶4. The Commission has averred that Abrams already is receiving the very same procedural process agreed upon in the approved State Plan following *Hayden*. *See Abrams v. Fowler*, No. 5:20-ct-03231-M, D.E. 18 at *6 (E.D.N.C. July 14, 2022)("It further is admitted that the Commission has complied with the procedural requirements of *Hayden v. Butler*.").

36

Thus, neither Abrams, a juvenile homicide offender, nor Murphy, an adult offender, have a state statutory right, to obtain copies, even through their counsel, of their parole and/or prison records, be it for a parole review, clemency proceedings, or to prepare for an unfiled MAR. Thus, without such a statutory right, neither have a state-created liberty interest that invokes procedural due process to do so.

Both are in the class of offenders contemplated by *Jones v. Keller*, (those who have killed (Abrams) and those who "ought to" foresee that life will be taken (Murphy)), to have fewer procedural due process rights to parole, if any, and no rights to obtain their inmate records. While Abrams, a **juvenile homicide offender** sentenced to life with parole, by agreement with the State Plan, is within the class of *Hayden* offenders, a higher court has yet to find a procedural due process right that includes dissemination of prison/parole records to his class.

## V.   INMATE RECORDS

The above paragraphs are incorporated by reference as if realleged herein.

While both orders and presumably both motions reference a "good faith" basis for the defendants' inmate records, based on the foregoing reasons including, but not limited to, statutes prohibiting

37

such dissemination, privileges, safety and security concerns, and otherwise publicly available information indicate otherwise, the Commission, by and through Chairman Fowler and the undersigned, dispute that whatever bases given to this Court upon motion were sufficient to justify this Court's orders.

A. <u>Security</u>

    1. Statutory Authority

        a. Dissemination of Inmate Records

The plain language of G.S. 148-76 and our highest court's interpretation of the statute make clear "G.S. 148-76 states the information collected shall be made available to law-enforcement agencies, courts, correctional agencies, or other officials requiring criminal identification, crime statistics, and other information respecting crimes and criminals. These **records are confidential and only named parties have access to them.**" *Goble v. Bounds* at 581, 186 S.E.2d at 639 (emphasis added); *Id.* ("[P]rison records of inmates are confidential and **are not subject to inspection by the public nor the inmate concerned.**")(emphasis added). *See also State v. Perkins*, ___ N.C. App. ___, ___ S.E.2d ___, P37 (2022), 2022 N.C. App. LEXIS 36, *21-22 ("The word 'must' and the word 'shall' in a statute,

38

are deemed to indicate a legislative intent to make the provision of the statute mandatory.").

Abrams moved this Court for **the entirety of his records** with the Commission and other agencies within NCDPS by arguing, the "Commission may consider factors including whether Mr. Abrams will conform to reasonable conditions of parole, whether he would follow the law if released, and whether his continued incarceration would enhance his ability to lead a law-abiding life is released later. *See* N.C. Gen. Stat. § 15A-1371(d)." Attach. A at ¶6. Presumably, this Court then made a finding that "it is in the interest of justice, and within this Court's discretion to manage criminal proceedings, to grant the motion;" and a conclusion mandating that the Commission furnish Abrams' records to his counsel. Attach. B ¶6 of Findings, ¶1 of Conclusion.

However, despite citing to G.S. 15A-1371(d), Abrams listed all but the third statutory reason that the Commission may deny an inmate parole. He conspicuously omitted "(3) His continued correctional treatment . . . in the institution will substantially enhance his capacity to lead a law-abiding life if he is released at a later date." *See* N.C.G.S. § 15A-1371(d)(3). Never mind, one of the bases for Abrams' pending lawsuit in federal court is that he averred in his

Complaint, "Since the change in the parole procedures for juvenile offenders, the defendant has now added a need for counseling and cognitive behavior treatment/programming. It was never before required, it is not a requirement for a MAPP or parole and is not required of similar situated offenders." *Abrams v. Fowler*, No. 5:20-ct-03231-M, D.E. 1-1 at *3 (E.D.N.C. July 21, 2020). *But see* Attach. O at 4.

> (In the event parole release is denied, the Parole Commission will send a letter to the Eligible Offender stating the specific reason(s) why parole release was denied **as well as any recommendation(s) for steps the Eligible Offender may take to improve his or her future chances for parole release, such as the completion of specific . . . rehabilitative programs offered by the Division of Prisons**.)

(emphasis added).

> Abrams also averred in his Amended Complaint:

> I was denied parole again on June 17, 2020. The reasons for denial were the following . . . 2) The second specific reason for parole denial, that my continued correctional programming in the institution will substantially enhance my capacity to lead a law-abiding life is released at a later date, has been rotated in and out of parole denial decisions since I became eligible for parole.

*Abrams v. Fowler*, No. 5:20-ct-03231-M, D.E. 7-1 at *1 (E.D.N.C. Dec. 22, 2021). *See also* Attach. R at 1.

In turn, the Commission averred in its Answer, "It specifically is denied that Plaintiff has utilized available correctional programming regarding cognitive behavioral interventions ['CBI's']. It is admitted that the Commission believes that correctional programming regarding CBI's might assist Plaintiff in understanding his thoughts and feelings that influenced the behavior he exhibited during the murder for which he is presently serving a life sentence." *Abrams v. Fowler*, No. 5:20-ct-03231-M, D.E. 18 at *7 (E.D.N.C. July 14, 2022). *See* Attach. R at 1.

Thus, while Abrams did not argue an untrue statement in his motion, by omitting the statutory basis he deemed critical to his prior parole denial, he failed to present circumstances surrounding his need to prepare for his next parole hearing. Arguably, just as he intimated the third statutory reason had been used numerous times in the past, barring cognitive behavioral intervention, it is arguable his future parole hearing will address the same issue. With or without the entirety of his records with the Commission, by his own admission and that of the Commission, the Commission has given him a tool for improving his opportunity for future release. *See also* Attach. E at 3-4

> (Upon request of defendant's counsel without objection from the State, this Court recommends to the Department of Corrections that it provide to Brett Allen Abrams **any**

41

**and all psychological and psychiatric counseling and treatment** which it now has available **or which may become available** to the Department of Corrections during the term of Mr. Abrams' incarceration.

The Court recommends that if and when the North Carolina Parole Commission considers Mr. Abrams for parole that it **not grant any privilege of parole until it is satisfied** beyond a reasonable doubt that that **he has been cured of the emotional and mental disorders which prompt him to act with violence toward other human beings.**)

(emphasis added).

Furthermore, this point seems apparent in at least Abrams' Order, as he has moved this Court for Commission records in that, "Counsel will have incomplete knowledge of otherwise **indiscoverable** information in the possession of the [Commission]." Attach. A at ¶12 (emphasis added). Clearly, Abrams' counsel understands the legal limitations of his right on behalf of Abrams to obtain the information mandated in Abrams Order. Again, because G.S. 148-76 prohibits the release of prison and/or inmate records, and its language is clear and unambiguous, "there is no room for judicial construction and the courts **must** give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." *State v. J.C.* at 208, 827 S.E.2d at 283 (emphasis added).

42

b.    Dissemination of Security Information

G.S. 132-1.7 provides in part that "[p]ublic records . . . shall not include specific security information or detailed plans, patterns, or practices associated with prison operation;" and "shall not include specific security information or detailed plans, patterns, or practices to prevent or respond to criminal, gang, or organized illegal activity." N.C.G.S. §132-1.7. Assuming *arguendo* that such records are in the possession of the Commission, more often than not inmate records are combined with information detailing plans or practices related to crimes and/or gang activity, especially when: the matter of grievances or disciplinary actions are involved; there are complaints and investigations regarding Prison Rape Elimination Act [PREA]; or when investigations of various matters involve the locations of cameras or other security devices and their inner workings.    Moreover, inmate records routinely include patterns or practices associated with prison operations such as information related to accessing sensitive computer storage and procedures to do so; and descriptions of internal areas.

2.    Security of Staff and Inmates

Albeit in reference to the Commonwealth of Virginia, *Franklin v. Shields* also held, "The state also has an immediate interest in maintaining security. Therefore, it must not be encumbered with

43

procedures which might undermine discipline." *Franklin v. Shields* at

791. Whereas, North Carolina has held that where:

> [t]he penal measure at issue in the present case is the withholding from prisoners direct access to their prison mental health records[;] [the] [f]ailure to provide such access, particularly in light of the defendant's interest in maintaining the confidentiality of the records so as to preclude the possibility of prisoner retaliation against, e.g., any inmates who may have provided defendant with information about a prisoner's behavior, can hardly be said to offend 'evolving standards of decency.'

*Baugh v. Woodard*, 56 N.C. App. 180, 186, 287 S.E.2d 412, 416 (1982).

See also Attach. Q ¶10.

  3. Victims' Safety and Rights

  Since both Abrams' and Murphy's convictions, our state Constitution was amended to provide that "[v]ictims of crime or acts of delinquency shall be treated with dignity and respect by the criminal justice system." N.C. Const. Art. I, § 37 (1). "The victim or, if the victim is a minor, is legally incapacitated, or deceased, a family member, guardian, or legal custodian may assert the rights provided in this section." N.C. Const. Art. I, § 37 (1b).

  The Court of Appeals recently interpreted the constitutional provision by reasoning, "To further protect the minor and consistent with our **evolving practices regarding protection of innocent persons**, we exercise our discretion **to prevent the unnecessary**

44

**inclusion of potentially identifying information regarding the victim in this case and her family.**" *See State v. Perkins*, \_\_\_N.C. App. \_\_\_, \_\_\_ S.E.2d \_\_\_, P4 (2022), n. 3, 2022 N.C. App. LEXIS 36, *5.

As such, the decision to grant either Abrams Motion or Murphy Motion, should protect the unnecessary dissemination of identifying information regarding the victims and their families. Per Attachment Q, information about crime victims and/or their families is maintained as a part of the inmate files with the Commission. In keeping with the rationale for the constitutional provision, sensitive information contained in confidential inmate records with the Commission about crime victims and/or their families must be protected.

       4.    Safety of the Public

Again, "the State has a duty to seek to ensure public safety through the **orderly release of prisoners** who are both under adequate supervision and **prepared for resuming life outside of confinement.**" *Jones v. Keller*, 364 N.C. at 258, 698 S.E.2d at 56. *See also* Attach. E at 4 (The Court entered an order recommending that the Commission not parole Abrams "until they are satisfied beyond a reasonable doubt that he will not present any threat or danger to another living human being."). Clearly, disseminating information confidential information in inmate records maintained by the

45

Commission has the potential for impacting the safety of the public, especially for inmates for have not yet been deemed prepared to resume life outside of confinement.

B.    Duties of State Agencies Re: Murphy and Abrams Orders

1.    Duties of Secretary

"There is established the Department of Public Safety. The **head** of the Department of Public Safety is the Secretary of Public Safety, who shall be known as the Secretary." N.C.G.S. § 143B-600 (a)(emphasis added). "The **Secretary of Public Safety** shall have the powers and duties as are conferred on the Secretary by this Article, delegated to the Secretary by the Governor, and conferred on the Secretary by the Constitution and laws of this State." N.C.G.S. § 143B-602 (emphasis added). The secretary of the Department of Public Safety serves as the **sole representative** on the governor's cabinet for the state's . . . corrections." https://www.ncdps.gov/about-dps/office-of-the-secretary (last visited February 21, 2022) (emphasis added). "The Secretary . . . shall have control and custody of all prisoners serving sentence in the State prison system, and such prisoners shall be subject to all the rules and regulations legally adopted for the government thereof." N.C.G.S. § 148-4. "All **facilities** established or acquired by the [DAC] of the Department of Public Safety shall be under the

46

administrative control and direction of the Secretary of Public Safety, and operated under rules and regulations proposed by the Secretary and adopted by the Division of Adult Correction and Juvenile Justice of the Department of Public Safety as provided in G.S. 148-11." N.C.G.S. § 148-36 (emphasis added).

In 2011, Chapter 143B of the General Statutes was amended by adding a new Article to read:

> Section 143B-259.
> Organization.
> (a) **There is established the Department of Public Safety. The head of the Department of Public Safety is the Secretary of Public Safety, who shall be known as the Secretary**. The Department shall consist of **seven divisions** and an Office of External Affairs as follows:
> (1) **The Division of Adult Correction**, which shall consist of the **former Department of Correction**. The head of the Division of Adult Correction shall be a chief deputy secretary, **who shall be responsible for prisons, community corrections**, and correction enterprises.

2011 N.C. Sess. Laws 145 §32.6 ("Except as otherwise provided, this act becomes effective July 1, 2011.").

2.      Duties of Parole Commission

Despite the creation of NCDPS and the inclusion of the Commission within the agency, N.C.G.S. § 143B-720 grants the

47

Commission sole authority to grant or deny parole. *See* N.C.G.S. §

143B-720 (a)-(c).

((a) There is hereby created a Post-Release Supervision and Parole Commission **of the [DAC]** with the authority to grant paroles, including both regular and temporary paroles, to persons held by virtue of any final order or judgment of any court of this State as provided in Chapter 148 of the General Statutes and laws of the State of North Carolina.. . . The Commission shall also have authority to revoke, terminate, and suspend paroles of such persons (including persons placed on parole on or before the effective date of the Executive Organization Act of 1973) and **to assist the Governor in exercising his authority in granting reprieves, commutations, and pardons**, and **shall perform such other services as may be required by the Governor in exercising his powers of executive clemency**. The Commission shall also have authority to revoke and terminate persons on post-release supervision, as provided in Article 84A of Chapter 15A of the General Statutes.. . .

(b) All releasing authority previously resting in the Commissioner and Commission of Correction with the exception of authority for extension of the limits of the place of confinement of a prisoner contained in **G.S. 148-4 is hereby transferred** to the Post-Release Supervision and Parole Commission.

(c) The Commission is authorized and empowered to adopt such rules and regulations, not inconsistent with the laws of this State, in accordance with which prisoners eligible for parole consideration may have their cases reviewed and investigated and by which such proceedings may be initiated and considered. **All rules and regulations heretofore adopted by the Board of Paroles shall remain in full force and effect unless and until repealed or superseded by action of the Post-Release Supervision and Parole Commission**. All rules and

48

regulations adopted by the Commission **shall be enforced by the [DAC].**)

(emphasis added).

The General Assembly also has mandated, "Nothing in this Chapter shall be construed **to limit or restrict the power of the Parole Commission to parole prisoners** under such conditions as it may impose or prevent the reimprisonment of such prisoners upon violation of the conditions of such parole, as now provided by law." N.C.G.S. § 148-48 (emphasis added). In interpreting the statutes, the Courts succinctly have ruled, "The Parole Commission has the **exclusive authority** to grant or deny paroles." *Harwood v. Johnson*, 326 N.C. 231, 240, 388 S.E.2d 439, 444 (1990)(emphasis added).

While G.S. 148-64 mandates that "[t]he officials and employees of the Division of Adult Correction [DAC] of the [DPS] and the [Commission] shall at all times **cooperate with and furnish each other such information** and assistance as will promote the purposes of this Chapter and the purposes for which these agencies were established;" and G.S. 143B-720(c) mandates that DAC must enforce rules of the Commission, none of the subagencies within DPS, including those under the Division of Prisons, are "agents" of the Commission. N.C.G.S. § 148-64 (emphasis added). Simply put, the agencies within

49

the Division of Prisons answer to Secretary, by and through the DAC. However, while the Commission is considered part of DAC, it is not part of the Division of Prisons. Attach. Q ¶2.

Furthermore, "[t]he duties of the Department of Correction . . . do not include supervising the Parole Commission's duties of granting and denying paroles.. . . [The] Secretary of the Department of Correction [has] no authority to grant or deny [a] plaintiff's parole nor [does] he have authority to supervise the Commission's granting or denying of [a] plaintiff's parole." *Harwood* at 240, 388 S.E.2d at 444 (citations omitted). *See also Teasley v. Beck*, 155 N.C. App. 282, 285, 574 S.E.2d 137, 139 (2002) ("The Secretary of the Department is also appointed by the Governor, but, unlike the Commission, has no authority over parole eligibility. Rather, the Secretary has the sole authority over **the unconditional release** of offenders.")(emphasis added); Attach. Q ¶2.

Thus, while the Commission is **organized** as part of the DAC, the Commission does not answer to either the DAC or the Secretary. Likewise, the Commission has no authority over the Secretary, or other parts of the DAC, including those under the Division of Prisons. The two entities, e.g. the Secretary by and through the Division of Prisons and the Commission simply must cooperate with one another and

50

furnish information; whereas, and the Division of Prisons (as a part of DAC) must enforce the rules and regulations of the Commission.

Furthermore, the Commission is neither an investigatory agency, nor a law enforcement agency; and it employs no sworn officers, including probation and parole officers. *See* Attach. Q ¶2. While it is empowered to assist the Governor's Clemency Office with matters related to clemency, it rarely has any involvement with such matters, and such assistance comes from the sworn probation and parole officers with the Division of Community Corrections. *See* Attach. Q ¶8; Attach. P at 1-2.

3.    Duties of Community Corrections

While DPS policies and statutes refer to the Commission, the Governor's Clemency Office is assisted by the investigation of probation and parole officers. *See* Attach. P at 1-2; Attach. Q ¶8. "The Governor's Clemency Office oversees and coordinates clemency investigations utilizing all resources available including the Division of Community Corrections (N.C.G.S. § 143B-720) in preparing reports and information for review during the Clemency Process." Attach. J at 8.

4.    Duties of Governor

In a lawsuit filed by an inmate against members of the Commission and then Governor Pat McCrory, alleging violations of due

51

process, false imprisonment and wrongful denial of parole eligibility, the Federal District Court found that "[D]efendant McCrory had no legal authority to release offenders on parole despite assuming office in January 2013 as governor of North Carolina. Such authority rests solely with the commission. *See* N.C. Gen. Stat. §§ 143B-720(a),(b) (2015)." *Langley v. Bulter*, at n. 5.

However, the governor has the constitutional authority to grant clemency to an inmate.   *See* Attach. J at 3 ("North Carolina Constitution, Article III Section 5(6) provides the Governor with the Authority to grant Executive Clemency.").   Clemency may be granted as a reprieve, a commutation (reduction of a sentence) or a pardon.. *See* Attach. J at 3-4.   Pardons are either conditional and subject to revocation, an unconditional "pardon of forgiveness", or a pardon of innocence (based upon actual innocence). *See* Attach. J at 5-7.

The Governor's Clemency Office, noted as an independent office within DAC on DPS's Organization Chart, **oversees and coordinates** clemency investigations.   *See* Attach. J at 8; https://www.ncdps.gov/documents/ncdps-organizational-chart (last accessed July 27, 2022). As noted above, while G.S. 143B-720(a) grants the Commission the authority to **assist** the Governor with reprieves, commutations and pardons; in fact, it is the Division of Community

52

Corrections, another subdivision of the of DAC, that **conducts** clemency investigations for the Governor's Clemency Office. *See* Attach. J at 8; N.C.G.S. § 143B-259(a)(1).

Notwithstanding the statutory language, records from the Commission will likely have little if any impact on the actions of Community Corrections or the Governor's Clemency Office, neither of which answers to the Parole Commission. Never mind, it is neither the Governor's Clemency Office, nor the Parole Commission, but the Governor, who has sole authority and discretion over matters of clemency.

5.     Custodian of Records – the Parole Commission has its own custodian of records, which is not the custodian of prison records or any other part of the NCDPS, which would include the Division of Community Corrections and the Division of Prisons as a whole. *See* Attach. Q ¶4.

6.     Prosecutor's Office

In interpreting the capital provisions of the MAR statutes, the state Supreme Court has made clear, "It is the district attorney who is responsible for the prosecution of criminal cases on behalf of the State. Accordingly, it is the district attorney who shall be responsible for the prosecution on behalf of the State of all criminal actions in the Superior

Courts of his district, perform such duties related to appeals therefrom as the Attorney General may require, and perform such other duties as the General Assembly may prescribe." *State v. Sexton*, 352 N.C. 336, 341-342, 532 S.E.2d 179, 182 (2000) (citations and quotations removed), citing and quoting N.C. Const. art. IV, § 18. *See also* N.C.G.S. § 15A-101(7) (defining prosecutor); N.C.G.S. §§ 15A-1415(f); 15A-903(a)(1) (mandating that the prosecution be involved in the investigation of the crimes committed or the prosecution of the defendant).

Thus, the Parole Commission is not a prosecutorial agency, either by statute or the Constitution. As such, it has no obligation under the MAR statutes to provide discovery of is records, inmate or otherwise.

7.    Investigatory Agency

Both G.S. 15A-1415(f) and 15A-903(a)(1) mandate that the prosecution "to the extent allowed by law, shall make available to the defendant's counsel the complete files of all law enforcement and prosecutorial agencies **involved in the investigation of the crimes committed or the prosecution of the defendant**." Therefore, by definition, the Commission is not an investigatory agency for purposes of criminal discovery, as its duties do not involve investigating the crimes committed. *See* N.C.G.S. §§ 15A-1415(f); 15A-903(a)(1); Attach. Q ¶2.

54

8.    Law Enforcement Agency

For the same reasons noted for investigatory agencies, by definition, the Commission is not a law enforcement agency, because by definition, its duties do not involve by definition, investigating the crimes committed. *See* N.C.G.S. §§ 15A-1415(f); 15A-903(a)(1); Attach. Q ¶2.

C.    Confidentiality

Although as will be discussed below, much of what is in an inmate's file can be obtained elsewhere, as earlier referenced, G.S. 148-76 provides that the contents are deemed confidential. Per *Goble v. Bounds* at 311, 188 S.E.2d at 350, "[a]s the District Court held, **Prison Records of Inmates Are Confidential and Are Not Subject to Inspection by the Public Nor the Inmate Concerned.**" (citations omitted)(emphasis added).

Regardless of whether the same documents can be obtained elsewhere, if sought from the Commission, the records are not subject to dissemination, except to the parties noted in G.S. 148-76. Furthermore, various documents that are routinely in an inmate's file, are confidential no matter the source.

55

Despite finding that Virginia inmates had a statutorily-created liberty interest in their parole review hearings such that they were entitled to their inmate records, even *Franklin v. Shields* held:

> [Virginia], however, does have an interest in withholding information which could adversely affect rehabilitation and discipline. **For example, the disclosure of documents such as psychiatrists' reports might harm the prisoner. Access to other documents, such as critical statements made by members of his family or by other prisoners might cause breaches of discipline and harm to the informants.** Therefore, the [Virginia] **may** develop procedures for removing such documents from a prisoners file before allowing him access to it.

*Franklin v. Shields*, 569 F.2d at 795 (emphasis added). As noted above, since then, our Courts have made clear that in North Carolina, an inmate is not entitled to his own records from the Commission.

Notwithstanding the statutory and common law provisions mandating that inmate records are not public records, even for the inmate, the following are confidential even without being part of an inmate's records with the Commission:

1.    Medical Records

G.S. 122C-52 provides in part that with regard to mental health records, substance abuse records, and developmental disabilities records, "[e]xcept as provided in G.S. 132-5 and G.S. 122C-31(h), confidential information acquired in attending or treating a client is not

56

a public record under Chapter 132 of the General Statutes;" and "[e]xcept as required or permitted by law, disclosure of confidential information to someone not authorized to receive the information is a Class 3 misdemeanor and is punishable only by a fine, not to exceed five hundred dollars ($ 500.00)."

When inmates have argued that the fact their psychiatric or mental health records were contained in their inmate files should not preclude dissemination of the psychiatric or mental health records to them, our Courts have disagreed.

> As to mental health patients who are in the custody of the Department of Corrections, their rights and privileges are determined by the rules and regulations adopted by the Department of Corrections pursuant to G.S. § 143B-261.1... . Although there are exceptions to the common law prohibition of disclosure, see, e.g., 5 N.C.A.C. 2D .0601(b) (permitting disclosure to an inmate's attorney of medical records, **except for psychiatric or psychological evaluations**), the rule in *Goble* remains as a refutation of any argument that there is a common law right to inspect any prison records, **including prison psychiatric and psychological records**.

*Baugh v. Woodard* at 184, 287 S.E.2d 414-415 (emphasis added).

"There are no statutory or common law rules which would secure to a prisoner a property right in the mental health records generated while he is in prison; plaintiff, therefore, has no more than a unilateral desire for access to his prison mental health records. He has no

57

legitimate claim of entitlement protected by procedural due process."

*Id.* at 185-186, 287 S.E.2d at 415-416. *See also Abrams v. Fowler*, 5:20-ct-03231-M, D.E. 18 at *4 (E.D.N.C. July 14, 2022)

> (It is denied that the Commissioners have access to all medical information or assessments conducted by employees of the individual prison facilities, Division of Prisons or other division within the Department of Public Safety ['DPS']. Such information may or may not be a part of the inmate's medical file with the psychologist on staff at the Commission, to which the Commissioners do not have access or knowledge, barring a report from the on-staff psychologist.);

Attach. Q ¶¶6-7; *State v. Smith*, 2014 N.C. App. LEXIS 1119, *7, 237 N.C. App. 183, 767 S.E.2d 149 (2014)

> (holding that a criminal defendant was not entitled to an order requiring the disclosure of any and all mental health and related medical records of the complaining witness to the defense. In the alternative, defendant requested that the trial court conduct an in camera inspection of [the witness'] mental health and related medical records and disclose to the defense any favorable and material evidence. Defendant did not allege that the requested information was in the State's possession.)

(internal quotations omitted)(unpublished).

2.    Attorney-Client Privilege

Inmate records may include information given to the Commission from its counsel that may be attorney-client privileged. *See Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (stating that "the [attorney-client] privilege is that of the **client alone**.")(emphasis

58

added). That being the case, it is not for the undersigned and certainly not for either Defendants to waive the attorney-client privilege of any records contained in inmate records held by the Commission.

### 3. Attorney Work Product

Inmate records may include information given to the Commission from its counsel that may be part of attorney work product. *See* N.C.G.S. § 132-1.9 ("a custodian may deny access to a public record that is also trial preparation material").

### 4. Other Inmates' Records

An inmate's records may include information about other inmates. For the same reasons G.S. 148-76 prohibits inmates from obtaining their own records, it protects other inmates from having their information disseminated.

### 5. Clemency Proceedings

Our appellate courts also have addressd the issue of the confidentiality of clemency records. In *News & Observer Publ'g Co. v. Easley*, 182 N.C. App. 14, 19, 641 S.E.2d 698, 702 (2007), "the question before the Court [was] whether the N&O [was] entitled, under the Public Records Law, to certain clemency records within the possession of the Governor." The Court reasoned that the N&O's contention that

the statute allowing dissemination of public records did not specifically exempt clemency records:

> disregards the constitution's requirement that, with respect to clemency, there must be specific and not general legislation. It is not enough that the General Assembly did not exempt clemency records from a generally-applicable statute; it must have expressly chosen to exercise its authority to include them. Because of the specific language of the constitution and the separation of powers implications, we deem it inappropriate to infer an otherwise unspecified intent. We hold, therefore, that the N&O may not use the Public Records Law to compel Governor Easley to disclose the requested documents.

*Id.* at 24, 641 S.E.2d at 705. In other words, clemency records are confidential and not subject to dissemination. Thereafter, then Governor Easley issued an executive order allowing information about clemency proceedings under certain circumstances. *See* Attach. M. None of the circumstances exempted in the executive order apply to dissemination to the inmate seeking clemency or his counsel to have either his own clemency records. It certainly did not exempt an inmate seeking clemency, to have his own inmate/parole records from the Commission, so as to prepare for a clemency proceeding. *See also* Attach. J at 8 ("All clemency investigations, records, and reports are confidential.").

    6.    Prison Security

As noted above, G.S. 132-1.7 prohibits the disclosure prison records that include specific security information.

## D. Documents Available Elsewhere

One of the basic tenets of discovery, is that a party is not obligated to provide information or documents that is available elsewhere.

### 1. Documents Already in Possession of Counsel

Just as Defendants' counsel sought the *ex parte* motions and orders, which were duly filed in the counties of their origin, e.g. Iredell and Scotland, their counsel have access to copies of Defendants' prior court documents from the Clerks of Court in those counties. Indeed, both Defendants' counsel have made a request for the court files. *See* Attach. C at 4-7; Attach. D. While Abrams' request came from NCPLS, his current counsel, Ben Finholt was working at NCPLS at the time of the request, e.g. March 23, 2020. *See* https://www.linkedin.com/in/ben-finholt-he-him-02723918 (last accessed August 25, 2022).

Per G.S. 148-59, following sentencing, the Clerk of Court shall forward to the [DAC] certain names and information relevant to the criminal conviction, in addition to the criminal record of the inmate, and the judgment of the court. That information and documents "thus furnished shall constitute the foundation and file of the prisoner's

61

case." *See* N.C.G.S. § 148-59. Numerous documents from a criminal file are not mandated by the statute, such as a transcript of plea, exhibits, written pre-trial motions, docket sheets, felony punishment findings of factors in aggravation and mitigation of punishment form, or jury verdict sheets.

Assuming *arguendo* that some of Defendants' court documents other than their criminal record and judgment are in Defendants' inmate records with the Commission, those same records, are available to the public, and therefore to Defendants and their counsel. Regardless, the records are likely in the possession of both counsel at present.

2. Documents Subject to Disclosure from Trial Counsel

G.S. 15A-903(a)(1) mandates that "upon motion of the defendant, the court **must** order [t]he State to make available to the defendant the complete files of **all law enforcement agencies, investigatory agencies**, and **prosecutor's offices** involved in the **investigation of the crimes** committed or **the prosecution of the defendant**." N.C.G.S. § 15A-903(a)(1)(emphasis added). Thus, both defendants' trial counsel should have many if not more of the documents they now seek in discovery from the Commission, than the Commission likely has in its possession. *See* Attach. Q ¶¶6, 7, 9.

62

3. Unprivileged documents available to Abrams through discovery in his currently pending federal case.

As a matter of course, in each *pro se* inmate federal case involving Section 1983, the inmate is invited to accept the assistance of PLS in obtaining discovery. *See* Attach. S at 1-2, ¶2.

On January 30, 2020, the Federal District Court of the Eastern Division of North Carolina, entered Standing Order 20-SO-1 mandating among many things that in state prisoner civil rights cases, filed by North Carolina state prisoners against DAC, upon appointment and acceptance of said appointment of PLS to: serve discovery requests upon DAC on the prisoner's behalf, collect discovery responses, and provide materials to the prisoner and legal advice pertaining to his/her case. *See* Attach. S at 4.

Said order names the following authorities for the confidentiality of information and documents:

1) G.S. 126-22(3) ("Personnel files of former State employees who have been separated from State employment for 10 or more years may be open to inspection and examination except for papers and documents relating to demotions and to disciplinary actions resulting in the dismissal of the employee.")

63

2) G.S. 126-24 ("All other information contained in a personnel file is confidential and shall not be open for inspection and examination except to the following persons."); G.S. 126-24(4) ("A party by authority of a proper court order may inspect and examine a particular confidential portion of a State employee's personnel file; and"); G.S. 126-24(5) (An official of an agency of the federal government, State government or any political subdivision thereof. Such an official may inspect any personnel records when such inspection is deemed by the department head of the employee whose record is to be inspected or, in the case of an applicant for employment or a former employee, by the department head of the agency in which the record is maintained as necessary and essential to the pursuance of a proper function of said agency.).

2) G.S. 122C-52.

3) G.S. 132-1.7.

5) G.S. 148-74.

4) G.S. 148-75 (Repealed)

5) G.S. 148-76

64

6) *Goble v. Bounds*, 281 N.C. 307, 311, 188 S.E.2d 347, 349-350 (1972)(holding that:

> [t]he decision [to parole] is not in the nature of an adversary proceeding under rules of evidence.. . . Execution of the United States parole system rests on the discretion of an administrative board. The **due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure**.. . . [An inmate] sought to obtain access to his prison file to learn the source of a derogatory statement which was allegedly made concerning him. **As the District Court held, Prison Records of Inmates Are Confidential and Are Not Subject to Inspection by the Public Nor the Inmate Concerned**.)

(citations and quotations omitted)(emphasis added).

7) *Paine v. Baker*, 595 F.2d 197, 201 (4th Cir. 1979)(holding that where an inmate sued to obtain his parole file:

> in certain limited circumstances a claim of constitutional magnitude is raised where a prisoner alleges (1) **that information is in his file**, (2) **that the information is false**, and (3) that **it is relied on to a constitutionally significant degree**; . . . **An inmate must first allege that particular information is contained in his file**. It is, of course, difficult in the ordinary course of events for a prisoner who has never seen his file to know what information is contained therein. But experience teaches that in many instances prisoners do gain such knowledge, and a **requirement of particularity is necessary**

65

**to discourage fishing expeditions through files**. It is not sufficient that the inmate allege that 'something must be wrong;' **nor may he simply set out the true facts and demand assurances that the information in the file comports with those facts.**

Second, the inmate must affirmatively plead that the information in his file is false. **It is not sufficient that the information is true but the inmate nonetheless deems it prejudicial.** Similarly, **it is not sufficient that the inmate disputes evaluations and opinions regarding him.**)

(citations and quotations omitted).

8) 42 U.S.C. § 1320d *et seq*. (The Health Insurance Portability and Accountability Act ("HIPPA"))

9) 45 CFR §§ 60-164 ("The Privacy Rule," which provides the first comprehensive Federal protection for the privacy of health information).

*See* Attach. S at 8-9, ¶¶ 4-5.

Thus, there is little reason to justify the dissemination of either defendant's files, especially Abrams', as the bases for the Standing Order simply articulates law that applies to this Court as well as the Federal District Court. Neither Defendant has articulated **with particularity** the specific information he believes is in his parole records, and has simply listed several types of documents while moving

66

for the entirety of the records; neither has alleged that information in his parole records is false, but appears to have set out true facts (years eligible for parole, frequency of reviews, fact of denial, etc. . .) that even if true, give him no right to demand that the information in his record comports with those facts, or to receive the records simply because he disagrees with opinions or evaluations or deems the information prejudicial.

As relied upon in the Standing Order, that is not enough for purposes of the Fourth Circuit, and should not be enough for this Court. Given that this Court granted the Abrams' Order based upon *Franklin v. Shields*, a 1977 Fourth Circuit opinion related to Virginia's statutory parole regime, it is highly relevant that in 1979 via *Paine v. Baker*, a case about access of North Carolina inmates' rights to their records, the Fourth Circuit disavowed the position taken in Abrams' Order ¶5 by holding:

> Paine argues that the holding in *Franklin* should be limited to its facts **right of access before parole hearing** and that **a general right of access is constitutionally mandated** before or after other prison disciplinary proceedings involving forfeiture of statutory privileges. We disagree. 'The burden cast upon the State by such a requirement clearly outweighs any interest of the prisoner . . . .' *Franklin v. Shields*, 569 F.2d at 799 (Field, J. dissenting from panel opinion). The Department has represented to this court that it maintains a central record file on the prison records of more than 15,000 prisoners,

67

who are housed in more than 80 separate locations. Any across-the-boards rule of access would clearly be an overwhelming administrative burden; and 'what an inmate might find most often upon inspection of institutional files is that there is 'some evidence' to support (an adverse administrative decision), but evidence which he believes is outweighed by other facts.' *Williams v. Ward,* 556 F.2d 1143, 1160 (2d Cir.), Cert. dismissed, 434 U.S. 944, 98 S. Ct. 469, 54 L. Ed. 2d 323 (1977). The federal **courts are not an appropriate forum to review the discretionary decisions of prison administrators which are based on evidence conflicting in nature and degree.**

Therefore the holding of the district court, **insofar as it rests on the court's view that a prisoner has a constitutional right of access to his prison file, is reversed.**

*Paine v. Baker*, 595 F.2d at 200 (emphasis added). While the basis for Abrams' Motion was in part a procedural due process argument, and Murphy's Motion appears to be a pending MAR, the holdings of *Paine v. Baker* and *Goble v. Bounds* still apply, as the MAR statutes give no such right to inmate records from the Commission.

4.      Public Records

a.      News Articles

Without inmate records, public records available from the Clerks of Court, make clear that Abrams pled guilty to a lesser offense than he was originally charged, that being second-degree murder as opposed to first-degree murder, to stabbing his 20-year-old neighbor 17 times,

68

while she was sunbathing behind her home, and after being caught peeping at her at least once. *See* Attach. L, https://www.wbtv.com/2020/05/11/family-fights-keep-convicted-killer-prison/ (last accessed July 19, 2022); Attach. T, https://www.iredellfreenews.com/news-features/2020/n-c-parole-commission-rejects-latest-parole-bid-for-man-who-murdered-mooresville-woman/ (last accessed August 25, 2022). It is also public record that "Since the age of six, Abrams had been taken to mental health agencies. Following the murder, psychiatrists concluded that he was suffering from an aggressive conduct disorder." *See* Attach. K, https://www.lincolntimesnews.com/news/family-petitions-against-parole/article_e8c089b3-8644-55f9-8c69-514bc791a0d6.html (last accessed July 19, 2022).

  b.  Other Court Proceedings

  It is public record that while pursuing the order in this matter, Abrams also has a Section 1983 claim pending against the Chairman of the Commission in his official capacity, 5:20-ct-3231-M, alleging "lack of a meaningful opportunity for parole" in violation of his alleged rights to liberty and due process, and that he has a right to limited discovery subject to a standing protective order. It is also public record that the same federal court judge, Myers, before whom Abrams' complaint is

pending, in keeping with the above-referenced precedent regarding procedural due process and parole, recently has found there is no procedural due process right to parole for a juvenile homicide offender sentenced to life with the possibility of parole. *See Leggett v. Fowler*, No. 5:18-CT-03296-M, D.E. 44 at *11 (E.D.N.C. Sept. 7, 2021)(holding that the Court:

> defers to the Parole Commission's **application of state laws**. *See Vann*, 73 F.3d at 522 (noting, '**whether or not a liberty interest exists, federal courts must defer to state agencies applying state laws and thus their oversight of state parole proceedings has been extremely limited.**'); *Riccio v. Cty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) ('Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state created procedures exceed the amount of process otherwise guaranteed by the Constitution.'); *see also Covington v. Beck*, No. 1:01CV00968, 2002 WL 32500561, at *3 (M.D.N.C. June 3, 2002) ('[A]n individual must have a rightful claim of entitlement to parole to claim a protected interest to it, and mistakes by the Parole Commission do not create rights for inmates.' (citations omitted)).

Likewise, without inmate records, it is clear that Murphy has been imprisoned multiple times; he previously has been paroled; and during his 1983 parole, he reoffended by committing the crime of burglary. It is public record that a jury found him guilty of burglary; and that he was charged with raping the burglary victim, an 89-year

70

old woman, a charge for which he previously had admitted guilt. *See*

*State v. Murphy*, 321 N.C. 72, 73, 361 S.E.2d 745, 746 (1987)

> (At 12:12 a.m. on 9 July 1985, Detective Johnny Joseph was called to the apartment of the victim, an eighty-nine-year-old woman. The victim told Joseph that she had been awakened by someone climbing on top of her. The assailant choked her, and she resisted. **He also raped her**.
> Joseph found that the kitchen window of the apartment was open and the screen was lying on the ground. Another officer discovered that the window curtain was partially pushed back and two flower pots on the windowsill were upset. The victim's bedroom was in disarray, and the back door was slightly ajar. Defendant's fingerprints were found on the windowsill and screen.
> **Defendant's prison cellmate testified that defendant had told him that he 'raped a lady.' According to the witness, defendant said he 'went in there to rob her [but] she didn't have but seven dollars and he raped her.' Defendant told this story in the cell block several times. On cross-examination the witness testified: '[It's] not too easy to forget a man when he snickers and grins in your face for six or seven months about how he raped an old woman . . . .')**

(emphasis added).

    c.    Medical Examiner's Records

Medical examiner records that are not performed at the sole request of the next-of-kin, are also public record, as they are not considered medical records. *See* N.C.G.S. § 130A-389; N.C.G.S. § 132-1.8. ("the text of an official autopsy report, including any findings and interpretations prepared in accordance with G.S. 130A-389(a), is a public record and fully accessible by the public)". *See also* Attach. U at

1, 3, 5 (indicating as with media reports that Abrams' victim was stabbed 17 times and was "apparently sunbathing clad in a bikini on the back patio of her residence"). While copies of photos or videos generally are not available to the public, they are available if ordered upon signature of a Superior Court Judge. *See* N.C.G.S. § 132-1.8. ("a photograph or video or audio recording of an official autopsy is not a public record as defined by G.S. 132-1."); N.C.G.S. § 130A-389.1 (a), (b) (4). Whether or not the Commission's records for Abrams contain such records is irrelevant, as those same records and/or photos are available from the Medical Examiner and by signature of this Court. Never mind, as a matter of course, the same records would have been handed over to Abrams' trial counsel during discovery in his underlying criminal case.

> d.    Public DPS Records

It is public record that since Murphy's re-imprisonment, he has committed 167 infractions, including numerous sex acts. *See* Attach. H,

https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offe nderID=0296909&searchOffenderId=0296909&searchGender=M&searc hRace=2&searchDOBRange=0&listurl=pagelistoffendersearchresults& listpage=1 (last accessed July 19, 2022). It also is clear that Murphy

72

has filed numerous claims in federal court alleging various constitutional violations, each of which have been found to be without merit, 5:89-ct-00530-DU; 5:95-ct-00742-F; 5:93-ct-00742-H; 5:92-ct-00433-F.

E.   Governor's Authority

Given that Abrams Order specifically lists the Juvenile Sentence and Review Board [JSRB] and Abrams' intent to seek clemency as a form of relief from JSRB, in its findings, it is material that the authority of JSRB not only is created by the Governor, but also is at the sole discretion of the Governor. *See* Attach. B ¶¶ 3,4; https://governor.nc.gov/media/2347/open (last accessed July 25, 2022).

Per the Executive Order:

> **Article Ill, Sections 1 and 5(6) of the North Carolina Constitution vests the power** to grant reprieves, commutations, and pardons, after convictions, for all offenses (except in cases of impeachment), in the Governor;
> . . .
> [T]he North Carolina Constitution vests the authority to make such clemency determinations **exclusively in the Governor;** . . .
>
> [T]he Governor may make clemency determinations in his **sole discretion;** . . .
>
> [D]ata shows that **over eighty (80) percent of the people committed to North Carolina prisons for crimes they committed as juveniles are people of color;** . . .

73

> [T]here is a **long history of structural inequity and racism in the criminal justice system;** . . .
>
> [A] **fair and equitable criminal justice system, free from racism and bias, is necessary** to maintain the safety and well-being of the State of North Carolina; . . .
>
> [A] review mechanism for juvenile sentences will advance North Carolina's commitment **to improve the administration of justice in this state and eliminate racial inequities in the criminal justice system,** Communities **of color are disproportionately affected throughout the criminal justice system, with data showing that people of color make up nearly sixty (60) percent of the population of North Carolina's prisons;** . . .
>
> The North Carolina Juvenile Sentence Review Board ('Review Board') is hereby established as an advisory board. The mission of the Review Board is to review sentences imposed on juveniles in North Carolina and **make recommendations to the Governor** concerning **clemency** and commutation of such sentences when appropriate.. . .
>
> The Governor may act in accordance with the Review Board's recommendation **but is not obligated to do so.**

https://governor.nc.gov/media/2347/open (last accessed July 25, 2022),

Attach. N.

The JSRB's role is simply to "review" certain sentences imposed on juveniles and make a "recommendation" to the Governor, which he may or may not follow. While the point is partially the issue of the maturity of the juvenile over time, it is also about addressing the issue

74

of racial discrimination against people of color in the criminal justice system in North Carolina.

As with the language of the Executive Order, the purpose of establishing the JSRB was that "[t]he North Carolina Juvenile Sentence Review Board is a recommendation of the Governor's Task Force for Racial Equity in Criminal Justice which found that the group of people included in this Executive Order are **disproportionately Black**."                     https://governor.nc.gov/news/press-releases/2021/04/08/governor-cooper-announces-formation-north-carolina-juvenile-sentence-review-board (last accessed July 25, 2022)(emphasis added). That is not to say that race, e.g. being Caucasian, will disqualify a juvenile offender. However, it is noteworthy that race was one of the leading reasons for the creation of the JSRB, not simply the age of the offender. Thus, it makes sense that the JSRB was not created as a result of any biases it found in sentencing juvenile offenders who are Caucasian.

Meanwhile, it is the understanding of the undersigned that if a juvenile offender has a pending case related to his criminal conviction, or has a parole hearing pending, the JSRB will **not** make a recommendation for that juvenile offender until the resolution of the pending case or the pending parole review, so as to not grant a form of

75

relief similar to parole, or to usurp the authority of the Court in the pending matter. Thus, just as it is relevant to JSRB, it should be relevant to this Court that Abrams not only has a pending federal case involving his parole and therefore his underlying conviction, but he also is scheduled for parole review this year. Both factors minimize the urgency of Abrams Order as it relates to clemency.

Regardless, while Section 2 of the Executive Order mandates that the Commission provide records **upon request** to the JSRB: 1. there is nothing in the Executive Order **mandating** JSRB to request records from the Commission, let alone its **"complete"** file, and 2. there is no indication that the records before the JSRB are **solely** those from the Commission. *See* Attach N. Thus, the finding of fact that one of the purposes for requesting Abrams Order, e.g. assistance in preparing Abrams' "evidence in support of . . . clemency," does not appear to be based upon competent evidence that supports the conclusion of law that the Commission should hand over its "complete files." *See* Attach. B ¶4. Never mind, even when the Governor considers clemency for adults, the Commission is rarely involved, and does not investigate clemency matters, nor employ the investigators, e.g. sworn probation and parole officers. *See* Attach. Q ¶¶2, 8.

Even assuming discovery were allowed in parole review hearings or for unfiled MAR's, the use of either an allegedly pending clemency petition to obtain parole records or an allegedly pending MAR, is a "fishing expedition" that even in criminal cases, our appellate courts frown upon. *See State v. Davis*, 282 N.C. 107, 111-112, 191 S.E.2d 664, 667(1972)(holding that where the "defendant's motion requested practically the complete files of the sheriff's department and the solicitor's office pertaining to this case . . . [d]efendant was not entitled to the granting of his motion for a **fishing expedition**.") (emphasis added), citing Moore *v. Illinois*, 408 U.S. 786 (1972).

The fact that clemency records are confidential should not usurp the General Assembly's intent to keep inmate prison/parole records confidential. *See* Attach. A ¶ 12 ("Otherwise, counsel will have incomplete and otherwise undiscoverable information in the possession of the Parole Commission."). Never mind, Abrams also has the right to **seek** discovery of the **exact same** information from the Parole Commission in his pending case before the Federal District Court. However, his right to discovery will be subjected to limitations on the basis of confidentiality, namely G.S. 148-76 in that matter. *See* Attach. S at 7.

F.   Order to Seal and Dissemination to Attorney

*Baugh v. Woodard* at 184, 287 S.E.2d 414-415 makes clear that inmate psychological records pose a security risk, even if disseminated to an inmate's attorney. Likewise, the Director of the Commission has made clear that inmate records normally contain victim information and psychological reports, both of which are considered extremely sensitive. *See* Attach Q ¶10.

While it is relevant that the current orders would place the documents under seal; and that counsel would only be able to disseminate them to certain individuals, if disseminated in their current state, the orders would not protect the safety and security victims,' Parole Commission staff, the facilities, or the computer system of the Parole Commission; prevent the dissemination of information about other inmates, or the work product of counsel for the Commission, or documents between the Commission and its counsel that are attorney-client privileged. Furthermore, the order is silent on the ability of Defendant's counsel to share the documents with him, which again, is prohibited by statute.

Given that the purpose of Murphy Order as noted in the findings, is the investigation and preparation of an MAR motion and Murphy's "ability to work with his attorneys to make strategic decisions,"

78

presumably about his future MAR, it makes sense that Murphy's counsel intends to share the same privileged and otherwise security related information with Murphy. *See* Attach. C at 1, ¶¶ 3,6.

Likewise, Abrams Motion informs this Court that his counsel represents him in front of the JSRB for purposes of seeking relief through "that mechanism;" and that the JSRB will consider Abrams' prison record. *See* Abrams' Motion ¶¶ 10,11. Whereas Abrams Order includes a finding that the basis for the mandate was that "Abrams will be considered for parole by the [Commission] and for relief by the Juvenile Sentence Review Board;" and that his counsel "represent Mr. Abrams for purposes of preparing evidence in support of parole and clemency." Attach. B ¶¶3,4. It also makes sense that Abrams' counsel intends to share the same privileged and otherwise security related information with Abrams.

To give either Defendant (or his counsel) unfettered access to his inmate records, is counter not only to the statutory provisions of G.S. 148-76, but also the interpretations of state and federal law in the above-referenced cases as well as those noted hereinafter. *See* e.g. *Goble v. Bounds*.

## G. Orders Signed by this Court in Other Matters

It is worth mentioning that this Court has issued other orders for various parts of NCDPS to turn over inmate records to inmate counsel. However, while not waiving the Commission's position on any similar defenses in those matters, at a minimum, those circumstances are distinguishable from the ones at hand. For example: 1) the orders were not sought in tandem with a federal lawsuit about the very issue the inmate claims to be in need of records, e.g. parole; 2) were not sought for the purpose of pursuing an unfiled MAR, 3) were not so broad as to include either the entirety of Commission files or files of other parts of NCDPS, whose records are not maintained by the Commission; 4) did not involve tandem litigation such as the Attorney General's Office had reason to know about the orders; and/or 5) did not involve an unfiled MAR, as the Attorney General's Office often represents the State in MAR's once they are filed.

Furthermore, it is up to the Secretary to waive confidentiality for NCDPS' inmate records, an act which he can designate to his General Counsel's Office. *See* N.C.G.S. § 143B-10 (a) ("Assignment of Functions. — Except as otherwise provided by this Chapter, the head of each principal State department may assign or reassign any function

80

vested in him or in his department to any subordinate officer or employee of his department.")(emphasis added).

However, when matters are in litigation, by constitutional authority, the Attorney General represents NCDPS, and as such, the Commission. *See* N.C.G.S. § 114-2 (2)("Pursuant to Section 7(2) of Article III of the North Carolina Constitution, it shall be the duty of the Attorney General to represent all State departments, **agencies**, institutions, **commissions,** bureaus or other organized activities of the State which receive support in whole or in part from the State.")(emphasis added).

Again, and as with all matters involving parole, whether in litigation or not, the Secretary has no authority to waive confidentiality of inmate records maintained by the Commission, and the Commission has not waived its right to confidentiality of the inmate records in question. As such, Abrams Order and Murphy Order are distinguishable from other orders issued by this Court for the dissemination of inmate records.

## VI.   FINDINGS OF FACT, FACTUAL ALLEGATIONS, AND/OR CONTEXT OF LAW CITED DOES NOT SUPPORT CONCLUSIONS OF LAW

The above paragraphs are incorporated by reference as if realleged herein.

Many of the factual allegations and findings therefrom appear to be based upon incomplete or inaccurate factual recitations. Likewise, the case references in the conclusions appear to be distinguishable from the cases at hand. As such, the application of the cases to the facts as alleged by Defendants (which were either inaccurate or materially incomplete) or this Court's findings therefrom, appear misplaced.

For example:

Attach. A at ¶8 ("If Mr. Abrams does not get relief through parole and spends the remainder of his life in prison, he will have the same prison term as a person who served life without parole."). *But see Conn. Bd. of Pardons v. Dumschat*, 452 U.S. at 464

> (There is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence. **The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined.** But the conviction, with all its procedural safeguards, has extinguished that liberty right: **Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.**)

(emphasis in original)(emphasis added).

Also minimizing the competency of the evidence in support of the finding and the support of the conclusion of law is that as referenced above, most of the information normally contained in Commission records can be obtained elsewhere. Namely, many ocuments listed in

82

the orders can be obtained from Defendants' own trial counsel, as well as their current counsel, who have all requested court records from the Clerks of Court.

The point of the approval of the State Plan was to ensure that juvenile offenders such as Abrams had a "meaningful opportunity" to obtain release. At no point in Abrams Motion or Abrams Order is it made clear that he is receiving "Hayden Hearings," the very point of which are to give him that opportunity.

At no point in Abrams Motion has he informed the court of his pending federal matter in which he had made numerous admissions that are not in keeping with his motion. More importantly, he has not informed the court of the fact he has accepted NCPLS as counsel in his federal case, for the purpose of seeking discovery of the same information he sought from this Court in Abrams Motion.

As mentioned above, at no point has Abrams mentioned one of the grounds for his prior denials, about which he has filed his federal lawsuit, e.g. "(3) His continued correctional treatment . . . in the institution will substantially enhance his capacity to lead a law-abiding life if he is released at a later date." *See* N.C.G.S. § 15A-1371(d)(3). In so doing, he also has omitted the trial court's order about its concern for his mental health. *See* Attach. E at 3-4.

*Franklin v. Shields, State v. Buckner, State v. Ballard*, and *State v. Taylor* appear to be have been argued out of context such that they are distinguishable from the facts of Murphy and/or Abrams' orders. Namely, for Abrams, there is no due process right or liberty interest in parole review hearings other than what the statutes have provided, or in Abrams' case, what the State has agreed to in the State Plan; and the presumed argument in Murphy Motion regarding strategic decisions is taken out of context with *State v. Ballard*.

This Court's inherent authority to order discovery "in the interest of justice" is contingent upon this Court's jurisdiction over a criminal proceeding for which a statute in Chapter 15A has not answered the question of whether an inmate may seek his own prison records, but G.S. 148-76 has. Furthermore, this Court's criminal jurisdiction over the request in Murphy Motion also is contingent upon **a filed** MAR.

The Commission does not have authority over the Secretary and its records, and *visa versa*. *See* Attach. Q ¶¶4-5. The Secretary and its other sub-agencies within DAC are not agents of the Parole Commission, such sub-agencies include as the Division of Prisons and Community Corrections. The Commission has its own records custodian who has no authority over records of other parts of NCDPS, and *visa versa*. That this Court has ordered the dissemination of

84

inmate records in other matters is distinguishable from the cases at hand.

The Commission is not privy to or mandated to have every document in the possession of the Clerk's Office, nor is it privy to all medical documentation held by its own psychiatrist(s)/psychologist(s). Attach. Q ¶¶ 5-7, 9. Thus, the orders are not legally applicable to some of the information the orders mandate. Not to mention, some of the documents are confidential, not simply because they are inmate records, but because they are privileged for other reasons noted above. Neither order refers to any of the above-referenced points, such that the resulting conclusions of law are problematic.

## VII. EQUITABLE RELIEF

The above paragraphs are incorporated by reference as if realleged herein.

Rule 60 also allows relief from a judgment where "it is no longer equitable that the judgment should have prospective application." N.C.G.S. § 1A-1, Rule 60(b)(5). As such, "Rule 60(b) has been described as a grand reservoir of equitable power to do **justice** in a particular case. The North Carolina Supreme Court has stated that its broad language gives the court ample power to vacate judgments whenever such action is appropriate to **accomplish justice**." *Jim Walter Homes,*

*Inc. v. Peartree*, 28 N.C. App. 709, 712, 222 S.E.2d 706, 708 (1976)(citations and quotations omitted)(emphasis added).

For the above-referenced reasons, including but not limited the safety of the victims' families, the safety of Commission staff, the sanctity of attorney/client privileged information and attorney work product, the safety of other prisoners' information as well as information about the defendants that might pose a safety issue, and the Commission's legitimate interest in maintaining order, are some but not all of the reasons that the orders as written should be subject to relief. Without this Court's relief from the orders as written, the interest of justice for the victims' families, the public, the Commission staff, other prisoners, witnesses, and the State's legitimate interest in maintaining security will not be protected.

**WHEREFORE AND AS A MATTER OF LAW**, the Commission respectfully requests that this Court grant it relief from the above-referenced orders by

1.    Setting aside the above-referenced orders;

2.    Enjoining counsel for Defendants, including but not limited to, Ben Finholt, Johanna Jennings, Lyndsay Bass, the North Carolina Prisoner Legal Services, Inc., The

86

Declaration Project, and Duke University School of Law's Wilson Center for Science and Justice, from seeking future *ex parte* motions for inmate records from the Commission; and

3.  Ordering a hearing to address the issue of a protective order to address the privileges and concerns noted in this motion.

Respectfully submitted, this the  29th  day of August 2022.

JOSHUA H. STEIN
ATTORNEY GENERAL


Sonya Calloway-Durham
Special Deputy Attorney General
N. C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6576
State Bar No. 21960
scalloway@ncdoj.gov

87

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served the foregoing

MOTION FOR RELIEF FROM ORDERS upon counsel for each

Defendant, by placing a copy of each into the United States mail, first

class, postage pre-paid and addressed as follows:

Lindsay Bass
Attorney for Jerome Murphy
N.C. Prisoner Legal Services, Inc.
P.O. Box 25397
Raleigh, NC 27611

Benjamin Finholt
Attorney for Brett Abrams
P.O. Box 62512
Durham, NC 27715

This the 29th day of August 2022.

Sonya Calloway-Durham
Special Deputy Attorney General

STATE OF NORTH CAROLINA
COUNTY OF ~~WAKE~~ IREDELL

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
83CRS010721

2022 ... - 1  ... 48

STATE OF NORTH CAROLINA
IREDELL ... ... ...

v.

BY ...

Brett Abrams,
Defendant.

)
)
)
)
)
)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION FOR THE COURT TO ORDER THE POST-RELEASE SUPERVISION AND PAROLE COMMISSION TO RELEASE RECORDS TO DEFENSE COUNSEL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOW COMES the defendant, Brett Abrams, by and through counsel, and moves this

Court *ex parte*, pursuant to U.S. Const. amends. V, VI, VIII, XIV; and N.C. Const. art. I, §§ 19

and 23; and the Court's inherent authority, to issue an order requiring the North Carolina Post-

Release Supervision and Parole Commission (the Parole Commission) and any other entity

overseen by the Parole Commission, to furnish undersigned counsel with any and all records

related to Mr. Abrams [OPUS # 400, DOB: 09/01/1968].

Mr. Abrams seeks his entire file as maintained by the Parole Commission and notes

regarding Mr. Abrams taken by agents thereof, including but not limited to incarceration records,

post-release supervision records, and parole records. These records may include case-worker

reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation

reports, raw psychiatric data, records of psychiatric and psychological testing (including IQ

scores and dates and names of administrators of IQ or other psychiatric or psychological tests),

and all information contained in the computer systems on Mr. Abrams by the Parole

Commission. Mr. Abrams also seeks all medical and mental health records produced, pursued, or

obtained by the Parole Commission.

In support of this Motion, the undersigned shows unto the Court the following:

DEFENDANT'S
EXHIBIT

1. Mr. Abrams is presently incarcerated at Orange Correctional Center in Hillsborough, North Carolina.

2. Mr. Abrams is serving an active sentence for second degree murder after conviction in Iredell County file number 83 CRS 10721. He was sentenced to life with parole.

3. A life sentence, which to date has not resulted in parole, weighs heavily on Mr. Abrams in part because he was only 14 years old at the time of the offense and only 15 years old at the time of conviction. Mr. Abrams is now 53 years old.

4. Mr. Abrams only receives parole review every two years because he was convicted of murder committed when he was a juvenile. *See* 2008 N.C. Sess. Law 133, § 1 (amending N.C. Gen. Stat. § 15A-1371(b) to change eligibility for people convicted of murder from every year to every three years) and Order, *Hayden v. Keller*, No. 5:10-CT-3123-BO, (E.D.N.C. Nov. 2, 2017) (ordering the Parole Commission to implement its plan, which included review every two years for all people eligible for parole based on juvenile conduct).

5. Undersigned counsel represents Mr. Abrams for purposes of preparing evidence in support of releasing Mr. Abrams on parole. He will be considered for parole in the next six months.

6. The Parole Commission may consider factors including whether Mr. Abrams will conform to reasonable conditions of parole, whether he would follow the law if released, and whether his continued incarceration would enhance his ability to lead a law-abiding life if released later. *See* N.C. Gen. Stat. § 15A-1371(d).

7. Whether Mr. Abrams receives parole determines whether he leaves prison after serving 39 of years in custody. This is one of the weightiest questions in Mr. Abrams's life.

8. If Mr. Abrams does not get relief through parole and spends the remainder of his life in

prison, he will have had the same prison term as a person who served life without parole. Life without parole is the second-most severe punishment that courts can impose. *See Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part).

9. The United States Supreme Court has recognized that, for a younger person, a longer prison term is a harsher punishment because the person will spend more of his life in prison. *See Miller v. Alabama*, 567 U.S. 460, 475 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 70 (2010)).

10. In addition, Mr. Abrams is now eligible for review by the Juvenile Sentence Review Board and undersigned counsel represents Mr. Abrams for purposes of preparing evidence in support of relief through that mechanism. *See* Executive Order 208, *available at* https://governor.nc.gov/news/press-releases/2021/04/08/governor-cooper-announces-formation-north-carolina-juvenile-sentence-review-board.

11. The Juvenile Sentence Review Board may consider factors including Mr. Abrams's prison record, the degree of risk Mr. Abrams poses to society, and whether Mr. Abrams has demonstrated maturity and rehabilitation. *Id.*

12. If counsel is to provide zealous, professionally reasonable services, then they need to review the requested information. Otherwise, counsel will have incomplete knowledge of otherwise undiscoverable information in the possession of the Parole Commission.

13. Undersigned counsel agrees not to disclose the records to any other person except to such mental health professionals, mitigation specialists, social workers, and certified law students involved in the case and acting under supervision, as they may see fit.

14. Wide-ranging mitigation investigations are a normal part of criminal defense for high-level felonies. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (describing counsel's duty in a

capital case to conduct an investigation that satisfies professional standards). Given the importance of clemency review and the usefulness of the requested records, counsel would be deficient in their professional duties if they did not seek a variety of records. *Cf. id.*; N.C. R. of Prof'l Conduct 0.1 ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system."), 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client.").

15. To ensure that Mr. Abrams has access to zealous, professionally reasonable advocacy during clemency and parole review affecting his sentence, and to ensure that counsel satisfies their ethical duties to their client, counsel seeks records as described below.

16. Granting the requested relief is in the interests of justice and within this Court's discretion to manage discovery in criminal proceedings. *See State v. Buckner*, 351 N.C. 401, 410, 527 S.E.2d 307, 313 (2000); *State v. Taylor*, 327 N.C. 147, 153, 393 S.E.2d 801, 806 (1990) (the trial court has inherent power to order discovery to assure justice in criminal cases).

17. Disclosure of the records maintained by the Parole Commission is necessary to the proper administration of justice.


WHEREFORE, Defendant respectfully prays the Court ORDER:

1. The production of records from the North Carolina Post-Release Supervision and Parole Commission to counsel concerning Brett Abrams, OPUS # 400.

2. That the Post-Release Supervision and Parole Commission produce Mr. Abrams's entire file, including but not limited to incarceration records, post-release supervision records, and parole records. These records may include case-worker reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation reports, raw psychiatric data, records

of psychiatric and psychological testing (including IQ scores and dates and names of administrators of IQ or other psychiatric or psychological tests), and all information contained in the computer systems on Mr. Abrams by the Parole Commission. Mr. Abrams also seeks all medical and mental health records produced, pursued, or obtained by the Parole Commission.

3. That counsel for Mr. Abrams are directed not to disclose said records to any other person except to mental health professionals and other individuals assisting in the representation of Mr. Abrams.

4. That the fee for copying and mailing records be waived due to Defendant's indigence.

5. For such other and further relief as the Court deems just and appropriate.


Respectfully submitted, this the 24th day of June, 2022.


*Johanna Jennings*

Johanna Jennings
N.C. State Bar No. 42943
The Decarceration Project
P.O. Box 62512
Durham, NC 27715
Telephone: 919-355-9535
E-mail: JJ@tdpnc.org


*Ben Finholt*

Ben Finholt
N.C. State Bar No. 40402
Duke University School of Law
210 Science Dr.
Durham, NC 27708
Telephone: 919-613-7119
E-mail: benjamin.finholt@duke.edu

STATE OF NORTH CAROLINA

COUNTY OF IREDELL

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

83CRS010721

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Brett Abrams, | ) | |
| Defendant. | ) | |

THIS CAUSE coming on to be heard and being heard by the undersigned Superior Court Judge; and for good cause shown as detailed in Defendant's Motion, the Court hereby finds that:

1. On May 22, 1984, Brett Abrams (09/01/1968; OPUS # 400) was convicted of second degree murder in Iredell County file number 83 CRS 10721.

2. Mr. Abrams received a sentence of life with parole and is serving the sentence now at Orange Correctional Center in Hillsborough, North Carolina.

3. Over the next six months, Mr. Abrams will be considered for parole by the North Carolina Post-Release Supervision and Parole Commission and for relief by the Juvenile Sentence Review Board.

4. Undersigned counsel represent Mr. Abrams for purposes of preparing evidence in support of parole and clemency.

5. The Fourth Circuit has held that an incarcerated person has procedural due process rights during parole review. *See Franklin v. Shields*, 569 F.2d 784, 794 (4th Cir. 1977) (upholding lower court's conclusion that an incarcerated person "should be afforded access to the information in his files on which the parole decision is to be based, unless such access threatens prison security or poses harm to someone"). The requested relief is consistent with *Franklin*.

6. Additionally, it is in the interests of justice, and within this Court's discretion to manage discovery in criminal proceedings, to grant the motion. *See State v. Buckner*, 351 N.C. 401, 410,

DEFENDANT'S
EXHIBIT
13

527 S.E.2d 307, 313 (2000); *State v. Taylor*, 327 N.C. 147, 153, 393 S.E.2d 801, 806 (1990).

7. Because the North Carolina Post-Release Supervision and Parole Commission maintains its central offices within Wake County, the above-captioned matter is within this Court's jurisdiction.

THEREFORE, IT IS HEREBY ORDERED THAT:

1. Upon presentation of this order to the appropriate custodian, the North Carolina Post-Release Supervision and Parole Commission and/or its other agents shall furnish records of Brett Abrams, OPUS # 400, to Mr. Abram's counsel.

2. That the North Carolina Post-Release Supervision and Parole Commission produce Mr. Abrams's entire file, including but not limited to incarceration records, post-release supervision records, and parole records. These records may include case-worker reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation reports, raw psychiatric data, records of psychiatric and psychological testing (including IQ scores and dates and names of administrators of IQ or other psychiatric or psychological tests), and all information contained in the computer systems on Mr. Abrams by the Parole Commission. Mr. Abrams also seeks all medical and mental health records produced, pursued, or obtained by the Parole Commission.

3. The attorneys for Defendant are directed not to disclose said records to any other person except to mental health professionals and other individuals assisting in the representation of Mr. Abrams.

4. The fee for copying and mailing records shall be waived due to Defendant's indigence.

This the __28__ day of __June__, 2022.

Superior Court Judge

Paul C. Ridgeway
Senior Resident
Superior Court Judge

STATE OF NORTH CAROLINA
COUNTY OF ~~WAKE~~ SCOTLAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
SCOTLAND CO. FILE NO. 85 CRS 004084

STATE OF NORTH CAROLINA    )
    )
v.    )        ORDER
    )
JEROME MURPHY,    )
DEFENDANT.    )

THIS CAUSE coming on to be heard and being heard by the undersigned Superior Court

Judge; and for good cause shown as detailed in Defendant's *Ex Parte* Motion, the Court hereby

finds that:

1. On October 29, 1986, Jerome Murphy (5/17/1962; OPUS # 0296909) was convicted of

burglary in Scotland County file number 85 CRS 004084.

2. Mr. Murphy received a sentence of life imprisonment and is serving the sentence now at

Lumberton Correctional Institution in Lumberton, North Carolina.

3. Undersigned counsel represents Mr. Murphy and is in the process of investigating and

preparing a post-conviction Motion for Appropriate Relief (MAR).

4. It is in the interests of justice, and within this Court's discretion to manage discovery in

criminal proceedings, to grant the motion. *See State v. Buckner*, 351 N.C. 401, 410, 527 S.E.2d

307, 313 (2000); *State v. Taylor*, 327 N.C. 147, 153, 393 S.E.2d 801, 806 (1990).

5. Because the North Carolina Post-Release Supervision and Parole Commission maintains

its central offices within Wake County, the above-captioned matter is within this Court's

jurisdiction.

6. Because the disclosure of the motion for production of records and this order to

prosecutorial agencies would impair Mr. Murphy's ability to work with his attorneys to make

DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

strategic decisions in confidence, Mr. Murphy is entitled to file the motion and have it resolved ex parte. *See State v. Ballard*, 333 N.C. 515, 522, 428 S.E.2d 178, 182 (1993).

THEREFORE, IT IS HEREBY ORDERED THAT:

1. Upon presentation of this order to the appropriate custodian, the North Carolina Post-Release Supervision and Parole Commission and/or its other agents shall furnish to counsel Mr. Murphy's entire file.

2. If maintained by the Parole Commission, the records produced shall include, but not be limited to, incarceration records, probation records, post-release supervision records, community corrections records, and all medical and mental health records produced, pursued, or obtained by the Parole Commission. These records shall also include, if maintained, inmate grievances, caseworker reports, inmate evaluations, custody reviews, disciplinary records, infraction records, violation reports, raw psychiatric data, records of psychiatric and psychological testing (including IQ scores and dates and names of administrators of IQ or other psychiatric or psychological tests), jackets from each facility in which Mr. Murphy has been housed, and all information contained in the computer systems on Mr. Murphy by the Parole Commission.

7. The attorneys for Defendant are directed not to disclose said records to any other person except to mental health professionals and other individuals assisting in the representation of Mr. Murphy.

3. The fee for copying and mailing records shall be waived due to Defendant's indigence.

4. FINALLY, IT IS ORDERED that, due to the *ex parte* nature of Defendant's Motion, this Order and the *ex parte* Motion shall be placed in an envelope and sealed by the ~~Wake~~ County Scotland

Clerk of Superior Court prior to being placed in the record. This Order shall remain under seal unless or until a further court order specifically requires otherwise.

This the _15_ day of _July_, _2022_

_____
Superior Court Judge Presiding

P. Ridgeway

## Cooper, Bettye D.

| | |
|---|---|
| **From:** | Cooper, Bettye D. |
| **Sent:** | Friday, July 15, 2022 3:47 PM |
| **To:** | 'Lindsay Bass' |
| **Subject:** | RE: Ex parte motion for parole records - State v. Jerome Murphy - 1986 first-degree burglary conviction |
| **Attachments:** | Murphy, Jerome - Scotland Co 85CRS4084 - Ex Parte Motion & Order for NCPRS&P Commission to Release Records to Defense Counsel.pdf |

Good afternoon,

Attached is a copy of the Motion and signed Order you requested and a commission has been issued for Judge Ridgeway for the entry of this Order in Scotland County. I will mail a copy of your motion and the original order to the Scotland County Clerk's Office to be filed.

Thanks in advance and I hope you have a great weekend!!

Best,

**B. Davis Cooper**
Court Coordinator
Wake County Superior Court Judges' Office
Post Office Box 351
Raleigh, NC 27602
**North Carolina Judicial Branch**
O 919.792.4778
F 919.792.4969

*thanks so much!*

**From:** Lindsay Bass <lbass@ncpls.org>
**Sent:** Friday, July 15, 2022 12:05 PM
**To:** Ridgeway, Paul C. <Paul.Ridgeway@nccourts.org>; Cooper, Bettye D. <Bettye.D.Cooper@nccourts.org>
**Subject:** Ex parte motion for parole records - State v. Jerome Murphy - 1986 first-degree burglary conviction

Dear Judge Ridgeway and Ms. Cooper,
I represent Jerome Murphy in his post-conviction case. He was convicted of first-degree burglary in 1986, and he is serving an FSA life sentence. I have attached an *ex parte* motion for Mr. Murphy's file from the Parole Commission for your consideration, along with a proposed Order.

Please let me know if I can provide you with more information. I greatly appreciate your time.
Respectfully,
Lindsay

**Lindsay Bass**
**Civil Litigation Managing Attorney**

**N.C. Prisoner Legal Services, Inc.**
**P.O. Box 25397**
**Raleigh, NC 27611**
**T 919-856-2200**
**F 919-856-2223**

1

**Cooper, Bettye D.**

| | |
|---|---|
| **From:** | David.F.Hoke@nccourts.org |
| **Sent:** | Friday, July 15, 2022 3:45 PM |
| **To:** | Adams, Jamie T.; Cooper, Bettye D.; Cooper, Pamela C.; Dunham, Tierryicah M.; Dycus, Cindy S.; Fox, Erika P.; Haywood, Chad B.; Hoke, David F.; Mcinnis, Jonathan L.; Mcpherson, Vicky E.; Mcrae, Walter P.; Myers, Kellie Z.; Newton, Kristy M.; Ridgeway, Paul C.; Saunders, Winfred R.; Smallwood, Shanda R.; Snead, Dawn M.; Tucker, Lisa R.; Turnley, Dawn |
| **Subject:** | Week of 7/11/2022 - CRCV Special Session |

entry of order

Scotland County
     A Special Session of Superior Court is hereby set for Scotland County for the trial of Criminal and Civil cases to begin July 15, 2022, and continue One Day, or until the business is completed. The Honorable Paul C. Ridgeway, one of the Regular Judges of the Superior Court, is commissioned and assigned to preside over this session.

1

## Cooper, Bettye D.

| | |
|---|---|
| **From:** | Futrell, Stephan R. |
| **Sent:** | Friday, July 15, 2022 1:54 PM |
| **To:** | Paul Ridgeway; Cooper, Bettye D. |
| **Subject:** | RE: Ex Parte motion involving Scotland County case |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please sign away. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Best regards!
Steve

Stephan R. Futrell
Senior Resident Superior Court Judge
Judicial District 16A
North Carolina Judicial Branch
O  910-419-7686
F  910-419-7677

**From:** Paul Ridgeway <paul.ridgeway@gmail.com>
**Sent:** Friday, July 15, 2022 12:21 PM
**To:** Futrell, Stephan R. <Stephan.R.Futrell@nccourts.org>; Cooper, Bettye D. <Bettye.D.Cooper@nccourts.org>
**Subject:** Ex Parte motion involving Scotland County case

Judge Futrell:

Happy Friday, Judge:

I've received a motion from an attorney to enter an ex parte order for various records maintained by the NC Parole Commission  for a defendant (Jerome Murphy) who was convicted in the  '80s of first degree burglary in Scotland County (85 CRS 4080) and received a life sentence.   The request for the order came from an attorney in her representation of this defendant before the Parole Commission.

The ex parte motion and order were sent to me since the records being sought are housed in Wake County.

Since this is a case originating outside of Wake County, it is my practice, when I receive similar motions, to notify the senior resident superior court judge in the matter's home judicial district  prior to my obtaining a commission and signing the order.   If you don't have a problem with me taking care of this, I will be glad to, and after I sign the order I'll send it to the Scotland County Clerk of Superior Court  to put in the  court file, under seal.

Let me know if you have any concerns about me proceeding as outlined above and I'm happy to discuss with you further.

Thanks, and see you in Raleigh soon.

Paul

Paul Ridgeway
Senior Resident Superior Court Judge

1

| | |
|---|---|
| **From:** | Smith, Joy R |
| **Sent:** | Tuesday, May 3, 2022 6:30 AM |
| **To:** | 'Ben Finholt' |
| **Subject:** | RE: [External] Brett Abrams, # 400 |

Ben,

I asked Chairman Fowler about this. He said Abrams' parole review would be delayed until the end of August however he said the video conference and PC telephone conference will go as already scheduled.

Joy

Joy Smith
N.C. Post-Release Supervision & Parole Commission
2020 Yonkers Road
4222 MSC
Raleigh, NC 27699-4222
(919)716-3010
(919)324-1196-direct
(919)324-6254-fax
Joy.R.Smith@ncdps.gov

-----Original Message-----
From: Ben Finholt <benjamin.finholt@duke.edu>
Sent: Monday, May 2, 2022 3:21 PM
To: Smith, Joy R <Joy.R.Smith@ncdps.gov>
Cc: Johanna Jennings <jj@tdpnc.org>
Subject: Re: [External] Brett Abrams, # 400

CAUTION: External email. Do not click links or open attachments unless you verify. Send all suspicious email as an attachment to Report Spam.<mailto:report.spam@nc.gov>

Joy,

Thanks for letting me know. If we could push back both the telephone conference and video conference, that would be great. Please let me know if those changes are possible.

Ben

—
Ben Finholt (he/him)
Director, Just Sentencing Project
Wilson Center for Science and Justice
Duke University School of Law

> On May 2, 2022, at 3:09 PM, Smith, Joy R <Joy.R.Smith@ncdps.gov> wrote:
>

DEFENDANT'S
EXHIBIT

1

> No. I was speaking about a PC meeting/telephone conference.
>
> The video conference is scheduled for May 19th. Changing the scheduled video conference is possible but difficult as we do not do them every week. We base them on Commissioners' schedules and now we do them only the third Thursday of each month.
>
> Joy Smith
> N.C. Post-Release Supervision & Parole Commission
> 2020 Yonkers Road
> 4222 MSC
> Raleigh, NC 27699-4222
> (919)716-3010
> (919)324-1196-direct
> (919)324-6254-fax
> Joy.R.Smith@ncdps.gov
>
> -----Original Message-----
> From: Ben Finholt <benjamin.finholt@duke.edu>
> Sent: Monday, May 2, 2022 2:57 PM
> To: Smith, Joy R <Joy.R.Smith@ncdps.gov>
> Cc: Johanna Jennings <jj@tdpnc.org>
> Subject: Re: [External] Brett Abrams, # 400
>
> CAUTION: External email. Do not click links or open attachments unless
> you verify. Send all suspicious email as an attachment to Report
> Spam.<mailto:report.spam@nc.gov>
>
>
> Joy,
>
> Is that the videoconference interview with Brett? If so, is it possible to move that meeting?
>
> Thanks.
>
> Ben
>
> —
> Ben Finholt (he/him)
> Director, Just Sentencing Project
> Wilson Center for Science and Justice
> Duke University School of Law
>
>> On May 2, 2022, at 7:33 AM, Smith, Joy R <Joy.R.Smith@ncdps.gov> wrote:
>>
>> Okay. We already have a PC meeting scheduled and that will be held at the already scheduled time.
>>
>> Joy Smith
>> N.C. Post-Release Supervision & Parole Commission
>> 2020 Yonkers Road
>> 4222 MSC
>> Raleigh, NC 27699-4222
>> (919)716-3010

>> (919)324-1196-direct
>> (919)324-6254-fax
>> Joy.R.Smith@ncdps.gov
>>
>> -----Original Message-----
>> From: Ben Finholt <benjamin.finholt@duke.edu>
>> Sent: Friday, April 29, 2022 8:30 AM
>> To: Smith, Joy R <Joy.R.Smith@ncdps.gov>
>> Cc: Johanna Jennings <JJ@tdpnc.org>
>> Subject: [External] Brett Abrams, # 400
>>
>> CAUTION: External email. Do not click links or open attachments
>> unless you verify. Send all suspicious email as an attachment to
>> Report Spam.<mailto:report.spam@nc.gov>
>>
>>
>> Joy,
>>
>> Two years ago, I represented Brett during the parole review process. This time, he is also eligible for review by the Juvenile Sentence Review Board. Johanna Jennings, copied here, is representing him in that process. We would like to submit documents to the JSRB and the Parole Commission at the same time.
>>
>> Therefore, I am writing to request a 90 day extension of time for Brett's parole review. I believe that would set his review date at August 29, 2022.
>>
>> Thanks, and please let me know if this request can be granted.
>>
>> Ben
>>
>> --
>> Ben Finholt (he/him)
>> Director, Just Sentencing Project
>> Wilson Center for Science and Justice Duke University School of Law
>>
>> _____
>>
>> Email correspondence to and from this address may be subject to the North Carolina Public Records Law and may be disclosed to third parties by an authorized state official.



RECEIVED
APR 27 2020
COMBINED RECORDS

**State of North Carolina**
**Post Release Supervision and Parole Commission**
2020 Yonkers Road,
4222 MSC
Raleigh, NC 27699-4222
Telephone (919) 716-3010
Fax (919) 324-6254

ROY COOPER
GOVERNOR

WILLIS J. FOWLER
CHAIRMAN

COMMISSIONERS
GRAHAM H. ATKINSON
ERIC A. MONTGOMERY
ANGELA BRYANT

April 27, 2020

Ben Finholt
Director, Just Sentencing Project
NC Prisoner Legal Services
PO Box 25397
Raleigh, NC 27611

Re: Brett A. Abrams 0000400

Dear Mr. Finholt:

We have received your April 20, 2020 written request to obtain the parole records of Brett Abrams 0000400. Please be advised that the Post-Release Supervision and Parole Commission would need a court order or subpoena to release the parole records of Mr. Abrams to you. The Commission and its legal representatives may also negotiate a protective order before releasing confidential parole case records which are namely psychological evaluations/assessments and victim information. Some of the information that you are requesting such as prison visitation history, prison custody level history, prison programs completed (educational, substance abuse, vocational, behavioral), prison job history, and gang membership/programs, are the prison records of this inmate and would not be provided by the Post-Release Supervision and Parole Commission. You should contact Combined Records Director Sarah Llaguno to see if the type of prison information you are seeking would be available in the Combined Records file.

Sincerely,

Joy Smith
Senior Parole Case Analyst

**NORTH CAROLINA PRISONER LEGAL SERVICES, INC.**
Post Office Box 25397
Raleigh, North Carolina 27611
(919) 856-2200
Facsimile Transmission (919) 856-2223



## CONFIDENTIAL LEGAL MAIL

April 20, 2020

Ms. Joy Smith
Juvenile Parole Case Analyst
NC Post-Release Supervision and Parole Commission
4222 Mail Service Center
Raleigh N.C. 27699-4222

NCPLS File #: 11-0104760

Dear Ms. Smith:

My firm represents Brett Abrams, OPUS #0000400, in his upcoming parole hearing. As his attorney, I am requesting Mr. Abrams' complete file as gathered by the Commission. My request includes, but is not limited to, the following documents:

1. The Official Crime Version
2. Any psychological or psychiatric evaluations, interviews, or testing completed or received by the Commission
3. The names of the psychological tests or evaluation tools used by Commission staff to complete psychological testing
4. Any parole case analyst reports completed by Commission staff
5. Any information the Commission possesses regarding my client's time in DPS custody, including:
   a. Educational programs completed
   b. Drug, alcohol, or chemical dependency treatment completed
   c. Training or vocational programs completed
   d. Behavioral programs completed
   e. Gang repudiation programs completed
   f. Custody level history
   g. Visitation history
   h. Job history over the preceding 36 years.
   i. Home plan

I appreciate your attention to this matter and your assistance as I prepare for this legal matter. Please do not hesitate to contact me with any questions.

Sincerely,

Ben Finholt
Director, Just Sentencing Project

APR 22 '20 PM 2:11

## AUTHORIZATION FOR RELEASE OF CONFIDENTIAL INFORMATION

My name: Brett Evans

My OPUS Number: 0090400

My birthday: 9/_/1968 ~~~~ Sept 1st

Social Security number: 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

I hereby authorize and instruct _____ Orange Correctional Center _____ to release any and all information and records in your files or that any employee or agent of your agency or business may have as described below to the Juvenile Parole Process. This information shall include any and all information and records in your custody pertaining to me in each of the following categories:

( ✓ ) Incarceration, pretrial detention and criminal record including but not limited to records pertaining to custody, classification, intake, testing, evaluation, discipline, presentencing, sentencing, time credits, probation, parole, education, medical, mental health, job assignment, drug and alcohol treatment and/or programs, transfers between institutions and/or to court, prior incarcerations, juvenile proceedings, cell assignments, visiting logs, prior convictions, incident reports, police records, and any and all records, correspondence, documents or materials of any kind whatsoever you may have relating to my incarceration, pretrial detention, criminal record and/or personal history.

( ✓ ) Medical and/or mental health records including but not limited to physician, psychotherapy and nursing notes, prescriptions, medications, test results, evaluations, reports, discharge summaries, and any and all records, correspondence, documents or materials of any kind whatsoever you may have relating to my medical and/or mental health and/or personal history.

( ✓ ) Educational records including but not limited to grades, teachers' notes, psychologist and/or social work notes, special education and IEP records, test results, evaluations, diagnoses, recommendations, and any and all records, correspondence, documents or materials of any kind whatsoever you may have relating to my education and/or personal history.

( ✓ ) Employment records including but not limited to application for employment, performance appraisals, salary and salary increases, reprimands, warnings, drug or alcohol screens, nursing or medical notes, test results, or evaluations, diagnoses, recommendations, and any and all records, correspondence, documents or materials of any kind whatsoever you may have relating to my employment and/or personal history.

( ✓ ) Any and all records, correspondence, documents or materials of any kind whatsoever you may have relating to me.

Your Signature: Brett Evans    Date: 3/6/20

**PLEASE RETURN TO:**
Juvenile Parole Project
c/o Jessica Garcia
P.O. Box 25397
Raleigh, NC 27611

**NORTH CAROLINA PRISONER LEGAL SERVICES, INC.**
POST OFFICE BOX 25397
RALEIGH, NORTH CAROLINA 27611

NEOPOST          FIRST-CLASS MAIL
04/20/2020
US POSTAGE $000.50⁰


ZIP 27604
041M11451893

Joy Smith
NC Post-Release Supervision and Parole
Commission
4222 Mail Service Center
Raleigh, NC 27699-422

File No. _83 CRS 10721_

Film No. _____



STATE VERSUS

Defendant _BRETT ALLEN ABRAMS_

**TRANSCRIPT OF PLEA**

G.S. 15A-1022

The defendant, having offered a plea of _Guilty_ and being first duly sworn, makes the following answers to the questions set out below:

**Answers**

1. Are you able to hear and understand me? — _Yes_

2. Do you understand that you have the right to remain silent and that any statement you make may be used against you? — _Yes_

3. Are you now under the influence of alcohol, drugs, narcotics, medicines, pills, or any other intoxicants? — _No_
   (a) When was the last time you used or consumed any such substance? — _last night_

4. Have you discussed your case fully with your lawyer and are you satisfied with his legal services? — _Yes_

5. Do you understand that you are pleading (guilty) ~~(no contest)~~ to the felonies of _____
   _SECOND DEGREE MURDER_ — _Yes_
   ~~misdemeanors~~ of _____
   _____ ? — _____

6. Have the charges been explained to you by your lawyer, and do you understand the nature of the charges, and do you understand every element of each charge? — _Yes_

7. Do you understand that upon your plea you could be imprisoned for a possible maximum sentence of _life imprisonment_ months (and that the mandatory minimum sentence is ____ years ____ months)? — _Yes_

8. Do you understand that you have the right to plead not guilty and be tried by a jury and at such trial to be confronted with and to cross-examine the witnesses against you, and by this plea you give up these and your other constitutional rights relating to trial by jury? — _Yes_

9. Do you now personally plead (guilty) ~~(no contest)~~? — _Yes_

10. (a) [If applicable] Are you in fact guilty? — _Yes_
    (b) [If applicable] Do you understand that upon your plea of no contest you will be treated as being guilty whether or not you admit your guilt? — _X_

11. Have you agreed to plead as a part of a plea arrangement? Before you answer, I advise you that the Courts have approved plea negotiating, and if there is such, you may advise me truthfully without fear of incurring my disapproval. — _Yes_

12. [If applicable] The prosecutor and your lawyer have informed the Court that these are all the terms and conditions of your plea _That the defendant receive a sentence of life imprisonment in the State Prison, and that the Court I [shall] find that the defendant will receive and derive no benefit as a Committed Youthful Offender and that the sentence of life imprisonment shall be served as a regular offender and not as a Committed Youthful Offender_

    (a) Is this correct as being your full plea arrangement? — _Yes_
    (b) Do you now personally accept this arrangement? — _Yes_

**DEFENDANT'S EXHIBIT 5**
PENGAD 800-631-6989

AOC-CR-300

13. [Other than the plea arrangement between you and the prosecutor] has anyone made any promises or threatened you in any way to cause you to enter this plea?

**Answers**

~~Yes~~ No

14. Do you enter this plea of your own free will, understanding what you are doing?

*Yes*

15. Do you have any questions about what has just been said to you or about anything else connected with your case?

*No*

I am *15* years of age and have completed the *9* grade of school. (List any additional education, if applicable.)

I have read or have heard all of these questions and understand them. The answers shown are the ones I gave in open court and they are true and accurate. Neither my lawyer nor anyone else has told me to give false answers in order to have the Court accept my plea in this case. The conditions of the plea as stated on the reverse hereof, if any, are accurate.

*yes*

| SWORN AND SUBSCRIBED TO BEFORE ME | Date *5/21/84* |
|---|---|
| Date *May 21, 1984* <br> Signature of Deputy of Assistant Clerk of Superior Court *Brenda L Lewis* | Signature of Defendant <br> *Brett Allen Abrams* |

## CERTIFICATION BY LAWYER FOR DEFENDANT

As lawyer for the defendant, *Brett Allen Abrams* I hereby certify that the conditions stated on the reverse hereof, if any, upon which the defendant's plea was entered are correct and they are agreed to by the defendant and myself upon which the defendant's plea was entered. I further certify that I have fully explained to the defendant the nature and elements of the charges to which he is pleading.

| Date *5/21/84* | Signature of Attorney for Defendant |
|---|---|

## CERTIFICATION BY PROSECUTOR

As prosecutor for the *22* Judicial District, I hereby certify that the conditions stated on the reverse hereof, if any, are the terms agreed to by the defendant and his lawyer and myself for the entry of the plea by the defendant to the charge in this case.

| Date *5/21/84* | Signature of Prosecutor |
|---|---|

## PLEA ADJUDICATION

Upon consideration of the record proper, evidence presented, answers of defendant, and statements of the lawyer for the defendant and the prosecutor, the undersigned finds:
1. That there is a factual basis for the entry of the plea.
2. That the defendant is satisfied with his lawyer.
3. That the defendant is competent to stand trial and that the plea is the informed choice of the defendant and is made freely, voluntarily and understandingly.

The defendant's plea is hereby accepted by the Court and is ordered recorded.

| Date *5/21/84* | Signature of Presiding Judge *Kew Acker* |
|---|---|

STATE OF NORTH CAROLINA

COUNTY OF IREDELL

F I L E D
IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
MAY 22  3 53 PM '64  FILE NO. 83CRs 10721

IREDELL COUNTY,
C.S.C.
BY _____

STATE OF NORTH CAROLINA )
                              )
                              )
        VS              )                ORDER
                              )
                              )
BRETT ALLEN ABRAMS      )

    The defendant, Brett Allen Abrams, having entered a plea of
Guilty of Second Degree Murder, pursuant to a bargain with the
State of North Carolina as to the sentence which he will receive,
this Court makes no findings in Aggravation or Mitigation.  Pursuant
to the sentence bargain entered into between the State of North
Carolina and the defendant through his counsel, it is the judgment
of this Court that Brett Allen Abrams be imprisoned in the custody
of the North Carolina Department of Corrections for the remainder
of his natural life.  The Court finds that he will not benefit
from confinement upon a commitment as a Committed Youthful Offender.

    The Court having heard the evidence and having reviewed the
exhibits in this case, recommends that Brett Allen Abrams not be
paroled at any future date and that he be required to remain
incarcerated for the remainder of his natural life.

    In the event the Parole Commission of the State of North
Carolina disregards this recommendation, it is further recommended
by this Court that the Parole Commission not, in any event, consider
Brett Allen Abrams for parole at any date earlier than a date
Twenty (20) years from this date in keeping with the requirements
of G. S. 15A-1371 (a1) which says a person serving a term of life
imprisonment with no minimum term is eligible for parole after
serving Twenty (20) years.

    Upon request of the defendant's counsel without objection
from the State, this Court recommends to the Department of Corrections
that it provide to Brett Allen Abrams any and all psychological
and psychiatric counseling and treatment which it now has available
or which may become available to the Department of Corrections
during the term of Mr. Abrams' incarceration.

The Court recommends that if and when the North Carolina
Parole Commission considers Mr. Abrams for parole that it not
grant any privilege of parole until it is satisfied as a body
beyond a reasonable doublt that he has been cured of the emotional
and mental disorders which prompt him to act with violence toward
other human beings and not parole him until they are satisfied
beyond a reasonable doubt that he will not present any threat
or danger to another living human being.


This the 22nd day of May , 1984.

_____

RUSSELL G. WALKER, JR.
SUPERIOR COURT JUDGE

# STATE OF NORTH CAROLINA

In The General Court of Justice

☐ District    ☒ Superior Court Division

| | | |
|---|---|---|
| File No. | | 83CRS 10721 |

_____Iredell_____ County   ____Statesville____ Seat of Court (if applicable)

Film No.

## STATE VERSUS

**Defendant**
Brett Allen Abrams

| Race | Sex | Age |
|---|---|---|
| White | Male | 15 Years |

**Attorney for State**
Mr. H. W. Zimmerman, Jr

☐ Def. found not indigent
☐ Def. Waived attorney

## JUDGMENT AND COMMITMENT

☐ Misdemeanor
☒ Fair Sentencing Act Felony
☐ Pre-Fair Sentencing Act Felony

**Attorney for Defendant**
Ed Pressly    ☒ Retained
E. Edward Vogler, Jr.    ☒ Appointed

In open court the defendant appeared for trial on the following File No(s), and Charge(s) (include dates of offenses):

83CRS 10721-First Degree Murder-July 11, 1983

The defendant   ☒ pled guilty to:   ☐ was found guilty by a jury of:   ☐ was found guilty by the court of:   ☐ pled no contest to:

| Offense(s) | G.S. No. | Felony/Misd. | Felony Class | Maximum Prison Term Allowed by Law | Presumptive Term |
|---|---|---|---|---|---|
| Second Degree Murder | 14-17 | FEL. | C | LIFE OR UP TO 50 YEARS | 15 Yrs. |

The above listed offenses are consolidated for the purpose of judgment.

The Court having considered evidence, arguments of counsel, and statement of the defendant ORDERS AND ADJUDGES that the defendant be imprisoned

| For a term of: | in the custody of the |
|---|---|
| REMAINDER OF HIS NATURAL LIFE | ☒ N.C. Dept. of Correction<br>☐ Sheriff of _____ County |

NOTE: For Fair Sentencing Act Felonies, Judge may not impose a minimum and maximum prison term.

☐ The sentence imposed above shall begin at the expiration of all of sentences which the defendant is presently obligated to serve.

☐ The sentence imposed above shall begin at the expiration of the sentence imposed in the case referenced below:

Case number, county & court in which prior sentence imposed, date sentence imposed.

*(check all that apply)*

☐ The defendant shall serve as a committed youthful offender (CYO) pursuant to G.S. Chapter 148 Article 3B.

☒ The defendant should not obtain the benefit of release under G.S. 148-49.15.

☒ The defendant shall be given credit for __312__ days spent in confinement prior to the date of this judgment.

☐ The defendant shall pay the costs.    ☐ The defendant shall pay a fine of $_____.

☐ Work release is recommended.    ☐ Immediate work release is recommended.

☐ The Court does not recommend restitution or reparation as a condition of attaining work release or parole (*this condition of parole is not applicable to Fair Sentencing Act Felonies.*)

☐ The Court recommends that as a condition of attaining work release or parole (*this condition of parole is not applicable to Fair Sentencing Act Felonies.*), the defendant pay restitution as provided below.

☐ The Court recommends that the defendant be required to pay from his work release earnings restitution as provided below.

☐ Restitution is to be paid to the Clerk of Superior Court to be disbursed as follows:

| Fine $ | Costs $ | Reimbursement for Attorneys Fee $ | Restitution $ | Total Amount $ |
|---|---|---|---|---|
| | | | | |

Name and Addresses of persons to receive restitution

Case 5:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 113 of 210

AOC-CR-301    *Material opposite unmarked squares is to be disregarded as surplusage.*

The Court further recommends:

SEE ATTACHED ORDER ENTERED THIS DATE BY JUDGE RUSSELL G. WALKER, JR.
SUPERIOR COURT JUDGE

*For Use With Fair Sentencing Act Felonies Only*

The Court has considered the aggravating and mitigating factors in G.S. 15A-1340.4(a) and;

☒ makes no written findings because the prison term imposed is pursuant to **a plea arrangement as to sentence** under Article 58 of G.S. Chapter 15A.

☐ makes no written findings because the prison term imposed does not require such findings.

☐ makes written findings set forth on the Findings of Factors in Aggravation and Mitigation of Punishment (AOC-CR-303)

**Defendant's Counsel Fee**

A Fee (including expenses) of $ _____ was awarded the defendant's counsel or public defender at a hearing in open court at which the defendant was present.

**Order of Commitment**

It is FURTHER ORDERED that the Clerk deliver three certified copies of this Judgment and Commitment to the Sheriff or other qualified officer and that the officer cause the defendant to be delivered with these copies of the judgment to the custody of the agency named on the reverse to serve the sentence imposed or until he shall have complied with the conditions for release pending appeal.

| Date | Name of Presiding Judge | Signature of Presiding Judge |
|------|-------------------------|------------------------------|
| 5/22/84 | RUSSELL G. WALKER, JR. | RGWALKER JR |

**Appeal Entries**

The defendant gives notice of appeal to the:

☐ N.C. Court of Appeals ☐ N.C. Supreme Court. The defendant is allowed _____ days to serve proposed record on appeal, and the State is allowed _____ days after such service to serve objections or proposed alternative record on appeal. Release of defendant pursuant to G.S. 15A-536 is _____

| Date | Name of Presiding Judge | Signature of Presiding Judge |
|------|-------------------------|------------------------------|
| | | |

**Order of Commitment after Appellate Determination**

| Date withdrawal of appeal per G.S. 15A-1450 filed | Date Appellate Court Opinion finding no error filed. |
|---|---|

It is ORDERED that the Judgment herein be executed. It is further ORDERED that if there be need, the Sheriff arrest and recommit the defendant to the custody of the official named in the Judgment and furnish that official two certified copies of this Judgment and this Order as authority for the commitment and detention of the defendant.

| Date | Signature of Clerk of Superior Clerk |
|------|--------------------------------------|
| | ☐ Deputy ☐ Assistant ☐ Clerk of Superior Court |

**Certification**

I certify that this Judgment and Commitment ☐ and attached Findings of Factors in Aggravation and Mitigation of Punishment (AOC-CR 303) is a true and complete copy of the original which is on file in this case.

| Date of Certification | Date Certified Copies Delivered to Sheriff | Signature and Seal |
|-----------------------|--------------------------------------------|--------------------|
| 5-22-84 | 5-22-84 | Rachel D. Grant |
| | | ☒ Deputy ☐ Assistant ☐ Clerk of Superior Court |

Scotland _____ County

File No ____

**85 CRS 4084**

File No

85-15-423

| STATE VERSUS | |
| --- | --- |

Defendant
**Jerome Murphy**

| Date of Offense | Offense in Violation of G.S. |
| --- | --- |
| 7-9-85 | 14-51;14-72(b)(2); 14-72(c) |

**INDICTMENT**

**I. FIRST DEGREE BURGLARY**

~~II. FELONIOUS BREAKING~~

~~III. FELONIOUS POSSESSION OF STOLEN GOODS~~

I. The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously during the nighttime about the hour of 2:00 **am** & 12:30 **am** did break and enter the dwelling house of **Ethel S. Maske**

located at _____ **626 Carl Drive, Laurinburg, North Carolina**

At the time of the breaking and entering the dwelling house was actually occupied by _____ **Ethel S. Maske**

The defendant broke and entered the dwelling house with the intent to commit a felony therein: larceny **and rape**

~~II. And the jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did steal, take and carry away~~

~~the personal property of ____~~
~~having a value of -------- dollars, pursuant to the commission of first degree burglary described in Count I above.~~
~~III. And the jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully and feloniously did possess the personal property described in Count II above, being the personal property of the person, corporation, and other legal entity described in Count II above, and having the value described in Count II above, knowing and having reasonable grounds to believe the property to have been feloniously stolen and taken pursuant to the first degree burglary described in Count I above.~~

*(signature)*

| WITNESSES | |
| --- | --- |
| ☐ Jack Poe | ☐ |
| ☑ Lawrence Smith | ☐ |
| ☑ Bill Siler | ☐ |
| ☐ | ☐ |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing testimony, this bill was found to ____

☑ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

Date
**November 1, 1985**

Foreman of Grand Jury Foreman

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989



STATE OF NORTH CAROLINA

COUNTY OF SCOTLAND

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

File # 85-CRS-4084

STATE OF NORTH CAROLINA )
                         )
VS                       )          JURY VERDICT
                         )
JEROME MURPHY            )

WE, the twelve members of the Jury, unanimously find the defendant
to be:

1. ___✓___ Guilty of first degree burglary.

                    OR

2. _____ Guilty of second degree burglary.

                    OR

3. _____ Guilty of breaking and entering.

                    OR

4. _____ Not Guilty.

This the _29_ day of October, 1986.

                                    W. D. Chapman
                                    Foreperson

| | |
|---|---|
| **STATE OF NORTH CAROLINA** | File No. |
| In the General Court of Justice | 85 CRS 4085 |
| Superior Court Division | |

Scotland ———————————— County

Film No.

85-15-425

| STATE VERSUS | **INDICTMENT** |
|---|---|
| Defendant **Jerome Murphy** | **RAPE** |
| Date of Offense 7-9-85 | Offense in Violation of G.S. 14-27.2(a)(2); 14-27.3(a)(1) |

**INDICTMENT
RAPE
(FEMALE VICTIM)**

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did ravish and carnally know ———————————

Ethel S. Maske ——————————————————————, a female person, by force and against her will.

[*Note: This indictment is sufficient to charge both First and Second Degree Rape of a female person when force was used. G.S. 15-144.1(a); G.S. 15-155. A prosecutor who only intends to prosecute for Second Degree Rape may want "Second Degree" typed before "Rape" in the offense block.*
*This indictment is not sufficient to charge first degree rape of a child of the age of 12 years or less or second degree rape of a handicapped person. See G.S. 15-144.1 (b) and (c) to indict for these offenses.]*

Signature of Prosecutor

*[signature]*

**WITNESSES**

| | | | |
|---|---|---|---|
| ☐ | Jack Poe | ☐ | |
| ☑ | Lawrence Smith | ☐ | |
| ☑ | *Bill Siler* | ☐ | |
| ☐ | | ☐ | |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing testimony, this bill was found to be:

☑ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

Date **November 4, 1985**

Signature of Grand Jury Foreman *James P. M. Millan*

Case 1:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 117 of 210

# STATE OF NORTH CAROLINA

85-CRS-4084

Scotland County   Laurinburg   Seat of Court

In The General Court of Justice
☐ District   ☒ Superior Court Division

(Note: This form is not to be used for multiple offenses unless they are consolidated for judgment.)

## STATE VERSUS

**Defendant**
Jerome Murphy

## JUDGMENT AND COMMITMENT

| Race | Sex | DOB | |
|------|-----|-----|--|
| B | M | 5-16-62 | ☐ Pre-FSA Felony |

**Attorney for State**
Allen Webster

☐ Def. found not indigent   ☐ Def. waived attorney

**Attorney for Defendant**
Kenneth Etheridge

☒ Appointed   ☐ Retained

☐ DWI Offense   Level of Punishment (G.S. 20-179)   Driver's License No. (DWI only)   State (DWI only)

The defendant   ☐ pled guilty to;   ☐ was found guilty by the Court of;   ☒ was found guilty by a jury of;   ☐ pled no contest to:

| Fee No.(s) and Offense(s) | Date of Offense | G.S. No. | Felony/Misd | Class | Max Term | Presumptive |
|---------------------------|-----------------|----------|-------------|-------|----------|-------------|
| First Degree Burglary | 7-9-85 | 14-51 | Fel. | C | Life | 15 Year |

The above offenses are consolidated for the purpose of judgment.
The Court having considered evidence, arguments of counsel, and statement of the defendant ORDERS that the defendant be imprisoned

for a term of
**Life Imprisonment**

in the custody of the
☒ N.C. Dept. of Correction
☐ Sheriff of _____ County

The defendant shall be given credit against this sentence for **467** days spent in confinement prior to the date of this Judgment

*NOTE: For Fair Sentencing Act Felonies, Judge must impose a single prison term and may not impose a minimum and maximum prison term. In impaired driving cases, Judge must impose a minimum and a maximum prison term, and no credit may be given for the first 24 hrs. of confinement G.S. 20-179 (p)(1).*

☐ The sentence imposed above shall begin at the expiration of all sentences which the defendant is presently obligated to serve.
☐ The sentence imposed above shall begin at the expiration of the sentence imposed in the case referenced below.

Case number, date, county & court in which prior sentence imposed

(check all that apply)

☐ The defendant shall serve as a committed youthful offender (CYO) pursuant to G.S. Chapter 148, Article 3B

☐ The defendant should not obtain the benefit of release under G.S. 148-49.15

☐ The defendant shall pay the costs

☐ The defendant shall pay a fine of $ _____

☐ Work release is recommended

☐ Immediate work release is recommended

☐ The Court does not recommend restitution or reparation as a condition of attaining work release or parole

☐ The Court recommends that as a condition of attaining work release or parole the defendant pay restitution to the Clerk of Superior Court for the aggrieved party (parties) in the amount set out below

☐ The Court recommends that if work release or parole is granted the defendant be required to pay to the Clerk of Superior Court from his earnings the items and amounts set out below

| Fine | Costs | Reimbursement for Counsel fee(s) and other expenses | Restitution | Total Amount Due |
|------|-------|-----------------------------------------------------|-------------|------------------|
| $ | $ | $ | $ | $ |

Names and address(es) of aggrieved party (parties) to receive restitution

Case 5:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 118 of 210

# STATE OF NORTH CAROLINA

_____Scotland_____ County

In the General Court of Justice
Superior Court Division

File No. 85-CRS-4084

Form No.

### STATE VERSUS

Defendant

Jerome Murphy

## FELONY JUDGMENT
## FINDINGS OF FACTORS IN AGGRAVATION
## AND MITIGATION OF PUNISHMENT

(G.S. 15A-1340-4(a))

_Note: Separate findings of aggravating factors and mitigating factors should be made for each offense._

### Aggravating Factors

- [ ] 1. The defendant induced others to participate in the commission of the offense
- [ ] 2. The defendant occupied a position of leadership or dominance of other participants in the commission of the offense
- [ ] 3. The offense was committed for the purpose of avoiding or preventing a lawful arrest
- [ ] 4. The offense was committed for the purpose of effecting an escape from custody
- [ ] 5. The defendant was hired to commit the offense
- [ ] 6. The defendant was paid to commit the offense
- [ ] 7. The offense was committed to disrupt the lawful exercise of a governmental function or the enforcement of laws
- [ ] 8. The offense was committed to hinder the lawful exercise of a governmental function or the enforcement of laws
- [ ] 9. The offense was committed against a present or former: law enforcement officer, employee of the Department of Correction, jailer, fireman, emergency medical technician, ambulance attendant, justice or judge, clerk or assistant or deputy clerk of court, magistrate, prosecutor, juror, or witness against the defendant, while engaged in the performance of his official duties or because of the exercise of his official duties _(Note: Strike words that are not applicable.)_

- [ ] 10. The offense was especially heinous, atrocious or cruel
- [ ] 11. The defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person

- [ ] 12. The defendant held public office at the time of the offense and the offense related to the conduct of the office
- [ ] 13. The defendant was armed with a deadly weapon at the time of the crime
- [ ] 14. The defendant used a deadly weapon at the time of the crime
- [ ] 15. The victim was very young
- [ ] 16. The victim was very old
- [ ] 17. The victim was mentally infirm
- [ ] 18. The victim was physically infirm
- [ ] 19. The defendant committed the offense while on pretrial release on another felony charge
- [ ] 20. The defendant involved a person under the age of 16 in the commission of the crime
- [ ] 21. The offense involved an attempted taking of property of great monetary value
- [ ] 22. The offense involved the actual taking of property of great monetary value
- [ ] 23. The offense involved damage causing great monetary loss
- [ ] 24. The offense involved an unusually large quantity of contraband
- [ ] 25. The defendant took advantage of a position of trust or confidence to commit the offense
- [x] 26. The defendant has a prior conviction or convictions for criminal offenses punishable by more than 60 days' confinement
- [ ] 27. Additional written findings of factors in aggravation

- [ ] The Court makes no findings of any aggravating factors

AOC-CR-303
Rev 10-83

Material opposite unmarked squares is to be disregarded as surplusage

## Mitigating Factors

- [ ] 1  The defendant has no record of criminal convictions
- [ ] 2  The defendant has a record of criminal convictions consisting solely of misdemeanors punishable by not more than 60 days imprisonment
- [ ] 3  The defendant committed the offense under duress which was insufficient to constitute a defense but significantly reduced his culpability
- [ ] 4.  The defendant committed the offense under coercion which was insufficient to constitute a defense but significantly reduced his culpability
- [ ] 5.  The defendant committed the offense under threat which was insufficient to constitute a defense but significantly reduced his culpability
- [ ] 6  The defendant committed the offense under compulsion which was insufficient to constitute a defense but significantly reduced his culpability
- [ ] 7.  The defendant was a passive participant in the commission of the offense.
- [ ] 8.  The defendant played a minor role in the commission of the offense
- [ ] 9  The defendant was suffering from a mental condition that was insufficient to constitute a defense by significantly reduced his culpability for the offense
- [ ] 10  The defendant was suffering from a physical condition that was insufficient to constitute a defense but significantly reduced his culpability for the offense
- [ ] 11  The defendant's immaturity at the time of the commission of the offense significantly reduced his culpability for the offense
- [ ] 12  The defendant's limited mental capacity at the time of the commission of the offense significantly reduced his culpability for the offense
- [ ] 13  The defendant has made substantial restitution to the victim
- [ ] 14  The defendant has made full restitution to the victim
- [ ] 15  The victim was more than 16 years of age and was a voluntary participant in the defendant's conduct
- [ ] 16  The victim was more than 16 years of age and consented to the defendant's conduct
- [ ] 17.  The defendant aided in the apprehension of another felon
- [ ] 18  The defendant testified truthfully on behalf of the prosecution in another prosecution of a felony
- [ ] 19  The defendant acted under strong provocation
- [ ] 20  The relationship between the defendant and the victim was an extenuating circumstance
- [ ] 21  The defendant could not reasonably foresee that his conduct would cause or threaten serious bodily harm or fear
- [ ] 22.  The defendant exercised caution to avoid serious bodily harm or fear to other persons
- [ ] 23  The defendant reasonably believed that his conduct was legal
- [ ] 24.  Prior to arrest, the defendant voluntarily acknowledged wrong-doing in connection with the offense to a law enforcement officer
- [ ] 25.  At an early stage of the criminal process, the defendant voluntarily acknowledged wrong-doing in connection with the offense to a law enforcement officer
- [ ] 26.  The defendant has been honorably discharged from the United States armed services
- [ ] 27  The defendant has been a person of good character or has had a good reputation in the community in which he lives
- [ ] 28  The defendant is a minor and has reliable supervision available.
- [ ] 29  Additional Written Findings of Factors in Mitigation.

[X]  The Court makes no findings of any mitigating factors.

---

The Court, after considering the evidence and arguments presented at the trial and sentencing hearing, finds that the factors marked above were proven by a preponderance of the evidence and that the

[✓] factors in aggravation outweigh the factors in mitigation.
[ ] factors in mitigation outweigh the factors in aggravation.

| | Name of Presiding Judge | Signature of Presiding Judge |
|---|---|---|
| -29-86 | Wiley F. Bowen | *Wiley F. Bowen* |

AOC-CR-303
10-83

Material opposite unmarked squares is to be disregarded as surplusage.



# North Carolina Department Of Public Safety
## Offender Public Information

### View Offender



**Back To Search Results**

---

**Offender Information**



### JEROME MURPHY

**Offender Number:** 0296909
**Inmate Status:** ACTIVE
**Gender:** MALE
**Race:** BLACK/AFRICAN AMERICAN
**Ethnic Group:** NOT HISPANIC/LATINO
**Birth Date:** 05/17/1962
**Age:** 60
**Current Location:** LUMBERTON CI

**Printable Version**

---

**Name(s) Of Record**

| Last Name | Suffix | First Name | Middle Name | Name Type |
|-----------|--------|------------|-------------|-----------|
| MURPHY | | JEROME | | COMMITTED |

---

**Most Recent Incarceration Summary**

| | |
|---|---|
| **Incarceration Status:** ACTIVE | **Total Incarceration Term:** LIFE |
| **Conviction Date:** 10/29/1986 | **Projected Release Date:** LIFE |
| **Primary Crime:** BURGLARY 1ST DEGREE (PRINCIPAL) | **Primary Crime Type:** FELON |
| **Special Characteristics:** LIFE | **Current Status:** FELON |
| **Admission Date:** 10/29/1986 | **Admitting Location:** CENTRAL PRISON |
| **Control Status:** REGULAR POPULATION | **Next Control Review:** UNKNOWN |
| **Custody Classification:** MEDIUM | **Next Custody Review:** UNKNOWN |
| **Number Of Infractions:** 167   **View Infractions** | **Last Infraction Date:** 11/27/2021 |
| **Current Location:** LUMBERTON CI | **Previous Location:** NOT PUBLIC INFORMATION |
| **Last Movement :** NOT PUBLIC INFORMATION | **Last Movement Date:** 06/14/2022 |

**Escapes?:** Y

---

**Offender Sentence History**

**Most Recent Period of Incarceration Record**



DEFENDANT'S
EXHIBIT

Sentence Number: BA-001
Commitment Type: INMATE
Conviction Date: 10/29/1986
County Of Conviction: SCOTLAND
Service Status: ACTIVE
Sentence Begin Date: 10/29/1986
Sentence Status: ACTIVE
Actual Release Date:
Punishment Type: FAIR FELONS
Projected Release Date: LIFE
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Sentence Type 2: LIFE SENTENCE
Minimum Term:
Maximum Term: LIFE

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|------------|---------|---------------------|--------------|------|-------------------------------|
| INITIAL | | 85004084 BURGLARY 1ST DEGREE (PRINCIPAL) | 07/09/1985 | FELON | CLASS C |

### Previous Period of Incarceration Record

Sentence Number: AC-001
Commitment Type: INMATE
Conviction Date: 11/12/1981
County Of Conviction: SCOTLAND
Service Status: EXPIRED
Sentence Begin Date: 11/12/1981
Actual Release Date: 02/20/1985
Punishment Type: FAIR MISDEMEAN
Projected Release Date: 02/20/1985
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Minimum Term: 18 MONTHS
Maximum Term: 18 MONTHS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|------------|---------|---------------------|--------------|------|-------------------------------|
| INITIAL | | 81006295 WRONGFUL B & E (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |

Sentence Number: AC-002
Commitment Type: INMATE
Conviction Date: 11/04/1981
County Of Conviction: SCOTLAND
Service Status: EXPIRED
Sentence Begin Date:
Actual Release Date: 02/20/1985
Punishment Type: FAIR MISDEMEAN
Projected Release Date: 02/20/1985
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Minimum Term:
Maximum Term: 6 MONTHS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|------------|---------|---------------------|--------------|------|-------------------------------|
| CONCURRENT TO SENTENCE NUMBER AC-001 | | 81005443 SHOPLIFTING (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |

Sentence Number: AC-003
Commitment Type: INMATE
Conviction Date: 11/04/1981
County Of Conviction: SCOTLAND
Service Status: EXPIRED
Sentence Begin Date:
Actual Release Date: 02/20/1985
Punishment Type: FAIR MISDEMEAN
Projected Release Date: 02/20/1985
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Minimum Term:
Maximum Term: 3 MONTHS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty |
|------------|---------|---------------------|--------------|------|--------------------|

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER AC-002 | 81006296 | RESISTING OFFICER (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |

Sentence Number: AC-004  
Conviction Date: 06/21/1982  
Service Status: EXPIRED  

Commitment Type: INMATE  
County Of Conviction: ROBESON  
Sentence Begin Date: 02/13/1983  
Actual Release Date: 02/20/1985  
Projected Release Date: 02/20/1985  

Punishment Type: FAIR MISDEMEAN  
Sentence Type 1: DEPT OF CORR DIV OF PRISONS  
Minimum Term:  
Maximum Term: 6 MONTHS  

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER AC-001 | 82009424 | ESCAPE PRISON (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |

Sentence Number: AC-005  
Conviction Date: 12/10/1982  
Service Status: EXPIRED  

Commitment Type: INMATE  
County Of Conviction: ROBESON  
Sentence Begin Date: 07/03/1983  
Actual Release Date: 02/20/1985  
Projected Release Date: 02/20/1985  

Punishment Type: FAIR FELONS  
Sentence Type 1: DEPT OF CORR DIV OF PRISONS  
Minimum Term:  
Maximum Term: 3 YEARS  

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER AC-004 | 82010202 | FELONY B&E (PRINCIPAL) | | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 00000000 | LARCENY (OVER $200) (PRINCIPAL) | | | |

| Previous Period of Incarceration Record |
|---|

Sentence Number: AB-001  
Conviction Date: 11/29/1979  
Service Status: EXPIRED  

Commitment Type: INMATE  
County Of Conviction: SCOTLAND  
Sentence Begin Date: 11/30/1979  
Actual Release Date: 03/17/1981  
Projected Release Date: 03/17/1981  

Punishment Type: PRE-FAIR  
Sentence Type 1: DEPT OF CORR DIV OF PRISONS  
Sentence Type 2: COMMITTED YOUTHFUL OFFENDER  
Minimum Term:  
Maximum Term: 24 MONTHS  

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 79006079 | LARCENY (OVER $200) (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |
| CONSOLIDATED FOR JUDGMENT | 00000000 | DAMAGE TO PROPERTY (PRINCIPAL) | | | |

## Previous Period of Incarceration Record

Sentence Number: AA-001
Conviction Date: 02/15/1979
Service Status: EXPIRED

Commitment Type: INMATE
County Of Conviction: SCOTLAND
Sentence Begin Date: 02/15/1979
Actual Release Date: 12/16/1979
Projected Release Date: 09/16/1979

Punishment Type: PRE-FAIR
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Sentence Type 2: COMMITTED YOUTHFUL OFFENDER
Minimum Term:

Maximum Term: 6 MONTHS 1 DAY

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 79000342 | DAMAGE TO PROPERTY (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |

Sentence Number: AA-002
Conviction Date: 01/24/1979
Service Status: EXPIRED

Commitment Type: INMATE
County Of Conviction: SCOTLAND
Sentence Begin Date: 01/24/1979
Actual Release Date: 12/16/1979
Projected Release Date: 09/16/1979

Punishment Type: PRE-FAIR
Sentence Type 1: DEPT OF CORR DIV OF PRISONS
Sentence Type 2: COMMITTED YOUTHFUL OFFENDER
Minimum Term:

Maximum Term: 12 MONTHS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER AA-001 | 78007762 | LARCENY OF MOTOR VEHICLE (PRINCIPAL) | | MISD. | MISD.(PRE-STRUCTURE) |



**Privacy Policy   Disclaimer   Contact Us   Help Using This Site**
© 2012 North Carolina Department Of Public Safety. All rights reserved.

 **Carolina Department Of Public Safety**
**Offender Public Information**

View Offender Sentence Component

| Offender Search | Escapes/Captures | Absconders | Inmate Releases | Downloads |  |

**Back To Offender Information**

**Offender Infractions**

Offender Number: 0296909   Offender Name: JEROME MURPHY

| Infraction Date | Infraction Type |
| --- | --- |
| 11/27/2021 | DISOBEY ORDER |
| 11/27/2021 | LOCK TAMPERING |
| 11/13/2019 | UNAUTHORIZED LEAVE |
| 11/23/2018 | SEXUAL ACT |
| 07/25/2018 | DISOBEY ORDER |
| 12/14/2015 | SELL/MISUSE MEDICATION |
| 06/07/2015 | SELL/MISUSE MEDICATION |
| 01/02/2015 | CREATE OFFENSIVE CONDITION |
| 01/02/2015 | DISOBEY ORDER |
| 01/02/2015 | PROFANE LANGUAGE |
| 06/17/2011 | DISOBEY ORDER |
| 06/17/2011 | PROFANE LANGUAGE |
| 06/15/2011 | ASSAULT STAFF W/WEAPON |
| 06/15/2011 | THREATEN TO HARM/INJURE STAFF |
| 06/15/2011 | DAMAGE STATE/ANOTHERS PROPERTY |
| 06/15/2011 | INTERFERE W/STAFF |
| 05/20/2011 | DISOBEY ORDER |
| 05/20/2011 | PROFANE LANGUAGE |
| 05/20/2011 | INTERFERE W/STAFF |
| 04/16/2011 | DISOBEY ORDER |
| 10/12/2010 | UNAUTHORIZED LEAVE |
| 10/12/2010 | DISOBEY ORDER |


DEFENDANT'S
EXHIBIT

| Date | Offense |
|---|---|
| 09/28/2010 | DISOBEY ORDER |
| 09/28/2010 | PROFANE LANGUAGE |
| 07/13/2010 | LOCK TAMPERING |
| 12/06/2009 | HIGH RISK ACT |
| 12/06/2009 | SEXUAL ACT |
| 11/30/2009 | ILLEGAL CLOTH/LINEN/SHEETS |
| 08/24/2009 | MISUSE/UNAUTH-USE PHONE/MAIL |
| 07/28/2009 | DISOBEY ORDER |
| 07/28/2009 | PROFANE LANGUAGE |
| 07/28/2009 | THREATEN TO HARM/INJURE STAFF |
| 03/06/2009 | PROFANE LANGUAGE |
| 02/04/2008 | WEAPON POSSESSION |
| 12/26/2007 | PROFANE LANGUAGE |
| 03/19/2007 | MISUSE MEDICINE |
| 01/18/2007 | THREATEN TO HARM/INJURE STAFF |
| 01/18/2007 | PROFANE LANGUAGE |
| 01/18/2007 | ATTEMPT CLASS A OFFENSE |
| 12/24/2006 | DAMAGE STATE/ANOTHERS PROPERTY |
| 11/30/2006 | DAMAGE STATE/ANOTHERS PROPERTY |
| 11/30/2006 | PROFANE LANGUAGE |
| 11/30/2006 | INTERFERE W/STAFF |
| 03/27/2006 | UNAUTHORIZED LEAVE |
| 02/02/2006 | PROFANE LANGUAGE |
| 07/05/2005 | FIGHTING |
| 07/05/2005 | SEXUAL ACT |
| 05/24/2005 | INTERFERE W/STAFF |
| 02/24/2005 | SEXUAL ACT |
| 06/08/2004 | PROFANE LANGUAGE |
| 01/15/2003 | SEXUAL ACT |
| 01/15/2003 | SUBSTANCE POSSESSION |
| 09/17/2002 | DISOBEY ORDER |
| 01/17/2002 | SUBSTANCE POSSESSION |
| 09/01/2001 | ILLEGAL CLOTH/LINEN/SHEETS |
| 09/01/2001 | NO THREAT CONTRABAND |
| 09/01/2001 | THEFT OF PROPERTY |
| 08/27/2001 | UNAUTHORIZED LOCATION |
| 05/12/2001 | UNAUTHORIZED LOCATION |
| 03/29/2001 | UNAUTHORIZED LEAVE |

| | |
|---|---|
| 03/29/2001 | PROFANE LANGUAGE |
| 09/04/2000 | FIGHTING |
| 09/04/2000 | DISOBEY ORDER |
| 08/22/2000 | DISOBEY ORDER |
| 06/29/2000 | PROFANE LANGUAGE |
| 01/08/2000 | PROFANE LANGUAGE |
| 12/15/1999 | VERBAL THREAT |
| 12/15/1999 | DISOBEY ORDER |
| 12/15/1999 | PROFANE LANGUAGE |
| 07/28/1999 | PROFANE LANGUAGE |
| 10/22/1998 | DISOBEY ORDER |
| 10/22/1998 | PROFANE LANGUAGE |
| 10/20/1998 | DISOBEY ORDER |
| 02/18/1998 | SELF INJURY |
| 02/18/1998 | DISOBEY ORDER |
| 02/18/1998 | NO THREAT CONTRABAND |
| 02/18/1998 | PROFANE LANGUAGE |
| 02/07/1998 | PROFANE LANGUAGE |
| 05/30/1997 | DISOBEY ORDER |
| 05/30/1997 | PROFANE LANGUAGE |
| 03/10/1997 | SELF INJURY |
| 09/01/1996 | SELF INJURY |
| 08/20/1996 | VERBAL THREAT |
| 07/14/1996 | SELF INJURY |
| 07/10/1996 | VERBAL THREAT |
| 07/10/1996 | PROFANE LANGUAGE |
| 07/09/1996 | PROFANE LANGUAGE |
| 01/15/1996 | VERBAL THREAT |
| 05/24/1995 | SELF INJURY |
| 05/23/1995 | SELF INJURY |
| 12/27/1994 | SELF INJURY |
| 12/25/1994 | VERBAL THREAT |
| 12/25/1994 | DISOBEY ORDER |
| 12/25/1994 | ATTEMPT CLASS A OFFENSE |
| 04/21/1994 | DISOBEY ORDER |
| 04/21/1994 | PROFANE LANGUAGE |
| 03/20/1994 | ATTEMPT CLASS B OFFENSE |
| 06/09/1993 | VERBAL THREAT |

| | |
|---|---|
| 06/06/1993 | SELF INJURY |
| 03/24/1993 | PROVOKE ASSAULT |
| 12/10/1992 | WEAPON POSSESSION |
| 12/07/1992 | DISOBEY ORDER |
| 11/04/1992 | VERBAL THREAT |
| 11/04/1992 | FLOOD CELL |
| 10/20/1992 | FLOOD CELL |
| 10/20/1992 | FLOOD CELL |
| 10/19/1992 | FLOOD CELL |
| 10/15/1992 | FLOOD CELL |
| 10/14/1992 | PROPERTY TAMPERING |
| 10/13/1992 | ATTEMPT CLASS B OFFENSE |
| 02/21/1992 | PROPERTY TAMPERING |
| 02/21/1992 | DISOBEY ORDER |
| 02/03/1992 | VERBAL THREAT |
| 02/01/1992 | VERBAL THREAT |
| 12/27/1991 | VERBAL THREAT |
| 08/21/1991 | ILLEGAL CLOTH/LINEN/SHEETS |
| 07/05/1991 | WEAPON POSSESSION |
| 06/26/1991 | PROVOKE ASSAULT |
| 06/26/1991 | PROVOKE ASSAULT |
| 06/21/1991 | PROPERTY TAMPERING |
| 06/20/1991 | FLOOD CELL |
| 06/08/1991 | DISOBEY ORDER |
| 06/08/1991 | SEXUAL ACT |
| 05/29/1991 | DISOBEY ORDER |
| 04/06/1991 | PROPERTY TAMPERING |
| 04/06/1991 | ATTEMPT CLASS B OFFENSE |
| 03/03/1991 | VERBAL THREAT |
| 01/17/1991 | PROVOKE ASSAULT |
| 01/16/1991 | VERBAL THREAT |
| 12/07/1990 | VERBAL THREAT |
| 11/27/1990 | VERBAL THREAT |
| 10/18/1990 | FLOOD CELL |
| 10/17/1990 | FLOOD CELL |
| 08/05/1990 | FLOOD CELL |
| 07/19/1990 | FLOOD CELL |
| 05/01/1990 | PROPERTY TAMPERING |

| | |
|---|---|
| 02/02/1990 | VERBAL THREAT |
| 06/20/1989 | ATTEMPT CLASS B OFFENSE |
| 06/18/1989 | PROFANE LANGUAGE |
| 06/04/1989 | DISOBEY ORDER |
| 05/25/1989 | PROPERTY TAMPERING |
| 05/25/1989 | WEAPON POSSESSION |
| 05/12/1989 | FLOOD CELL |
| 05/01/1989 | MISUSE MEDICINE |
| 04/22/1989 | PROFANE LANGUAGE |
| 04/04/1989 | FLOOD CELL |
| 03/21/1989 | DISOBEY ORDER |
| 03/06/1989 | PROFANE LANGUAGE |
| 12/13/1988 | PROPERTY TAMPERING |
| 10/12/1988 | FLOOD CELL |
| 10/09/1988 | DISOBEY ORDER |
| 08/24/1988 | THEFT OF PROPERTY |
| 06/17/1988 | PROFANE LANGUAGE |
| 04/30/1988 | DISOBEY ORDER |
| 04/12/1988 | PROPERTY TAMPERING |
| 01/22/1988 | SEXUAL ACT |
| 09/15/1987 | DISOBEY ORDER |
| 09/13/1987 | PROFANE LANGUAGE |
| 09/11/1987 | PROPERTY TAMPERING |
| 09/11/1987 | PROFANE LANGUAGE |
| 08/22/1987 | DISOBEY ORDER |
| 08/18/1987 | PROFANE LANGUAGE |
| 08/17/1987 | PROPERTY TAMPERING |
| 08/14/1987 | PROVOKE ASSAULT |
| 08/04/1987 | VERBAL THREAT |
| 04/22/1987 | PROFANE LANGUAGE |
| 01/10/1987 | VERBAL THREAT |



**Privacy Policy    Disclaimer    Contact Us    Help Using This Site**
© 2012 North Carolina Department Of Public Safety. All rights reserved.

STATE OF NORTH CAROLINA

COUNTY OF SCOTLAND

IN THE GENERAL COURT OF JUSTICE

SUPERIOR CRIMINAL DIVISION

FILE NO. 85 CRS 004084

STATE OF NORTH CAROLINA

VS

JEROME MURPHY
DEFENDANT/PETITIONER

ORDER OF

SUMMARY DISMISSAL ON

MOTION FOR APPROPRIATE RELIEF

**THIS MATTER** was heard upon a motion for appropriate relief filed on October 16, 2001, by defendant/petitioner, who is now confined in Johnston Correctional Center. The Court, having considered the allegations contained in the motion and the case file, finds a s a fact that the motion sets forth no probably grounds for the relief requested, either in law or in fact, (and further specifically finds)

THE COURT CONCLUDES that there are no probably grounds for relief, and IT IS THEREFORE ORDERED that

1.  The Motion is denied;

2.  The defendant/petitioner's failure to assert any other grounds in his motion shall be subject to being treated in the future as BAR to any other claims, assertions, petitions, or motions that he/she might hereafter file in this case, pursuant to G. S. 15A-1419;

3.  The clerk shall forward a copy of this order to the defendant/petitioner; the Secretary of Corrections, 214 W. Jones St., Raleigh, N. C. 27603-1337; and the District Attorney, Kristy Newton, Judicial District 16A.

This the 15th day of November, 2001.

Honorable B. Craig Ellis
Senior Resident Superior Court Judge

DEFENDANT'S
EXHIBIT

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF
COUNTY OF SCOTLAND                      JUSTICE.

2007 OCT 16 AM 11:47
SOTLAND COUNTY C.S.C.
BY _SUPERIOR COURT DIV.
FILE/NO._____

IN RE.
JEROME MURPHY,
PETITIONER
        .Vs.
THE STATE OF NORTH CAROLINA
AND THE SCOTLAND COUNTY
DISTRICT ATTORNEY OFFICE
RESPONDENT ET. ALs.

| PETITIONER
| MOTION AND
| BRIEF FOR A
| POST TRIAL
| CONVICTION.

To: THE OFFICE OF THE PRESIDING OR SENIOR
RESIDENT SUPERIOR COURT JUDGE OF THE
SCOTLAND COUNTY COURTHOUSE WITH GREETINGS.

NOW COME ONE THE UNDERSIGNED ALLEGED NAMED
PETITIONER JEROME MURPHY, IN THE SAID
NAMED COUNTY OF JOHNSTON ON AND ABOUT THE SAID
NAMED DATE OF _____ 200_ WHEREFORE TO THE
ALLEGED NAMED APPLICANT DOES FORMELY AND LAWFULLY
MOVED IN THIS HONORABLE COURT UPON THE INSURANCE
OF A PETITION FOR A POST-TRIAL CONVICTION
IN PURSUANT TO N.C. GENERAL STATUTES 15A-1415 AND

N.C. GENERAL STATUTES 15A-1411 And the Legal Jurisdiction of this Honorable Court Is Formerly Conferred on In 28 U.S.C.A. 2254 Which does give this Honorable Court the Authority to grant the Petitioner the Fundamental opportunity to Be Heard In this Habeas Corpus Proceeding In Latin which mean to produce the Body.

That fact and Evidence will firmly tend to showed that the Alleged Named Petitioner was Lawfully Brought to trial during the Alleged ________ term of the Scotland County Criminal Superior Court for the Criminal offense of 1st degree Burglary, ________ upon the Alleged Named Petitioner plea of guilty and was therefore sentenced to a term of Class C life term In the North Carolina Division of Prisons. That At times this Alleged Named Petitioner does says that he was also under the Legal Age of twenty one At which times he was formerly the under the fair sentencing Law of July 1st 1981 which was also In violation of N.C. General Statutes 148-49.1 In which he was a Committed Youthful offender And this Honorable Court did

3.

FORMERLY FAYLED TO SENTENCED THE ALLEGED NAMED PETITIONER JEROME MURPHY UNDER THE GUIDELYNES OF THE FAYL SENTENCYNG ACT OF JULY 1st 1981. WHICH WAS ALSO VIOLATION OF THE PETITIONER 5TH 6TH, 8TH AND 14TH AMINDMENTS. WHEN INFACT THE ALLEGED NAMED RESPONDENT KNEW INFACT THEY VIOLATED THE PETITIONER RIGHT UNDER THE LAW WHEN HE WAS GIVEN INEFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL FELONY WHEN HE WAS FACING A POSSIBLE DEATH SENTENCE CONVYCTYON / SEE / BRAYNED V. CYTY OF RICHFIRD, 468 U.S. 164, 33 L ED. 222 1972. IN WHICH THE UNITED STATES SUPREME COURT SLYD OVER TURNED THE CONVYCTYON OF THE PETITIONER BRAYNED WHYCH WAS FORMERLY BASED ON PREJUDYCYAL ERRORS. SEE LAKEWOOD V. PLAIN DEALER 486. U.S. 750, 771. ILL ED 2D 1988. THAT THE STATE OF NORTH CAROLYNA AND THE COUNTY OF SCOTTLAND KNEW THAT THE ALLEGED NAMED DEFENDANT JEROME MURPHY, WAS IN 14 AT THE TYME HE WAS FORMERLY TYRED AND HE IS NOW 39 YEARS OLD AND THE PETITIONER YAS GYVEN A C'LASS IC / LYFE SENTENCE WHYCH MADE HYM ELYGYBLE FOR PAROLE WELL 11 YRS AGO, AND THE STATE OF NORTH CAROLYNA HAVE CONTYNUED TO VYOLATE THYS PETITIONER RYGHT TO PAROLE OR CONDYTYONAL RYLEASE AND THE STATE OF N.C. HAVE



HAVE NOT TIMERLY AFFIACLED THE PETTTIONER THIS FUNDAMENTAL RYGHT UNDER THE LAW. AND THAT WAS A CASE OF SLECTED PROSECUTION WHICH WAS UN-FAUL UNDER THE LAW AND THAT THE ALLEGED NAMED PETTTIONER WAS NOT ABLE TO READ AND UNDERSTAND HIS RYGHTS.

/S/

2465 U.S. 70 WEST
SMYTHFEILD, N.C
27577.

Jerome Murphy,
2465 U.S. 74 West.
Smithfield, N.C. 27577

MAILED FROM:
JOHNSTON CORRECTIONAL INST.

office of the Clerk
Superior Court

Scotland/County Court House.
Laurinburg, N.C.
28352/3553

NC DEPT. OF CORRECTION
DIVISION OF PRISONS

SEP 10 2001

LEGAL MAIL
LOC. 4230 INT. WT

FILED

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF SCOTLAND                    SUPERIOR COURT DIVISION
                            2012 FEB 22  P 2: 02  85 CRS 4084

STATE OF NORTH CAROLINA  SCOTLAND COUNTY. C S C   )

        v.                  BY _____           )   NOTICE OF APPEARANCE
                                                    )   AND SUBMISSION OF EXHIBIT 10
                                                    )
JEROME MURPHY,                                      )
            Defendant.                              )


        Pursuant to N.C. Gen. Stat. § 15A-141, the undersigned counsel

gives his notice of appearance in the above case.

        Defendant also submits the attached additional Exhibit 10,

which includes the orders in the two Pitt County cases, *State v. James

Gregory Freeman* and *State v. Willie James Williams*, on the issue

presented in Defendant's Motion for Appropriate Relief.

        Respectfully submitted this the 21st day of February, 2012.


                                    _____
                                    Hoang Lam
                                    Attorney for Defendant
                                    N.C. Prisoner Legal Services
                                    PO Box 25397
                                    Raleigh, NC  27611
                                    (919) 856-2200
                                    hlam@ncpls.org

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Notice of Appearance has this day been served by first-class mail upon:

> The Honorable Kristy Newton
> District Attorney, Scotland County
> Post Office Box 769
> Laurinburg, NC  28353

This the 21st day of February, 2012.

_____
Hoang Lam
Attorney for Defendant

DEFENDANT'S
EXHIBIT

10

STATE OF NORTH CAROLINA

COUNTY OF PITT

FILED

2009 SEP 16

PITT COUNTY

BY _____ SDW

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 93CRS28301, 94CRS1047,
94CRS1050

STATE OF NORTH CAROLINA

v.

JAMES GREGORY FREEMAN,

Defendant

)
)
)
)
)
)
)
)
)
)

ORDER

THIS CAUSE COMING on to be heard before the undersigned Senior Resident Judge of the Superior Court of Pitt County upon Motion for Appropriate Relief filed by the Defendant on the 17th day of June, 2009. In support of this Order the court has examined the pertinent records available in the Office of the Clerk of Superior Court of Pitt County relative to the above captioned cases and makes the following findings of fact:

## FINDINGS OF FACT

1. On February 25, 1994, Defendant, Gregory Freeman, entered a plea of guilty to the offense of Second Degree Kidnapping (N.C.G.S. § 14-39) and two counts of Common Law Robbery (N.C.G.S. § 14-87.1) in Pitt County Superior Court.

2. The trial court sentenced Defendant to an active term of thirty years for Second Degree Kidnapping in case number 94CRS1050, a consecutive term of ten years for Common Law Robbery in case number 94CRS1047, and an additional consecutive term of ten years for Common Law Robbery in case number 93CRS28301.

3. In 1993 the General Assembly ratified the Structured Sentencing Act, Article 81B of the Criminal Procedure Act, to be effective January 1, 1995.

4. Under the Structured Sentencing Act, N.C.G.S. § 14-87.1, Common Law Robbery, was elevated from a Class H felony to a Class G felony. N.C.G.S. § 14-39, Second Degree Kidnapping, remains a Class E felony.

5. The statutory maximum punishment for Defendant's convictions under the Structured Sentencing Act would be determined by a calculation of Defendant's prior record level.

6. The defendant avers and the State agrees that his criminal history would place Defendant in Prior Record Level II under the current law.

7. The longest sentence that a Class G, Level II felon may receive in the aggravated range under Structured Sentencing is a minimum term of 19 months (1 year 7 months) with a corresponding maximum term of 23 months (1 year 11 months). The longest sentence that a Class E, Level II felon may receive in the aggravated range under current law is a minimum term of 36 months (3 years) with a corresponding maximum of 53 months (4 years 5 months). The maximum possible sentence for one Class E and two Class G felonies, at Level II, consecutively, is 74-99 months (6 years 2 months - 8 years 3 months).

8. The longest sentence that a Class G, Level VI felon may receive in the aggravated range under current law is a minimum term of 36 months (3 years) with a corresponding maximum term of 44 months (3 years 8 months). The longest sentence that a Class E, Level VI felon may receive in the aggravated range is 74 months (6 years 2 months) with a corresponding maximum term of 98 months (8 years 2 months). The maximum possible sentence for one Class E and two Class G felonies, at the highest record level, Level VI, consecutively, is 146-186 months (12 years 2 months - 15 years 6 months).

9. As of September 14, 2009 Defendant has been in custody for these crimes for 15 years, 8 months, 12 days.

Based upon the foregoing findings of fact, the Court concludes as a matter of law:

There have been significant changes in the sentencing laws of North Carolina. Based upon North Carolina's current assessment of the appropriate sentence for violations of N.C.G.S. § 14-87.1 and N.C.G.S. § 14-39, Defendant's continued incarceration violates the Eighth Amendment of the Constitution of the United States and Article 1, Sec. 27 of the North Carolina Constitution. The sentences imposed on 25 February 1994 are invalid as a matter of law. Retroactive application of Article 81B of the Criminal Procedure Act is required.

NOW, THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, it is hereby ordered, adjudged and decreed:

1. Pursuant to this Court's authority under N.C.G.S. §§ 15A-1415(7) & (8) Defendant's Motion for Appropriate Relief is hereby GRANTED.

2. The judgment entered February 25, 1994 in case number 94CRS1050 is hereby VACATED and Defendant is resentenced to a term of 4 years.

3. The judgment entered February 25, 1994 in case number 94CRS1047 is hereby VACATED and Defendant is resentenced to a term of 1 year.

4. The judgment entered February 25, 1994 in case number 93CRS28301 is hereby VACATED and Defendant is resentenced to a term of 1 year.

5. Defendant shall be given credit for 15 years, 8 months, 12 days of confinement.

6. The North Carolina Department of Correction is hereby ORDERED to immediately release Defendant.

7. Any processing of Defendant that the North Carolina Department of Correction deems necessary shall be done _after_ his immediate release from custody.

This is the 15th day of September 2009.

W. Russell Duke, Jr.
Superior Court Judge Presiding

STATE OF NORTH CAROLINA

COUNTY OF PITT

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 88CRS23221, 23225

---

STATE OF NORTH CAROLINA

v.

WILLIE JAMES WILLIAMS,

Defendant.

)
)
)
)
)
)
)
)
)
)

**ORDER**

---

THIS CAUSE COMING on to be heard before the undersigned Senior Resident Judge of the Superior Court of Pitt County upon Motion for Appropriate Relief filed by the Defendant on the 11th day of June, 2009. In support of this Order the Court has examined the pertinent records available in the Office of the Clerk of Superior Court of Pitt County relative to the above captioned cases and makes the following findings of fact:

<u>FINDINGS OF FACT</u>

1. On 13 December 1989, Defendant, Willie James Williams, entered a plea of guilty to the offense of Felonious Breaking or Entering (N.C.G.S. § 14-54), case number 88CRS23221, in Pitt County Superior Court, the Hon. Frank R. Brown presiding.

2. The trial court sentenced Defendant to an active term of ten years in case number 88CRS23221.

3. On 22 March 1990, Defendant entered a plea of guilty to the offense of First Degree Burglary (N.C.G.S. § 14-51), case number 88CRS23225, in Pitt County Superior Court, the Hon. Frank R. Brown presiding.

4. The trial court sentenced Defendant to a term of life in prison in case number 88CRS23225, to be served consecutively to the sentence in 88CRS23221.

5. In 1993 the General Assembly ratified the Structured Sentencing Act, Article 81B of the Criminal Procedure Act, to be effective January 1, 1995.

6. Under the Structured Sentencing Act, N.C.G.S. § 14-51, First Degree Burglary, was reduced from a Class C felony to a Class D felony. N.C.G.S. § 14-54, Felonious Breaking or Entering, remains a Class H felony.

7. That the statutory maximum punishment for Defendant's convictions under the Structured Sentencing Act would be determined by a calculation of Defendant's prior record level.

8. Defendant's record, as prepared by the State, shows the following convictions which would carry points for sentencing purposes:

   05-09-85 – Possession of Stolen Goods
   09-25-85 – Possession of Cocaine
   03-04-86 – (m) Assault with a Deadly Weapon
   02-02-89 – Assault on a Female
   06-02-89 – Assault on a Female

9. This criminal history would place Defendant at Prior Record Level III in case number 88CRS23221 and Prior Record Level IV in case number 88CRS23225 if sentenced under current law.

10. The longest sentence that a Class H, Level III felon may receive in the aggravated range under Structured Sentencing is a minimum term of 12 months (1 year) with a corresponding maximum term of 15 months (1 year 3 months). The longest sentence that a Class D, Level IV felon may receive in the aggravated range under current law is a minimum term of 146 months (12 years 2 months) with a corresponding maximum term of 185 months (15 years 5 months). The maximum possible sentence for one Class H felony at Level III and one Class D felony, at Level IV, consecutively, is 158-200 months (13 years 2 months - 16 years 8 months).

11. As of September 14, 2009 Defendant has been in custody for these crimes for 20 years, 2 days.

Based upon the foregoing findings of fact, the Court concludes as a matter of law:

There have been significant changes in the sentencing laws of North Carolina. Based upon North Carolina's current assessment of the appropriate sentence for violations of N.C.G.S. § 14-54 and N.C.G.S. § 14-51, Defendant's continued incarceration violates the Eighth Amendment of the Constitution of the United States and Article 1, Sec. 27 of the North Carolina Constitution. The sentences imposed on 12 December 1989 and 22 March 1990 are invalid as a matter of law. Retroactive application of Article 81B of the Criminal Procedure Act is required.

NOW, THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, it is hereby ordered, adjudged and decreed:

1. Pursuant to this Court's authority under N.C.G.S. §§ 15A-1415(7) & (8) Defendant's Motion for Appropriate Relief is hereby GRANTED.

2. The judgment entered 12 December 1989 in case number 88CRS23221 is hereby VACATED and Defendant is resentenced to a term of 1 year.

3. The judgment entered 22 March 1990 in case number 88CRS23225 is hereby VACATED and Defendant is resentenced to a term of 15 years.

4. Defendant shall be given credit for 20 years, 2 days of confinement.

5. The North Carolina Department of Correction is hereby ORDERED to immediately release Defendant.

6. Any processing of Defendant that the North Carolina Department of Correction deems necessary shall be done after his immediate release from custody.

This is the _15th_ day of _September_ 2009.

_W. Russell Duke, Jr._
W. Russell Duke, Jr.
Superior Court Judge Presiding

# PRESENTATION (Public)

# NORTH CAROLINA EXECUTIVE CLEMENCY AND REWARDS PROGRAM



bert Lee Guy
fice of the Governor
arch 5, 2020



PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT

# EXECUTIVE CLEMENCY

## Executive Powers

- President – Federal (US Constitution)
- Governor – State (NC Constitution)

## Reasons for Exercising this Power

- Humanitarian concerns (ex. illness, age)
- Excessive sentence
- Reward someone who has been a good member of their community and accepted responsibility for their actions
- Extraordinary or real doubts of guilt

# GOVERNOR'S EXECUTIVE CLEMENCY POWERS

North Carolina Constitution, Article III Section 5(6) provides the Governor with the Authority to grant Executive Clemency.

N.C. G.S. § 147-21: Guidelines for Executive Clemency.

- Every Application must be in writing.
- Must be signed by the convicted party or someone on his/her behalf.
- Must contain the grounds and reasons for Clemency.
- Application must be accompanied by certified copy of Indictment and the Verdict and Judgment.

Governor may grant Reprieves, Commutations, and Pardons, after conviction, for all offenses, except in cases of Impeachment.

# EXECUTIVE CLEMENCY:

ommutation: Individual's active sentence is commuted or reduced by Executive Clemency.

- Governor may commute (reduce) the active sentence to time served and the individual immediately released.

- Governor may commute (reduce) the active sentence to make the individual Parole Eligible. Post-Release/Parole Commission would then determine his/her release.

- Governor may commute (reduce) a Death Penalty to Life without Parole.

# EXECUTIVE CLEMENCY

<u>Pardons</u>: Individual has completed his sentence (active or probationary) and is petitioning the Governor for Forgiveness of his criminal convictions (three types):

<u>Pardon of Forgiveness</u>:

- Conditional Pardon
- Subject to such conditions, restrictions, and limitations as the Governor considers proper and necessary (G.S. § 147-23)
- Violations of conditions may trigger arrest and revocation of Proclamation
- Conditions must not be unconstitutional, illegal, immoral, or impossit

# EXECUTIVE CLEMENCY (cont.)

Unconditional Pardon:

- This is the same as the above Pardon of Forgiveness with the exception of no conditions or restrictions and no potential for Revocation.

Note:

Both of the above two types of Pardons basically forgive the individual for their criminal conviction(s) but does not expunge or erase the criminal record or restore their right to own or possess a firearm. It does allow them to apply to restore their right to bear arm

# EXECUTIVE CLEMENCY (cont.)

## Pardon of Innocence:

Issued upon Governor's satisfaction of Actual Innocence

- Authorizes the individual to petition for compensation for wrongful Imprisonment with the N.C. Industrial Commission the amount of $50,000 per year up to $750,000 maximum (G.S. §148-82-84).
- Authorizes Expungement
  - All Court Records (G.S. § 15A-149)
  - All DNA Records (G.S. § 15A-148)

# EXECUTIVE CLEMENCY INVESTIGATIONS

<u>eneral</u>:

- The Governor's Clemency Office oversees and coordinates clemency investigations utilizing all resources available including the Division of Community Corrections (N.C. G.S. § 143B-720) in preparing reports and information for review during the Clemency Process

<u>onfidentiality</u>:

- All Clemency Investigations, reports, and records are confidential (G.S. § 143B-720).

# EXECUTIVE CLEMENCY INVESTIGATIONS (cont.)

## ictim Notification:

- N.C. G.S. § 15A-838 states that all victims and/or relatives must be notified when the Governor is considering a commutation or pardon petition.
- The victim or next of kin has a right to present a written statemer prior to a final decision.
- After a decision is reached, letters are sent informing them of the decision.

## istrict Attorney Notification:

- The Office of District Attorney who prosecuted the case will be notified in order to provide their opinion or recommendation regarding the granting of a pardon or commutation.

# EXECUTIVE REWARDS PROGRAM

G.S. § 15-53.1 Governor may offer rewards for information furnished to the Governor, that a felony or other infamous crime has been committed within the State, whether the name or names of the person or persons suspected of committing the said crime be known or unknown. The Governor may issue a Proclamation and therein offer a reward not exceeding $100,000.

The Proclamation shall be upon such terms as the Governor may deem proper but it shall identify the felony or felonies and the authority to whom the information is to be delivered and shall state such other terms as the Governor may require under which the reward is payable.

https://www.lincolntimesnews.com/news/family-petitions-against-parole/article_e8c089b3-8644-55f9-8c69-514bc791a0d6.html

# Family petitions against parole

Since the murder of her niece in 1983, Penny Morrison has thought about the dancer and former beauty queen every single day. â€œEverybody thinks itâ€™s been 20 years, you can get over it, but you canâ€™t get over something like this,â€ she said. â€œIt never goes away.â€ Kimberly Goodman, Morrisonâ€™s niece, was stabbed 17 times […]

By Web
Jun 14, 2004

Since the murder of her niece in 1983, Penny Morrison has thought about the dancer and former beauty queen every single day.

â€œEverybody thinks itâ€™s been 20 years, you can get over it, but you canâ€™t get over something like this,â€ she said. â€œIt never goes away.â€

Kimberly Goodman, Morrisonâ€™s niece, was stabbed 17 times in her own backyard in southern Iredell County. She was only 20 years old.

Now, Goodmanâ€™s murderer is up for parole, and the victimâ€™s family, many of whom live in Lincoln County, have started a petition campaign to have his parole denied.

â€œWe will not ever stop the battle of trying to keep him in prison where he belongs,â€ said Bryan Morrison, Goodmanâ€™s uncle.

Goodmanâ€™s murderer, Brett Abrams, was 14 years old at the time of the crime. He was tall for his age and weighed 176 pounds.

Goodman had spent time babysitting Abrams, who was her neighbor. In 1982, when Abramsâ€™ younger brother was killed in a fire, Goodman had spent time comforting him.

DEFENDANT'S EXHIBIT

Prior to the murder, Abrams had been caught on a ladder peeping in Goodman's window. He had also exhibited menacing behavior to other female neighbors.

On the day of the murder, Goodman's father and brother were off on a fishing trip and Kim was alone at her home.

Abrams, who later pled guilty to second degree murder, stabbed Goodman 17 times in what the Iredell County Sheriff's report described as a "frenzied attack."

Since the age of six, Abrams had been taken to mental health agencies. Following the murder, psychiatrists concluded that he was suffering from an aggressive conduct disorder.

Abrams was sentenced to life in prison without parole, but due to the Fair Sentencing Act, Abrams could receive parole based on good behavior while incarcerated.

Abrams has been up for parole before, and every time Goodman's family members visit the N.C. Parole Commission and request that he stay behind bars.

"We do truly believe that he will kill again," said Bryan Morrison.

They tell the parole board what kind of person Goodman was and how her murder affected the lives of those who loved her.

"When we go to the hearing, we relive this stuff over and over and over," said Penny Morrison.

"It's bad when you sit there, and you talk and talk and talk, and you get no response."

This year was the first year, Goodman's father could not participate in the parole hearing. He died of cancer earlier in the year.

"The day he went into a coma he made us all promise that we would continue the fight," said Penny Morrison.

The family is doing their best by starting the petition campaign.

Abrams has been up for parole before, but this year they are especially concerned that it will be granted.

â€œThey werenâ€™t making the decision quick like in the past,â€ said Bryan Morrison.

Petitions will circulate throughout the county. All those interested in signing the petition or collecting signatures can contact Goodmanâ€™s family at P.O. Box 5086, Mooresville, NC 28115 or at 704-483-1832.by Sarah Grano

NC DHHS Flu    Marketplace    Meet the WBTV News Team!    Traffic

**89°**
Charlotte, NC

☰  Watch Live    Newsletter    Latest Video    News    Weather    Calendar    WBTV Investigates    On Your Side Tonight    🔍

ADVERTISEMENT


# Family fights to keep convicted killer in prison

ADVERTISEMENT




By David Whisenant
*Updated: May. 11, 2020 at 4:01 PM UTC*

CHARLOTTE, N.C. (WBTV) - The family of a woman who was murdered in Mooresville in 1983 is fighting to keep the killer behind bars.

Kim Goodman, 20 years old at the time, was stabbed to death by her 14-year old neighbor, Brett Abrams, in July of 1983 after he was caught peeping at her while she was getting some sun on the deck of her home.

Angry at being caught peeping at Goodman for a second time, Abrams stabbed Goodman 17 times.

Prosecuted as an adult, Abrams, now 51, pleaded guilty to second-degree murder on May 22, 1984, and was sentenced to life in prison. Under sentencing laws at the time, life in prison was defined as 40 years. It also meant Abrams was first eligible for parole in 1993.

## Most Read

**Hitachi Metals shutting down China Grove Plant** 

**Man featured on '90 Day Fiance' now on US Marshals most wanted list** 

**▶ Fire at southeast Charlotte apartment complex deemed accidental, investigators say**

**Rowan Co. woman to serve up to 6.2 years prison for financial exploitation of her mother-in-law** 

**▶ One arrested, one sought after 17-year-old killed in Concord shooting**

ADVERTISEMENT

ADVERTISEMENT


The first year that Abrams had a chance for parole, Kim Goodman's family collected 40,000 signatures on a petition opposing the release. In 2004, they collected more than 65,000 signatures.



DEFENDANT'S EXHIBIT

## Latest News

 **Vice President Kamala Harris to travel to Charlotte on Thursday**

 **1 person dead after west Charlotte shooting**

 **Stop sign concerns at neighborhood intersection**

 **Internal records dispute CATS' tweets with driver absence numbers**

 **Novant Health withdraws sponsorship of Fourth of July parade over Confederate imagery**

ADVERTISEMENT

WBTV News
Education
Programming Schedule

News
Health
WBTV Investigates

Weather
QC Kitchen
Calendar

Sports
Community
Latest Newscasts

**WBTV**
1 Julian Price Pl
Charlotte, NC 28208
(704) 374-3500

Public Inspection File   FCC Applications   Closed Captioning/Audio Description   publicfile@wbtv.com – 704-374-3973   Terms of Service   Privacy Policy

EEO Statement   Advertising   WBTV Careers

A Gray Media Group, Inc. Station - © 2002-2022 Gray Television, Inc.

# State of North Carolina

**MICHAEL F. EASLEY**
GOVERNOR

## EXECUTIVE ORDER NO. 4
### CLEMENCY

WHEREAS, Article III, Section 5(6) of the Constitution of North Carolina, vests the power of clemency exclusively with the Governor.

WHEREAS, the Constitution of North Carolina empowers the Governor with sole, unrestricted, and unlimited discretion to exercise the power of clemency to pardon, commute, or grant reprieves, except in cases of impeachment.

WHEREAS, North Carolina General Statute, Section 15A-838, the Crime Victims' Rights Act, requires, the Governor's Clemency Office to notify certain victims, as defined by North Carolina General Statute, Section 15A-830, when it is considering commuting the defendant's sentence or pardoning the defendant.

WHEREAS, crime victims and prosecutors should have the right to be notified, and the general public has the right to know, if the convicted perpetrator in a particular case has a petition for a reprieve, commutation, or pardon actively being considered before the Governor's Clemency Office.

NOW THEREFORE, by the authority vested in me as Governor of the State of North Carolina. IT IS ORDERED:

DEFENDANT'S
EXHIBIT

**Section 1.** The Governor's Clemency Office will create for public posting a listing of the names of every individual whose application for a reprieve, commutation, or pardon is actively being considered.

**Section 2.** The list of names will be publicly posted on a state governmental website. Additionally, the Governor's Clemency Office will post the list of names on a bulletin board outside of its office for public inspection during normal business hours.

**Section 3.** In addition to the applicant's name, information related to the individual's offense, conviction date, and length of sentence should also be publicly available.

**Section 4.** Beyond the requirements of the Crime Victims' Rights Act, North Carolina General Statute, Section 15A-838, the Governor's Clemency Office will notify the relevant crime victim and prosecutor in every case where the convicted perpetrator has a petition for a reprieve, commutation, or pardon actively being considered by the Governor's Clemency Office.

**Section 5.** For all petitions now actively being considered by the Governor's Clemency Office, public posting will take effect within thirty days from the effective date of this Executive Order. All other petitions subsequently filed, and actively considered, will be posted within thirty days of filing.

**Section 6.** Exceptions to this Executive Order may be made in capital cases where the Office of the Attorney General ensures that the victim's family and the relevant District Attorney's office are notified as to clemency petitions, and in other special cases, such as with claims of "actual innocence", where any delay for public posting and comment would cause further unjust incarceration or record of conviction. In such cases, the Clemency Office must notify the Governor's Office of Legal Counsel immediately.

2

This Executive Order is effective immediately and shall remain in effect, as written, until terminated or amended by further Executive Order.

Done in the Capital City of Raleigh, North Carolina, this 6th day of March 2001.



Michael F. Easley
Governor

ATTEST:

Elaine F. Marshall
Secretary of State

3

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6889

# State of North Carolina

## ROY COOPER
### GOVERNOR

April 8, 2021

### EXECUTIVE ORDER NO. 208

### ESTABLISHING THE JUVENILE SENTENCE REVIEW BOARD

**WHEREAS**, Article III, Sections 1 and 5(6) of the North Carolina Constitution vests the power to grant reprieves, commutations, and pardons, after convictions, for all offenses (except in cases of impeachment), in the Governor, upon such conditions as he thinks proper, and subject to regulations prescribed by law relative to the manner of applying for pardons; and

**WHEREAS**, the North Carolina Constitution vests the authority to make such clemency determinations exclusively in the Governor; and

**WHEREAS**, the Governor may make clemency determinations in his sole discretion; and

**WHEREAS**, nothing in this Executive Order shall restrict or infringe upon the Governor's powers under the North Carolina Constitution to grant reprieves, commutations, and pardons, after conviction, for all offenses, upon such conditions as he may think proper; and

**WHEREAS**, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds, specifically that juveniles have less control over themselves and their environments when compared to adults; and

**WHEREAS**, these psychological and neurological differences make juveniles less culpable for their conduct and more likely candidates for reform; and

**WHEREAS**, under the United States and North Carolina Constitutions, children are therefore treated differently from adults for purposes of sentencing; and

**WHEREAS**, the North Carolina General Assembly enacted the Juvenile Justice Reinvestment Act, ch. 57, sec. 16D.4.(a)-(tt), 2017 N.C. Sess. Law. 309-325, which raised the age of juvenile jurisdiction to eighteen (18), becoming the last state in the nation to no longer prosecute all sixteen (16)- and seventeen (17)-year-olds as adults; and

**WHEREAS**, data shows that over eighty (80) percent of the people committed to North Carolina prisons for crimes they committed as juveniles are people of color; and

**WHEREAS**, there is a long history of structural inequity and racism in the criminal justice system; and

**WHEREAS**, communities of color are disproportionately affected throughout the criminal justice system, with data showing that people of color make up nearly sixty (60) percent of the population of North Carolina's prisons; and

NOW, **THEREFORE**, by the authority vested in the undersigned as Governor by the Constitution and laws of the State of North Carolina, **IT IS ORDERED:**

## Section 1. Juvenile Sentence Review Board.

A. Scope of Order.

This Executive Order establishes a mechanism to review sentences of imprisonment imposed in North Carolina on individuals who were tried and sentenced in adult criminal court for acts committed when under the age of eighteen (18) and who meet certain qualifying conditions set forth in Section 2 of this Executive Order (hereinafter, "juveniles").

B. Establishment and Purpose.

The North Carolina Juvenile Sentence Review Board ("Review Board") is hereby established as an advisory board. The mission of the Review Board is to review sentences imposed on juveniles in North Carolina and make recommendations to the Governor concerning clemency and commutation of such sentences when appropriate. In so doing, the Review Board will assist the Governor in fulfilling his constitutional duty to grant commutations or clemency upon such conditions as he deems proper, seek to eliminate disparate outcomes in the criminal justice system, and improve the administration of justice.

C. Duties.

This Review Board's mandate is to promote sentencing outcomes that consider the fundamental differences between juveniles and adults and address the structural impact of racial bias while maintaining public safety. The Review Board shall, for each petition under consideration pursuant to Section 2 below, determine whether to recommend commutation or clemency to the Governor. The Governor may act in accordance with the Review Board's recommendation but is not obligated to do so. The Review Board is expected to consult with local, state, and national criminal justice and racial justice experts and people with experiences relevant to the Review Board's mandate.

D. Membership.

The Review Board shall be comprised of four members, including a chair. All members shall be appointed by the Governor and shall serve at the Governor's pleasure. The Governor shall select the chair to lead the Review Board.

E. Administrative.

The Review Board shall serve without compensation but may receive per diem allowance and reimbursement for travel and subsistence expenses in accordance with state law and Office of State Budget and Management policies and regulations.

The Review Board is authorized to conduct its meetings in confidential sessions.

## Section 2. Procedures for Review of Juvenile Sentences.

Any person held in the custody of the North Carolina Department of Public Safety ("DPS") for a crime they committed prior to the age of eighteen (18) may, on the person's own behalf or through counsel, petition the Review Board for review of their sentences upon the completion of the shorter of:

1. Twenty (20) years served on an active sentence; or

For each petition received, the Review Board shall determine whether to recommend commutation or clemency to the Governor. In making this determination, the Review Board shall consider:

1. The petition;
2. The petitioner's prison record;
3. Factors suggesting developmental immaturity in the commission of the crime, such as whether there was an adult co-defendant, whether the offense was committed with one or more accomplices, or other circumstances of the offense;
4. The petitioner's mental health at the time of the crime;
5. The input from the victim or members of the victim's immediate family;
6. The degree of risk the petitioner poses to society;
7. Rehabilitation and maturity demonstrated by the petitioner;
8. Whether the petitioner's race unduly influenced the trial or sentencing; and
9. Any other information the Review Board deems appropriate.

DPS and the Post-Release Supervision and Parole Commission shall provide records requested by the Review Board within thirty (30) days of such request. Consistent with the North Carolina Reentry Action Plan, DPS shall provide specialized reentry planning to individuals released following recommendation by the Review Board.

**Section 3. Preservation of Governor's Clemency Powers.**

Nothing in this Executive Order shall be construed to limit or infringe upon the Governor's authority under the North Carolina Constitution to grant reprieves, commutations, and pardons, after conviction, for all offenses, upon such conditions as he may think proper.

**Section 4. Effective Date.**

This Executive Order is effective immediately and shall remain in effect until December 31, 2024, unless repealed, replaced, or rescinded by another applicable Executive Order.

**IN WITNESS WHEREOF,** I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 8th day of April in the year of our Lord two thousand and twenty-one.

_____
Roy Cooper
Governor

**ATTEST:**

_____
Elaine F. Marshall
Secretary of State

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CT-3123-BO

| | |
|---|---|
| SHAUN ANTONIO HAYDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **DEFENDANT'S PROPOSED PLAN** |
| | ) **IN RESPONSE TO 25 SEPTEMBER 2016** |
| PAUL G. BUTLER, | ) **ORDER [D.E. 58]** |
| | ) |
| Defendant. | ) |

NOW COMES Defendant Paul G. Butler, Jr., by and through counsel, North Carolina Attorney General Roy Cooper and Special Deputy Attorney General Joseph Finarelli, in accordance with the directives contained in the Court's 25 September 2015 Order [D.E. 58] and its 25 August 2016 Order [D.E. 72], and submits the following proposed to comply with the Court's "plan for the means and mechanism of compliance with the mandates of *Graham* to provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults" [D.E. 58].[1]

Pre-Hearing Procedures

- Juvenile offenders convicted as adults and sentenced to life with the possibility of parole ("Eligible Offenders"), will be assigned to the caseload of a designated parole case analyst;

- Eligible Offenders will be reviewed on a biennial basis;

---

[1] Although he submits the plan set forth herein, Defendant Butler does so in compliance with the Court's Orders and expressly reserves his right to pursue an appeal.



DEFENDANT'S
EXHIBIT

D

- Eligible Offenders will receive written notice from the North Carolina Post-Release Supervision and Parole Commission ("the Parole Commission") at least 180 days in advance of any parole review hearing;

- In advance of an Eligible Offender's parole review hearing, the family members, advocates, attorneys, or other witnesses of the Eligible Offender will be guaranteed a thirty-minute meeting slot to address, in person, one or more members of the Parole Commission in order to demonstrate how the Eligible Offender has achieved the level of maturity and rehabilitation necessary to render him suitable for parole release;

- An Eligible Offender may request a reasonable continuance of a scheduled parole review hearing up to thirty (30) days in advance of the designated hearing date;

- Those who may wish to oppose an Eligible Offender's release on parole will be guaranteed, if requested, an equal thirty-minute meeting slot to address the same Commissioner(s) who will preside over any parole review hearing for the Eligible Offender whose suitability for parole release is being challenged;

- Offenders will be permitted to submit, in writing, a personal explanation of the circumstances of his underlying offense(s) or, if available, an appellate court opinion setting forth the facts of any offense(s), as well as any materials documenting the offender's maturity, rehabilitation, and suitability for parole;

- The designated parole case analyst will prepare, on a biennial basis, a summary of the offender's file, including a summary of any written materials submitted by or on behalf of the offender;

2

<u>Hearing Procedures</u>

- The Eligible Offender will be permitted to appear, via videoconferencing technology, before the Commissioner(s) and the designated parole case analyst during the thirty-minute parole review hearing;

- Audio recordings will be made of the proceedings of both the thirty-minute parole review hearing afforded to the Eligible Offender and, if requested, any thirty-minute hearing afforded to individuals opposing the Eligible Offender's parole release;

- Any attorney, expert witness, advocate, and/or witness on behalf of the Eligible Offender will be able to present to the Commissioner(s) any evidence demonstrating, in the opinion of the presenting party, the Eligible Offender's maturity, rehabilitation, and suitability for parole release;

- Any attorney, expert witness, advocate, and/or witness on behalf of those in opposition to an Eligible Offender's suitability for parole release will be able to present to the Commissioner(s) any evidence demonstrating, in the opinion of the presenting party, the Eligible Offender's lack of maturity, rehabilitation, and suitability for parole release;

<u>Post-Hearing Procedures</u>

- At the conclusion of the parole review hearing afforded to the Eligible Offender and, if requested, the hearing afforded to those opposing the Eligible Offender's parole release, the Commissioner designated to preside over the hearings, with the assistance of the designated parole case analyst, will prepare a report to be signed

3

by the presiding Commissioner and circulated to the remaining members of the Commission for review and consideration;

- In the event that parole release is denied, the Parole Commission will send a letter to the Eligible Offender stating the specific reason(s) why parole release was denied as well as any recommendation(s) for steps the Eligible Offender may take to improve his or her future chances for parole release, such as the completion of specific educational or rehabilitative programs offered by the Division of Prisons, or the continuation of infraction-free behavior prior to the next review;

- Although the STATIC-99 risk assessment tool is not currently used by the Parole Commission during the parole review process, that risk assessment tool will not be used nor will the results of any previously-administered STATIC-99 risk assessment be considered during the parole review process for any Eligible Offender;

- The audio recordings of the parole review hearing(s) for an Eligible Offender will be maintained for three years from the date of the denial of parole release following any parole review hearing or until such time as the Eligible Offender is released on parole, whichever occurs first;

- The Parole Commission will collect and maintain data, along the lines of its current practices, including how many parole review hearings for the population of Eligible Offenders are held annually, the results of the parole review process for the population of Eligible Offenders, and a statistical breakdown on the basis of age, race, gender, and type of criminal offense of parole review hearings conducted for Eligible Offenders;

4

- The Parole Commission will request that the Division of Adult Correction & Juvenile Justice and, specifically, the Division of Prisons, will give careful consideration to any MAPP contract recommended by the Parole Commission for any Eligible Offender when the MAPP contract contains requirements for the Eligible Offender's infraction-free behavior, education, job training, and/or successful participation in any available community volunteer, home visit, and work-release program

Respectfully submitted this 24th day of October, 2016.

ROY COOPER
Attorney General

/s/ Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General
Public Safety Section
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6531
Facsimile: (919) 716-6563
E-mail: jfinarelli@ncdoj.gov
N.C. State Bar No. 26712

5

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing **DEFENDANT'S PROPOSED PLAN IN RESPONSE TO 25 SEPTEMBER 2016 ORDER** with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to the following:

> Elizabeth G. Simpson
> esimpson@ncpls.org
> Mary S. Pollard
> mpollard@ncpls.org
> Benjamin Finholt
> bfinholt@ncpls.org
> *Attorneys for Plaintiff*
>
> John R. Mills
> j.mills@phillipsblack.org
> *Attorney for Proposed Intervenor-Plaintiff Eddie Smith*

This the 26th day of October, 2016.

> /s/ Joseph Finarelli
> Joseph Finarelli
> Special Deputy Attorney General

6



Issued: April 1, 2019

Supersedes:

Effective Date:

---

.0401 General Provisions

.0402 Commutation Investigations

.0403 Pardon Investigations

.0404 Death Row Investigations

## .0401 GENERAL PROVISIONS

Probation/Parole Officers will conduct clemency investigation only on cases referred by the Post Release Supervision and Parole Commission, the Governor's Clemency Administration or the Secretary of Public Safety or designee. Unless otherwise directed, Probation/Parole Officers will report investigation results in writing on approved Department letterhead.

G.S. 143B-720

Confidentiality

All clemency investigations are confidential and are not public record. The findings of a commutation, pardon, or death row investigation will be reported only to the Post Release Supervision and Parole Commission, the Governor's Clemency Administration or the Secretary of Public Safety or designee.

G.S. 15-207

## .0402 COMMUTATION INVESTIGATIONS

A commutation investigation requires the Probation/Parole Officer to report details regarding the crime and the inmate's proposed residence and employment plans, in order to provide the



DEFENDANT'S
EXHIBIT

1

Post Release Supervision and Parole Commission with as much information as possible to assist the Governor's consideration of a request for commutation and immediate parole eligibility. The Chief Probation/Parole Officer will review the commutation investigation report for completeness and timeliness.

G.S. 147-21, 23, 24, 25

Upon receipt of a commutation investigation request from the Chief Probation/Parole Officer, the investigating Probation/Parole Officer will:

(a) Conduct a crime version investigation;

(b) Conduct a residence and employment investigation;

(c) Contact the victim for an opinion regarding the possible commutation;

(d) Contact the victim's spouse, children, and parents for opinions regarding the possible commutation; and

(e) Contact as least 3 individuals from the community for opinions regarding the possible commutation; these individuals must not be law enforcement, court, or other criminal justice personnel

The commutation investigation report will include all findings and will be submitted in narrative form on approved Department letterhead to the Post Release Supervision and Parole Commission for consideration by the Governor within 30 calendar days following the original request for an investigation.

## .0403 PARDON INVESTIGATIONS

A pardon investigation requires the Probation/Parole Officer to report details regarding the crime and the inmate's proposed residence and employment plans, in order to provide the Governor with as much information as possible to assist in the consideration of a request for pardon. The Chief Probation/Parole Officer and JDM will review the pardon investigation report for completeness and timeliness.

G.S. 147-21, 23, 24, 25

Upon receipt of a pardon investigation request from the Chief Probation/Parole Officer, the investigating Probation/Parole Officer will:

(a) Conduct a crime version investigation;

(b) Conduct a criminal record check, including DCI;

2

(c) Conduct a residence and employment investigation;

(d) Contact the victim for an opinion regarding the possible pardon;

(e) Contact the victim's spouse, children, and parents for opinions regarding the possible pardon; and

(f) Contact as least 3 individuals from the community for opinions regarding the possible pardon; these individuals must not be law enforcement, court, or other criminal justice personnel.

The pardon investigation report will include all findings and will be submitted in narrative form on approved Department letterhead to the Post Release Supervision and Parole Commission for consideration by the Governor within 30 calendar days following the original request for an investigation.


## .0404 DEATH ROW INVESTIGATIONS

Upon request by the Parole Case Analyst, the Judicial District Manager will conduct a death row investigation and prepare a report for the Governor's use in consideration of commutation or execution for a death row inmate who has exhausted all legal appeals. Death row investigation reports must be thorough, accurate, factual and objective. The Division Administrator will review the death row investigation report for completeness, objectivity and accuracy.

The Judicial District Manager will not allow personal emotion or opinion to be reflected in the death row investigation report. Any recommendation by the investigating Judicial District Manager that the death penalty is not warranted in a particular case will be made as an appendix to the death row investigation report and will be supported with justification.

Upon receipt of a request for a death row investigation, the investigating Judicial District Manager will:

(a) Obtain an official crime version from law enforcement, the District Attorney's office, and/or other appropriate sources. If applicable and available, obtain a copy of the inmate's confession. If available without cost, obtain a trial transcript and use to summarize the State and defense cases.

(b) Conduct a social and economic background investigation by interviewing family members, employers, teachers, friends and co-workers for information regarding the inmate's pervious conduct, reliability, work performance and respect for authority. Include in the report:

(1) Childhood training and parental supervision;

(2) Education

3

(3) Work habits, job performance, employment record;

(4) Associates;

(5) Previous criminal record;

(6) Substance abuse history;

(7) Military record, if applicable; and

(8) Marital status

**In the event that common sources of social and economic information are not readily available, contact the Post Release Supervision and Parole Commission to determine if the inmate's records indicate alternative sources. Interview the inmate if necessary, to obtain this information.**

(c) Obtain medical and psychiatric history information. The results of any pretrial psychiatric examinations may be available through the courts.

(d) Gather and include pertinent newspaper clipping or other media reports.

(e) Tactfully and discreetly interview the victim(s) of the crime. In murder cases, interview members of the victim's family if possible.

(f) Include any previously undisclosed information that could have had a bearing on the inmate's degree of guilt.

Report all findings of the death row investigation in narrative form on Department approved letterhead for the Governor's consideration.

4

STATE OF NORTH CAROLINA

COUNTIES OF SCOTLAND AND
IREDELL
(HEARD IN WAKE)

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

85 CRS 4084,4085
83 CRS 10621

STATE OF N. CAROLINA,

v.

JEROME MURPHY,
and BRETT ABRAMS,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF MARY STEVENS**
**IN SUPPORT OF**
**JOINT MOTION FOR**
**RELIEF FROM ORDER**

---

I, Mary Stevens, after first being sworn, being competent to testify, and having personal knowledge of the matters herein, hereby state:

1.    I am employed by the North Carolina Department of Public Safety as Chief Administrator for the North Carolina Post-Release Supervision and Parole Commission ("the Commission"). I have worked for the Commission for 32 years.

2.    The Commission is an agency organized under the structure of the Department of Public Safety, but has sole authority over all matters involving parole. It is not part of the Division of Prisons; it is not an investigatory agency; and it has no employees or Commissioners who are sworn law enforcement officers. Despite the use of the word "parole," the Commission does not employ probation and parole officers, who must be sworn and who supervise offenders who are under probation, parole and/or post-release supervision.

**DEFENDANT'S EXHIBIT**

PENGAD 800-631-6989

3. The Commission also has no involvement in the prosecution of an inmate's underlying crimes. Despite its title including the term "Post-Release Supervision," the Commission's role as it relates to post-release supervision, is the sole authority over matters of revocation, reinstatement and release. While the Commission does set the conditions for post-release supervision, it has no role in supervising offenders who are under post-release supervision.

2. As Chief Administrator, I am familiar with the process by which parole decisions are made, although I have no substantive role in the decisions themselves, as they are made by the Parole Commissioners.

3. Given that the above-captioned matters are criminal, I am not a party in either of the above-captioned cases. I also was not involved in any parole decision regarding either Defendant Jerome Murphy, OPUS #0296909, or Defendant Brett Abrams, OPUS # 0000400, both of whom are currently incarcerated in prison facilities under the authority of the Department of Public Safety, and both are parole-eligible.

4. Inmate records maintained by the Commission are confidential. In my capacity as Chief Administrator, I also am the custodian of records for the Commission. I am not custodian of records for other agencies within the Department of Public Safety.

5. While I have clearance that allows me to see certain inmate records under the custody and control of other parts of the Department of Public Safety, I do not have access to all their records, nor are all their records a part of records maintained by the Commission.

6. While I am the custodian of records for the Commission, I do not have access to all psychological records maintained or used by psychologist(s) employed or contracted by the Commission.

7.    The Commissioners also do not have access to all inmate records maintained by other departments within the Department of Public Safety; nor do they have access to all psychological records reviewed or maintained by psychologist(s) employed or contracted by the Commission.  If requested, the psychologist(s) employed or contracted by the Commission, will create reports for the Commission.

8.    While the Commission is authorized to assist the Governor with matters of clemency, the Commission has no significant role in such matters.  More often than not, the Commission plays no role in matters of clemency.  The Commission does not investigate matters of clemency, and has no say the Governor's ultimate decision on clemency.  The Commission neither maintains records for the Governor's Clemency Office, nor has access to such records.

9.    The Commission's inmate records routinely contain information about crime victims and or their families.  However, as with records of other agencies within the Department of Public Safety, the Commission's inmate records do not include all records on file with the various Clerks of Court sitting in the jurisdictions in which the inmates' criminal cases were tried.  For inmates subject to the possibility of parole, the Commission reviews certain documents such as the criminal judgment and information about the inmate's criminal record.  The criminal judgment is provided by the Clerk of Court to the Division of Prisons and is then forwarded to Combined Records.  The inmate's criminal record is accessible in OPUS prison records or through other criminal databases such as CJLEADS and AOC records. Such records are not considered Parole Commission records even though this information, in part or all, may be noted within those inmate records maintained by the Parole Commission.

10.   The Commission treats victim information and psychological reports as more confidential information that poses a security risk for those third-party individuals.  For inmates

subject to the possibility of parole, victim information and psychological reports are more often contained in those inmate records than for those inmates subject to post-release supervision. Likewise, there are other inmate records such as official crime versions that may contain information from third-party individuals and such records are made available to and used throughout the structure of the Department of Public Safety such as the Division of Prisons and the Parole Commission or by the Governor's Clemency Office.

11. For the felony parole eligible population, for most class A through E offenses and for most sex offender cases, Parole Commission staff will make "investigatory" requests for official crime versions through a computerized OPUS alert request. The official crime version assignment request and completion is generally handled by probation and parole officers from Community Corrections. Prior to OPUS, official crime versions were completed as hardcopy documents, and copies were forwarded to various sections such as the Division of Prisons and the Parole Commission. Since OPUS, official crime version requests are made through OPUS and the information entered into a designated screen in the OPUS computer system when completed. This information is available to view by designated staff in various sections such as the Division of Prisons, Community Corrections, the Governor's Clemency office and the Parole Commission who have such security clearance. Parole Commission staff will also make "investigatory" requests for official crime versions in OPUS for the Governor's Clemency office when requested by the Governor's Clemency Office when no official crime version is available in OPUS. These requests are also completed by probation and parole officers from Community Corrections.

12. There are other "investigatory" alerts in OPUS such as for home plan investigations known as REI investigations and which are also completed by probation and parole officers from Community Corrections. These REI alerts generally occur when a prison case manager enters and

verifies the proposed home plan information in OPUS during a post-release supervision or parole investigation. The assigned parole case analyst is generally not involved in the REI work processes for proposed home plans in North Carolina but does become involved in the home plan verification and transfer requests for post-release supervision and parole cases being considered for release whenever the proposed home plan is out-of-state. This type of investigation follows the Interstate Compact work processes for the Interstate Commission for Adult Offender Supervision. Permission to use or review information in the Interstate Compact transfer system known as ICOTS is also restricted to approved individuals only.

13.     The Commission may also make investigatory request(s) to Community Corrections staff as written request(s). One such example is death row investigations that are generally handled by Judicial District managers from Community Corrections, who are notified by email of the request. A physical death row file is developed from the completed death row investigation report and maintained by the Parole Commission.

Further the affiant sayeth not.


Dated this the 8th day of August 2022.

<div style="text-align:right">

_____

MARY STEVENS

</div>

Subscribed and sworn to before me

this the 8 day of _August_, 2022.

_Charlotte A. Reynolds_

NOTARY PUBLIC

My Commission Expires: 3-22-23





State of North Carolina
Post Release Supervision and Parole Commission
2020 Yonkers Road,
4222 MSC
Raleigh, NC 27699-4222
Telephone (919) 716-3010
Fax (919) 324-6254

**ROY COOPER**
**GOVERNOR**

**WILLIS J. FOWLER**
**CHAIRMAN**

**COMMISSIONERS**
**GRAHAM H. ATKINSON**
**ERIC A. MONTGOMERY**
**ANGELA BRYANT**

June 17, 2020

Brett A. Abrams 0000400
Orange CC - 4240

Dear Mr. Abrams:

The Post-Release Supervision and Parole Commission has reviewed and evaluated all available information surrounding your case and concluded that parole should not be granted at this time. This decision was reached because of the following reasons:

Your release at this time would unduly depreciate the seriousness of the crime or promote disrespect for the law.

Your continued correctional programming in the institution will substantially enhance your capacity to lead a law-abiding life if released on a later date.

There is a substantial risk that you would engage in further criminal conduct.

You are commended for your progress in the counseling sessions with Dr. Conley that you completed since your last parole review. From what you said during your recent video-conference, it appears you understand the value of those counseling sessions. I hope that you are able to apply what you learned to your everyday life. That should serve you well. The Commission would like for you to continue participating in correctional programming or counseling. This recommended programming can include any cognitive behavior treatment/programming as well as programming related to the counseling sessions that you participated in. It can be programming/counseling related to interpersonal relationships and

DEFENDANT'S
EXHIBIT
B
PENGAD 800-631-6989

Case 5:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 180 of 210

self-esteem. Please speak with your unit case manager about the availability of such programs in your area. You may also want to speak with the psychologist serving your unit about this programming. The Commission would also like for you to continue with work release and community volunteer passes when the prison system is able to allow this again. You seem to have developed some good relationships with positive individuals who are willing to assist you in a future transition into the community.

Your case is scheduled to be reviewed for parole purposes again on or about May 21, 2022.

Sincerely,

Joy Smith
Senior Parole Case Analyst

cc: Warden
Orange CC - 4240

**FILED**

JAN 3 0 2020

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY ꞏYꞏCꞏSꞏ___ DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
20-SO-1

IN RE:                                    )
APPOINTMENT OF NORTH                      )
CAROLINA PRISONER LEGAL                   )          **ORDER**
SERVICES, INC. IN STATE PRISONER          )
CIVIL RIGHTS CASES                        )

This Standing Order is hereby entered to reflect an agreement this court has reached with North Carolina Prisoner Legal Services, Inc. (hereinafter "NCPLS") in state prisoner civil rights cases. This order applies only to civil rights actions filed by North Carolina state prisoners against current and former employees of the North Carolina Department of Public Safety, Division of Adult Correction (hereinafter "DPS"). This Standing Order supersedes the court's prior standing order regarding Appointment of North Carolina Prisoner Legal Services, Inc. in State Prisoner Civil Rights Cases, Standing Order 17-SO-03.

The court hereby ORDERS as follows:

1. NCPLS shall maintain an email inbox for the court's use in serving NCPLS with appointment orders and other related filings.

2. When the court has reviewed a state prisoner's civil rights complaint pursuant to 28 U.S.C. § 1915A, identified any cognizable claim(s), and directed the clerk to maintain management of the action, the clerk shall send a copy of the order to the plaintiff, together with a notice to the plaintiff and form response (attached to this order as Form A) by which the plaintiff can indicate if he/she consents to the appointment of NCPLS by the court to conduct discovery on his/her behalf. If the plaintiff accepts appointment of NCPLS for the purpose of conducting discovery, the court will appoint NCPLS for this purpose in a scheduling order setting a period for discovery after

**DEFENDANT'S EXHIBIT**
5

defendant(s) have been served and answered the complaint. The period of discovery shall not be less than 120 days, unless otherwise ordered by the court, and the discovery period will be extended only upon a strong showing of diligence and good cause.

3. Upon appointment by the court, and within 60 days of entry of the initial scheduling order governing discovery, NCPLS will serve discovery requests on counsel for defendant(s). During the discovery period, all contact seeking discovery from DPS employees shall be made to the Public Safety Section of the Attorney General's Office. Documents and materials covered by these provisions may appropriately include but are not limited to grievance forms, use-of-force reports, incident reports, disciplinary reports, inmate medical records, photographs and/or video footage of any alleged incident and/or any injuries incurred, complete PREA reports if the complaint alleges sexual assault, and personnel records including records of pre-disciplinary conferences, letters of reprimand, and unsatisfactory TAP entries, where those records describe disciplinary action taken against the named defendants related to the allegations in the prisoner's complaint. NCPLS will collect discovery responses, review them, and conduct any follow-up as necessary.

4. NCPLS and DPS agree that discovery shall be subject to a Consent Protective Order (attached to this order as Form B) to govern the disclosure of confidential information. The Consent Protective Order is deemed entered in all cases subject to this Standing Order.

5. Upon conclusion of the discovery period, NCPLS will file with the court a Response to Discovery Order (attached to this order as Form C). The Response will indicate that a) NCPLS will provide representation; b) NCPLS will not provide representation; or c) the plaintiff has declined any further assistance by NCPLS. Unless the Response indicates that NCPLS will provide representation, the clerk shall terminate NCPLS's representation on the docket without the need for NCPLS to file a motion to withdraw.

2

6. If NCPLS provides representation to the plaintiff, NCPLS may request that the court order an additional discovery period that will include time for depositions of parties and witnesses and designations of expert witnesses prior to the deadline for dispositive motions.

7. If NCPLS declines representation or the plaintiff rejects NCPLS's further representation following the period of discovery, NCPLS will provide the plaintiff with a packet of discovery materials, subject to the terms of the Consent Protective Order, and with advice regarding legal issues in the case before terminating representation.

8. In its discretion, the court may appoint NCPLS for limited purposes in other phases of a state prisoner's civil rights case, including: identifying defendant(s), filing a response to a dispositive motion, representing the plaintiff in a court-hosted settlement conference, representing the plaintiff in a trial or other hearing, and executing on a judgment. However, before appointing NCPLS to represent the plaintiff for trial, the court will provide NCPLS with notice and opportunity to accept or decline such appointment. If NCPLS is unable to accept any other appointment for any reason, including a lack of resources or a conflict of interest, NCPLS shall file a motion to withdraw within 14 days of the date of appointment informing the court why it is unable to provide representation.

SO ORDERED. This _30_ day of January 2020.

_Terrence Boyle_
TERRENCE W. BOYLE
Chief United States District Judge

3

**FORM A**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:__-CT-____-__

| | | |
|---|---|---|
| , | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **NOTICE TO PLAINTIFF** |
| | ) | |
| , | ) | |
| | ) | |
| Defendant(s), | ) | |

The court has directed the clerk to maintain management of this action, and the defendant(s) is/are in the process of being served with the complaint. You are hereby notified that North Carolina Prisoner Legal Services, Inc. ("NCPLS")[1] is available to assist you in conducting discovery **if ordered to do so by the court at the appropriate time.** If you accept NCPLS's assistance, NCPLS will be appointed when a scheduling order is entered and will serve discovery requests on defendant(s) on your behalf, collect the discovery responses, and provide you with a set of materials and legal advice pertaining to your case. Additionally, NCPLS will report whether it is willing to represent you in this action beyond the discovery period.

You are not required to accept any assistance by NCPLS, and you can decide now that you do not want NCPLS to conduct discovery on your behalf or to represent you. However, there is no general right to court-appointed counsel in civil cases, and counsel is only appointed in exceptional cases.

---

[1] NCPLS is a non-profit legal services firm, contracted with the Office of Indigent Defense Services (IDS) to assist it in providing inmates who are in the custody of the North Carolina Department of Public Safety, Division of Adult Correction with their constitutional right of meaningful access to the courts.

## FORM A

Please fill out the enclosed form indicating whether you want NCPLS to assist you in conducting discovery, and return it to:

Clerk, United States District Court
Post Office Box 25670
Raleigh, North Carolina 27611

You should sign, date, and return this form within twenty-one (21) days. Your failure to return this form by that deadline may be construed as a rejection of NCPLS's assistance, and the court might not order NCPLS to conduct discovery on your behalf.

<u>**FORM A**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:__-CT-____-__

|  |  |
|---|---|
| Plaintiff | ) ) ) ) |
| v. | )   **PLAINTIFF'S RESPONSE TO NOTICE** ) |
| , | ) |
| Defendant(s), | ) ) |

I have read the "Notice to Plaintiff" informing me of NCPLS's availability to assist me with conducting discovery if ordered to do so by the court at the appropriate time. I understand that if I accept NCPLS's assistance, upon entry of the initial scheduling order governing discovery, NCPLS will serve discovery requests on defendant(s) on my behalf, collect the discovery responses, provide me with a set of materials and legal advice pertaining to my case, and report to the court whether it is willing to represent me in this action beyond the discovery period. I further understand that there is no general right to court-appointed counsel in civil cases, and it is highly unlikely that the court will appoint other counsel for me.

Accordingly, I hereby

____ ACCEPT the assistance of NCPLS during the discovery period and agree to allow NCPLS to conduct discovery on my behalf **if ordered to do so by the court**.

____ REJECT the assistance of NCPLS, including any legal representation in my case.

_____
Date

_____
Plaintiff's Signature

_____
Plaintiff's Printed Name

**FORM B**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

**CONSENT PROTECTIVE ORDER
GOVERNING CASES SUBJECT
TO STANDING ORDER 20-SO-1**

Defendant(s), through counsel, and with the consent of counsel for Plaintiff, appearing for the limited purpose of conducting written discovery, agree to entry of a Protective Order which will control the production and dissemination of confidential documents, material, and information ("Confidential Information").

The Court finds that during the course of this litigation, Defendants obtained and will continue to obtain and disclose to Plaintiff or the Court, information and documents from the North Carolina Department of Public Safety ("the Department") that are deemed confidential under federal and state law, including, N.C.G.S. §§ 126-22(3) and -24, § 122C-52, § 132-1.7, § 148-74 and -76; *Goble v. Bounds*, 13 N.C. App. 579, 581, 186 S.E.2d 638, 639, *aff'd*, 281 N.C. 307, 188 S.E.2d 347 (1972); *Paine v. Baker*, 595 F.2d 197, 200 (4th Cir. 1979), *cert. denied*, 444 U.S. 925 (1979); 42 U.S.C. § 1320d *et seq.*; and 45 C.F.R. §§ 160-164.

In light of the confidential nature of much of the information which will be produced in this litigation, a Protective Order is necessary to authorize the release of such confidential information and to ensure that such confidential information is not disclosed or used for any purpose except in connection with this litigation.

THEREFORE, the court ORDERS as follows:

1.    <u>Scope of the Order</u>. This Order applies to all information produced during written discovery, including any discovery exchanged prior to the entry of this Order.

1

## FORM B

2.    <u>Use of Confidential Information</u>. All Confidential Information, as defined in this Order, shall be used solely in the prosecution or defense of this action, and shall not be used or disclosed by any person for any other purpose.

3.    <u>Disclosure</u>. "Disclose" or "disclosure" means to provide, impart, transmit, transfer, convey, publish, or otherwise make available.

4.    <u>Confidential Information</u>. "Confidential Information" consists of "General Confidential Information" and "Attorneys' Eyes Only Confidential Information," which are defined as follows:

    A. "General Confidential Information" refers to and includes:

        i. Information and documents contained in "personnel files", as that phrase is defined in N.C.G.S. § 126-22;

        ii. Information, documents, and related materials collected, created, and maintained by the Department pursuant to N.C.G.S. § 148-74, -76, -118.5; and § 122C-52

        iii. "Protected health information" as that phrase is defined in 45 C.F.R. § 160.103;

        iv. Other information that is potentially embarrassing or invasive of the privacy of a person not a party to this litigation and therefore an appropriate subject of a protective order under Rule 26(c)(1) of the Rules of Civil Procedure.

    B. "Attorneys' Eyes Only Confidential Information" means:

        i. "Personally Identifiable Information", as that phrase is defined in 45 C.F.R. § 75.2, of current or former employees and contractors of the Department, such as but not limited to date of birth, social security numbers, home

2

addresses and telephone numbers, insurance records or designations, medical and/or disability information, and other purely private information;

ii. The personal financial records, telephone records, and e-mail records of current or former employees and contractors of the Department; and

iii. Other non-public information as provided in N.C.G.S. § 132-1.7, which includes specific security information or detailed plans, patterns, or practices associated with prison operations, such as certain investigations, security designations, staffing patterns and logs, schematic or other drawings and diagrams, and other sensitive security information.

5. <u>Disclosure of General Confidential Information</u>. General Confidential Information shall not be disclosed to anyone except:

A. The court and its personnel;

B. The parties to this action;

C. Counsel for the parties to this action and employees of said counsel;

D. Experts or consultants specifically retained by the parties or their attorneys to assist them in the preparation of this case or to serve as expert witnesses at the trial of this action, but only after execution of a Confidentiality Agreement as provided in Paragraph 8; and

E. Court reporters or videographers engaged to record depositions, hearings, or the trial in this action.

6. <u>Disclosure of Attorneys' Eyes Only Confidential Information</u>. Attorneys' Eyes Only Confidential Information shall not be disclosed to anyone except:

A. The court and its personnel;

3

B. Counsel for the parties to this action and employees of said counsel;

C. Experts or consultants specifically retained by the parties or their attorneys to assist them in the preparation of this case or to serve as expert witnesses at the trial of this action, but only after execution of a Confidentiality Agreement as provided in Paragraph 8; and

D. Court reporters or videographers engaged to record depositions, hearings, or the trial in this action.

7.    Withdrawal of Plaintiff's Counsel.    In the event that counsel for Plaintiff withdraws from representation and Plaintiff proceeds *pro se*, any Attorneys' Eyes Only Confidential Information disclosed to counsel for Plaintiff may thereafter be disclosed to Plaintiff **only** upon the following conditions:

A. Plaintiff must sign a Confidentiality Agreement, a copy of which is attached hereto as Exhibit A; **and**

B. Prior to disclosing any Attorneys' Eyes Only Confidential Information to Plaintiff, Counsel for Plaintiff agrees in writing to copy any documents marked as Attorneys' Eyes Only Confidential Information onto red paper before providing said material to Plaintiff.

If, after the conclusion of this litigation, Department officials, discover red papers marked as Attorneys' Eyes Only Confidential Information, those officials are authorized to seize the documents and return them to the Department.

8.    Confidentiality Agreements.    Before Confidential Information or Attorneys' Eyes Only Confidential Information is disclosed to any person described in Paragraphs 5(d), 6(c), or 7, of this Order, counsel for the party disclosing the information shall inform the person to whom the

4

**FORM B**

disclosure is to be made that Confidential Information shall be used only for the purpose of the prosecution or defense of this action, and shall obtain from the person to whom the disclosure is to be made a signed a copy of the Confidentiality Agreement attached hereto as Exhibit A. Counsel for the party disclosing the Confidential Information to said person shall maintain the original Confidentiality Agreement and need not produce it except by agreement of the parties or upon order of the court.

9. <u>Designation of Confidential Information</u>. Information shall be designated as Confidential Information in the following manner:

    A. In the case of information reduced to paper form, the designation shall be made by placing the appropriate legend, "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" for General Confidential Information or "CONFIDENTIAL–ATTORNEYS' EYES ONLY" for Attorneys' Eyes Only Confidential Information, on each page containing such information or by such other means as agreed to by the parties. The party disclosing the information shall designate the documents as confidential at or before the time of disclosure. A party may make the designation with respect to information disclosed by another party by a writing directed to the producing party's counsel. The producing party's counsel shall then be responsible for labeling the designated information as provided herein, or otherwise agreed to by the parties.

    B. Information on a computer disk, flash-drive, or other medium that has not been reduced to paper form shall be designated as Confidential Information by informing counsel for the parties to this action in writing that the computer disk, flash-drive, or other medium contains such Confidential Information and,

5

where applicable, specifying by Bates or other page number the particular information being designated or by such other means as agreed to by the parties. To the extent practicable, such physical medium should also be labeled using the appropriate marking. Any party receiving Confidential Information designated under this Paragraph shall then be responsible for appropriately labeling any printed version(s) of such information that it creates.

C.  In the case of deposition testimony, any party may designate information disclosed during a deposition as Confidential Information by either identifying on the record at the deposition the information that is to be treated as Confidential Information or; marking the portions of the deposition transcript to be designated as Confidential Information within 21 days after receipt of the transcript. When the deponent and the attending parties do not agree to waive the reading, correcting, and signing of the transcript, all information disclosed during a deposition shall be treated as Attorneys' Eyes Only Confidential Information before the expiration of the 21-day period unless otherwise agreed by the parties and the deponent. If any deposition testimony or any document or information used during the course of a deposition is designated as Confidential Information, each page of the deposition transcript containing such information shall be labeled with the appropriate legend specified in Paragraph 9(A), and the first page of the deposition transcript shall be labeled in a manner that makes it readily apparent that the transcript contains Confidential Information.

D.  Any other information that is not reduced to physical form or cannot be

6

conveniently labeled shall be designated as Confidential Information by serving a written notification of such designation on counsel for the other parties. The notice shall, where applicable, specify by Bates or other page number the particular information being designated.

10. <u>Disputes over Designations</u>. If any party objects to the designation of any information as Confidential Information, counsel for the objecting party and counsel for the designating party shall attempt to resolve the disagreement on an informal basis. If the objection is not so resolved, the objecting party may move the court for appropriate relief. The information in question shall continue to be treated as confidential in accordance with the disputed designation unless and until the court issues a final ruling that the information does not qualify for such a designation. The non-filing by the objecting party of a motion for relief shall not be deemed an admission that the information in question qualifies for the disputed designation.

11. <u>Inadvertent Disclosure of Confidential Information</u>. Inadvertent disclosure of Confidential Information, without identifying the same as confidential, shall not be deemed a waiver of confidentiality with regard to similar or related information nor shall it be deemed a waiver of confidentiality with regard to the information inadvertently disclosed if promptly called to the attention of counsel for each receiving party.

12. <u>Filing of Confidential Information Under Seal</u>. Before filing a document containing any Confidential Information, the filing party must confer with the other parties about how the document should be filed. If the filing party decides that the document should be sealed, the filing party shall file the document along with a motion to seal and supporting memorandum showing that the document may properly be sealed. A motion to seal may be filed without a supporting memorandum only if the filing party can cite a statute or rule (federal, local or standing

7

**FORM B**

order) that requires the filing to be sealed. Absent such authority, the filing party must submit a supporting memorandum that specifies: (i) the exact document or item, or portions thereof, for which filing under seal is requested; (ii) how such request to seal overcomes the common law or the First Amendment presumption to access; (iii) the specific qualities of the material at issue which justify sealing such material, taking into account the balance of competing interest in access; (iv) the reasons why alternatives to sealing are inadequate; and (v) whether there is consent to the motion. If a party other than the filing party seeks to have the document sealed, the filing party shall file the document as a proposed sealed document. Instead of a motion to seal and supporting memorandum, the filing party shall file contemporaneously with the document a notice stating that, pursuant to this Paragraph, any party seeking the sealing of the document must within 7 days file a motion to seal and supporting memorandum as provided in Local Civil Rule 79.2 or the document will be unsealed by the Clerk without further order of the court.

13. <u>Authors/Recipients</u>. Except as specifically provided herein, this Order shall not limit use by a party of its own Confidential Information, nor shall this Order limit the ability of a party to disclose any document to its author or to anyone identified on the face of the document as a recipient.

14. <u>Return of Confidential Information</u>. Following the conclusion of this action, including any appeals, the Department may request in writing its return by any other party. Within 60 days after service of such a request, any party that received the Confidential Information shall either return it to counsel for the Department or destroy it, at the election of the receiving party; provided that the information shall not be destroyed if otherwise ordered by the court or a motion for relief from this Paragraph is pending. If a receiving party elects to destroy the Confidential Information rather than returning it to the Department, counsel for the receiving party shall provide

8

# FORM B

to the Department by the 60-day deadline a signed certification that the Confidential Information has been destroyed. This Paragraph shall not be construed to require the return or destruction of any regularly maintained litigation files held by the attorneys of record for each party as archival records or other attorney work-product created for any party. Any Confidential Information, or portions or excerpts thereof, which are not returned or destroyed pursuant to this Paragraph shall remain subject to the terms of this Order. The return of trial exhibits by the court shall be governed by Local Civil Rules 6.1 or 79.1.

15. <u>Admissibility of Information</u>. Neither the terms of this Order nor the disclosure or designation as confidential of any information pursuant to it shall be deemed to establish or vitiate the admissibility under the Federal Rules of Evidence of any information subject to this Order.

16. <u>Confidential Employee Information</u>. Pursuant to N.C.G.S. § 126-24(4), this Order specifically authorizes the disclosure of confidential portions of the personnel files maintained by the Department of current or former employees in accordance with the terms of this Order.

17. <u>Modification</u>. This Order is without prejudice to the right of any party or witness to seek modification or amendment of the Order by motion to the court, or to seek and obtain additional protection with respect to Confidential Information as such party may consider appropriate.

9

## FORM B

**EXHIBIT A**

**CONFIDENTIALITY AGREEMENT**

 I, _____ have read and am familiar with the terms of the Consent

Order governing the Confidential Information in the case of_____,

Civil Action No. 5:___-CT-_____-__, in the Eastern District of North Carolina, Western

Division. I agree to the following:

 1. To abide by all the terms of said Order and not to reveal or otherwise communicate

any of the information disclosed to me pursuant thereto to anyone except in accordance with the

terms of said Order.

 2. To make use of any information obtained, whether in documentary or other form,

pursuant to that Order other than for purposes of this litigation.

 3. Upon written request, to return to counsel of record or to destroy not later than 60

days after notification of the termination of this litigation any and all documents in my possession

containing information which is the subject of said Order (whether such information is in the form

of notes, memoranda, reports, or other written communications or documents prepared by any

person at any time containing information covered by the terms of said Order).

 4. To submit myself to the jurisdiction of the foregoing Court, including its contempt

power, for enforcement of said Order.

 This the _____ day of _____, 20__.

_____
PRINTED NAME

10

**FORM C**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:__-CT-____-__

|  |  |  |
|---|---|---|
| Plaintiff | ) ) ) ) | |
| v. | ) ) ) | **NCPLS RESPONSE TO DISCOVERY ORDER** |
| Defendant(s), | ) ) ) | |

In response to the court's order and pursuant to Standing Order 20-SO-1, I have

assisted the plaintiff with conducting discovery and provided legal advice in this case. As a

result of my review of the discovery:

_____ a)  North Carolina Prisoner Legal Services, Inc. ("NCPLS") will provide
representation to plaintiff in this action.

_____ b)  NCPLS will not provide further representation to plaintiff in this action.

_____ c)  The plaintiff has declined any further assistance by NCPLS following the
discovery period.

_____
Staff Attorney
North Carolina Prisoner Legal Services, Inc.
Post Office Box 25397
Raleigh, North Carolina 27611
(919) 856-2200

## FORM C

### CERTIFICATE OF SERVICE

I certify that on **DATE**, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and mailed the foregoing documents via USPS, postage prepaid, to the following:

Respectfully submitted,

_____

Staff Attorney
North Carolina Prisoner Legal Services, Inc.
Post Office Box 25397
Raleigh, North Carolina 27611
(919) 856-2200



This is your
**starting line.**

DOWNLOAD YOUR
STARTER KIT


Mitchell
COMMUNITY COLLEGE



(https://www.iredellfreenews.com/)

Home (https://www.iredellfreenews.com/)

News & Features (https://www.iredellfreenews.com/news-features/)

Obituaries (https://www.iredellfreenews.com/obituaries/)

Health (https://www.iredellfreenews.com/health/)

Non-Profits (https://www.iredellfreenews.com/non-profits/)

Perspectives (https://www.iredellfreenews.com/perspectives/)

About  +  (https://www.iredellfreenews.com/about-us/)

Contact (https://www.iredellfreenews.com/contact-us/)

Archives (https://www.iredellfreenews.com/archives/)



DEFENDANT'S
EXHIBIT

# N.C. Parole Commission rejects latest parole bid for man who murdered Mooresville woman (https://www.iredellfreenews.com/news-features/2020/n-c-parole-commission-rejects-latest-parole-bid-for-man-who-murdered-mooresville-woman/)

Posted on 🗓 June 20, 2020 (https://www.iredellfreenews.com/news-features/2020/n-c-parole-commission-rejects-latest-parole-bid-for-man-w...



Mooresville resident Kim Goodman was stabbed to death at her home on July 11, 1983.

Case 5:20-ct-03231-M   Document 35-18   Filed 04/24/23   Page 201 of 210

**FROM STAFF REPORTS**

The N.C. Parole Commission has turned down convicted murderer Brett Abrams' latest bid for parole following a public outcry against his release.

Abrams was sentenced to life in prison in 1984 for stabbing 20-year-old Kim Goodman to death while she was sunbathing behind her home in the Brookview community near Highway 150 in Mooresville.

A graduate of South Iredell High School and Mitchell Community College, Kim was preparing to continue her education at the University of North Carolina at Greensboro when she was killed. She was engaged to be married and planned to return to Mooresville to teach dance after earning her bachelor's degree.

After an article detailing Abrams' crime and the Goodman family's efforts to block his release was published by Iredell Free News in early May, dozens of people sent emails and letters to the Parole Commission opposing Abrams' release.

The family received notification on Saturday that commissioners had denied Abrams' application for parole.

In a statement Saturday, the Goodman family expressed its gratitude for the community's efforts to keep the killer behind bars.

"We have been amazed by your support and response to the newspaper article and we would like to thank you. Your heartwarming comments about Kim and our family have given us much comfort. We know that many of you have sent letters and e-mails to the Commission in support of our efforts and expressing your concerns. We are appreciative for each and every one."

Abrams, 51, will be eligible for parole again in May of 2022.

In the statement, the Goodmans pledged to continue working to prevent Abrams from being paroled and endangering others.

# Email Edition

**Email address:**    Your email address

Sign up

Search …

**Q** Search

**f** (https://www.facebook.com/svlfreenews)

© Iredell Free News

83-5118

NC BAPTIST HOSPITAL — BOWMAN GRAY SCHOOL OF MEDICINE — DEPARTMENT OF PATHOLOGY
Winston-Salem, NC 27103   Phone: 919/748-4311

A15456   GOODMAN, KIMBERLY R.   21YO   WA-Outside

Med-Legal  —  Dr. J. Alford     Admitted:
              Iredell Co. M.E., Mooresville, N.C.
Expired: 7/11/83 11:10 pm   Autopsy on: 7/12/83 09:05 am

Prosector/Consultant: Dr. Schary

Date Completed:  8/23/83

FINAL AUTOPSY DIAGNOSES

BODY AS A WHOLE:

   Stab wounds, multiple (total: 17):
      -chest (6X), upper abdomen (1X), right back (2X), right forearm (1X).
      -skin openings: slit-like, sharp edges, pointed ends; length: 1.8-4 cm.
      -depth of penetration: up to 8 cm.
      -angle of penetration: right and acute.
      -penetrated organs: rib cage (4X), heart (1X), left lung (1X), liver (2X),
       gallbladder, stomach.
      -Associated findings:  hemopericardium  (50 ml);  hemothorax, bilateral
       (50/200 ml);    hemorrhage,    intraperitoneal   (150 ml);    pneumothorax,
       bilateral;    pulmonary   atelectasis,   segmental;   anemia   secondary   to
       exsanguination.
   Incised wounds (=cuts), superficial: chest (4X), back o  left hand (3X).
   back of right thumb (1X).
   Incised wounds (=cuts), deep (="defense wounds"): palmar surface of left
   fingers 3, 4, and 5.

CARDIOVASCULAR SYSTEM:

   Cardiac trauma: penetrating stab wound.
   Hemopericardium (50 ml).

RESPIRATORY SYSTEM:

   Lung trauma: penetrating stab wounds, both lungs.
   Hemothorax, bilateral (50/200 ml).
   Pneumothorax, bilateral.
   Pulmonary atelectasis, segmental.

DEFENDANT'S
EXHIBIT
PERHAD 800-631-6989

FINAL AUTOPSY DIAGNOSES (Cont'd)

GASTROINTESTINAL SYSTEM:

Hepatic trauma: penetrating stab wounds (2X): anterior surface right and
left lobe.
Gallbladder trauma: penetrating stab wound.

HEMOLYTOPOIETIC SYSTEM:

Anemia secondary to exsanguination.

FEMALE GENITAL SYSTEM:

Corpus luteum, right.

AUTOPSY BACTERIOLOGY:

Culture of lung yielded:  Lactobacillus;    Bacillus  species;   Gamma strep;
Enterococci.

AUTOPSY TOXICOLOGY (T-83-3866):    Blood:
                                   Ethanol:  Negative

CONSULTATION:   Wet mount (vaginal pool):  No spermatozoa seen.

Acid phosphatase from vaginal pool specimen:
                                        Corrected
            Undiluted        2.6           2.6 u/l
            1:10             .16           1.6 u/l
            1:100            0             0 u/l
Comment:   There is no evidence of recent intravaginal ejaculation.
                                        C. A. Olympic, M.D.
                                        Pathology Dept.

COMMENT:   The principal autopsy findings are multiple stab wounds.

Modesto Schary, M.D.

ASSOCIATE CHIEF MEDICAL EXAMINER 4/30/83
67

HISTORY: 21-year-old white female was apparently strangled; died in a bathtub or the back patio of her residence in Harrisville, North Carolina, when she was stabbed in the chest and neck by an unknown assailant (or assailants). The body is discovered by a neighbor.

Mr. above, Brevard County Medical Examiner, requested an autopsy.

THE JOHNS HOPKINS HOSPITAL — JOHNS HOPKINS SCHOOL OF MEDICINE — DEPARTMENT OF PATHOLOGY

|  | WEIGHTS AND MEASUREMENTS | AUTOPSY NO. |
|---|---|---|
| BODY WEIGHT | 46.5 Kg. | II GMS |
|  | cm. | II GMS |
| BODY LENGTH | 160 cm. | II GMS |
| HEART | 260 gr. | II GMS |
| RIGHT LUNG | 300 gr. | III THICK |
| LEFT LUNG | 5.5 gr. | III THICK |
| RIGHT KIDNEY | 8.0 gr. | III THICK |
| LEFT KIDNEY | 6.0 gr. | III THICK |
| THICKNESS OF RIGHT VENTRICLE | 0.5 gr. | III THICK |
| THICKNESS OF LEFT VENTRICLE | 1.2 gr. | III THICK |
| BRAIN, Rt. 200 gr. 300 TOTAL | 260 gr. | III SEC |
| SPLEEN | 520 gr. | III SEC |
| PANCREAS | 26 gr. | |
| KIDNEYS, Rt. 200 Gr. 300 TOTAL | 230 gr. | III SECTION |
| THYROID | gr. | III SEC |
| LIVER | 300 gr. | III SECTION |
| ADRENALS | 0.5 gr. | III SECTION |
| PARATHYROIDS | less than 0.2 gr. | III SECTION |
| OVARY | 26 gr. | II BLU |
| APPENDIX, Rt. 5 Lt. 6 TOTAL | 11 gr. | III GLAND |
| UTERUS | 1420 gr. | III ODD |
| BLADDER | 13 gr. | II PIPE |

| PERICARDIAL FLUID | (Discard Fluid) 150 ml. | III ODD |
| PLEURAL FLUID Rt. 10 Lt. 20 TOTAL | 250 ml. | III SEC |
| (Discard Fluid) | | |
| PERITONEAL FLUID | (Discard Fluid) 50 ml. | II SECTION |

Height of diaphragm, Right: 4th rib ; Left: 5th rib
Test for pneumothorax, Neg /7  Positive /57

Complete Autopsy: /57  Trunk Only /7  11-11-47;
Head Only /7  11-11-48; Other /7  11-11-48;
Intracranial Only /7  1-11-48; Gross Photograph(s) /7  1-11-48

BOWMAN GRAY SCHOOL OF MEDICINE – DEPARTMENT OF PATHOLOGY
Winston-Salem, NC 27103   Phone: 919/766-4251

## GROSS PROTOCOL

The body is that of a well-developed, well-nourished white female of a small frame of body build appearing the stated age of 23 years. Body heat is absent. Rigor mortis is not yet established. Lividity is fixed upon the posterior portion of the trunk. Skin is of a good turgor.

Present Injuries: Multiple (total: 17) stab wounds are present in the anterior chest (6), upper abdomen (1), and right back (5), and in the right forearm (1). In addition, there are the following linear incised wounds (cuts): chest (4), back of left hand (3), back of right thumb; the above cuts are superficial, barely exposing the dermis; deeper cuts are present on the palmar surface of the left fingers 2, 4, and 5 ("defense cuts"). See attached diagram.

Head is normocephalic. Hair of the scalp is dense, light brown. Corneas are clear and transparent. Pupils measure 0.6 cm in diameter each. Irides are green-brown. Sclerae are white. Natural orifices are clear. Teeth are in a fair state of preservation. Neck and chest are bilaterally symmetrical. Breasts are small without masses. Costal angle is less than the expected in females. Abdomen is below the chest level. Pubic hair is of normal distribution. External genitalia are not remarkable. Extremities are bilaterally symmetrical. No peripheral edema. Note: The entire skin is light tan except bikini-clad areas.

The usual "Y"-shaped primary incision discloses a less than 1 cm thick abdominal panniculus. Skeletal muscles are of a good tone. Peritoneal cavity contains a small amount of bloody blood. In the upper abdomen, there is a spillage of gastric contents with solid food particles on the anterior surface of the stomach. Diaphragm is in the usual location and liver border is not

ventricular over the systolic process not below the apical region at the level of the right atrioventricular line.

Thoracic cavity. Thoracic cage is penetrated by the trocar scar tires (2 in the right hemithorax, 1 in the left hemithorax). Pleural spaces contain a collection of fluid. There are certain no obvious penetrations. Pericardial sac is fluid penetrated and is filled with fluid blood.

Heart is of normal size; apex is formed in the left ventricle. The penetrating stab wound is extending from the anterior wall of the right ventricle (entrance wound) through the ventricular septum into the posterior wall of the left ventricle (exit wound) continuing to the costosternal surface of the left lung (upper lobe) representing the deepest penetration, the depth of which is measuring 4 cm. Cardiac chambers are virtually empty. Endocardium, myocardium, and epicardium are not remarkable. Coronary arteries are widely patent. Ierater cycle is closed. Aorta exhibits occasional intimal streaks, otherwise is not remarkable. Large veins contain liquid blood.

Lungs are of normal size and are, for the most part, well aerated. The right lung displays three stab wounds affecting the intervertebral portions of the right lower lobe; left lung exhibits one stab wound. Pulmonary blood vessels contain liquid blood. Segments of the lung, respectively are collapsed. Main bronchi, trachea, and larynx contain a collection of liquid blood (see above p.3). Thyroid, parathyroids, and epiglottis are not remarkable.

Liver is small and is entirely bloodless; the anterior surface of the lobe exhibits a penetrating stab wound with continuation of the right lobe penetration into the gallbladder which appears empty. Spleen is bloodless; it is of normal size with a wrinkled fibrous capsule. Peritoneal cavities are not distended. Adrenals and kidneys are not remarkable. Urinary bladder contains a trace of an opaque urine. Uterus, 7 x 4.5 x 1.5 cm. Endocervical