IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:20-CT-3231-M

BRETT ABRAMS,

    Plaintiff,

v.

DARREN JACKSON,

    Defendant.[1]

ORDER

This matter is before the court on the parties' cross motions for summary judgment [D.E. 51, 60]. Also before the court are the parties' motions to seal [D.E. 56, 88] and plaintiff's motion to substitute party [D.E. 90]. Plaintiff responded in opposition to defendant's motion for summary judgment. For the reasons stated below, the parties' motions to seal are granted. Plaintiff's motion to substitute party is granted. The parties' cross motions for summary judgment are denied.

## PROCEDURAL HISTORY

On July 21, 2020, plaintiff, a state inmate proceeding pro se, filed the instant action pursuant to 42 U.S.C. § 1983 alleging defendant violated his Eighth Amendment rights under the United States Constitution by failing to provide him a meaningful opportunity to obtain release through parole. (Compl. [D.E. 1] at 1). Plaintiff sues defendant in his official capacity and seeks injunctive relief. On November 22, 2021, the court ordered plaintiff to file a particularized amended complaint. [D.E. 6]. Plaintiff filed his amended complaint on December 22, 2021. [D.E.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), the court substitutes defendant Willis Fowler for the current Chair of the North Carolina Parole Commission, Darren Jackson.

7]. That same day, the court conducted a frivolity review of the complaint and allowed the action to proceed. [D.E. 8]. On January 13, 2022, North Carolina Prisoner Legal Services accepted appointment as plaintiff's legal counsel. [D.E. 10].

After numerous extensions of the discovery and dispositive motions deadline, plaintiff, through counsel, filed the instant motion for summary judgment on March 4, 2024. [D.E. 51]. In support, he relies on a memorandum of law [D.E. 52], statement of material facts [D.E. 53], and appendix of exhibits thereto [D.E. 54] comprised of the following: (1) deposition transcript of the North Carolina Post-Release and Parole Commission ("commission"); (2) deposition of Joy Smith ("Smith"), a parole case analyst; (3) deposition of Willis J. Fowler ("Fowler"), a Chair of the Commission; (4) deposition of Angela Bryant ("Bryant"), a former parole commissioner; (5) defendant's proposed plan in response to Hayden v. Keller, 134 F. Supp. 3d 1000 (E.D.N.C. 2015); (6) parole case analyst caseload management training; (7) Standard Operations Manual; (8) Hayden letter to plaintiff; (9) declaration of Mary Stevens ("Stevens"), chief administrator of the commission; (10) parole review event dated August 8, 2018; (11) Fowler's supplemented responses to plaintiff's first interrogatories, requests for production of documents, and requests for admissions; (12) North Carolina Department of Public Safety statistics 2010 to 2015; (13) MAPP recommendations for 2020; (14) life sentence interviews dated July 26, 2018, May 14, 2020, and May 19, 2022; (15) parole denial letter to plaintiff dated April 25, 2018; (16) plaintiff's psychological records with Dr. Michael Conley; (17) classification and referral action dated June 1984; (18) Hayden statistical information; (19) parole commission events dated May 18, 2007, May 21, 2012, and April 10, 2019; (20) handwritten note dated 1996; (21) letter from Smith dated April 19, 2018; (22) parole commissioner review dated June 2020; (23) letter to plaintiff from

2

Smith dated June 17, 2020; (24) letter from NCPLS to parole commission; (25) court order adopting Hayden plan; (26) plaintiff's underlying criminal judgment and commitment; and (27) defendant's post-30(b)(6) responses. That same day, plaintiff also filed a motion to seal.

On March 28, 2024, defendant filed a cross motion for summary judgment. [D.E. 60]. In support, defendant relies on a memorandum of law [D.E. 61], statement of material facts [D.E. 62], and appendix of exhibits [D.E. 63] thereto comprised of the following: (1) affidavit of Stevens; (2) affidavit of Charles Mautz, Director of Rehabilitation Services for the Division of Rehabilitation and Re-Entry with the North Carolina Department of Adult Correction ("NCDAC"); (3) Iredell county court documents; (4) plaintiff's criminal trial transcript; (5) Hayden agreement; (6) letter from assistant district attorney of the 22nd Prosecutorial District of North Carolina; (7) Hayden correspondence with plaintiff; (8) April 2019 parole denial letter; (9) plaintiff's May 2020 parole review self-report; (10) May 2020 Ben Finholt packet sent to parole commission; (11) report of plaintiff's 2020 parole proceedings; (12) June 2020 parole denial letter; and (13) 2020 to 2021 Hayden statistical data. Defendant also filed a motion to seal. Plaintiff responded in opposition to defendant's motion for summary judgment.

On February 10, 2025, plaintiff filed a motion to substitute named defendant pursuant to Federal Rule of Civil Procedure 25(d).

## STATEMENT OF FACTS

The facts of this case are undisputed as follows:

A.   Plaintiff's Background

On May 22, 1984, plaintiff, at the age of 15, pleaded guilty to second degree murder in Iredell County Superior Court in North Carolina. (Pl. App. 32 [D.E. 54-10]). Plaintiff was

3

sentenced to life imprisonment. (Id.). By statute, plaintiff became eligible for parole in 1993. (Pl. Stmt. [D.E. 53] ¶ 4; Def. Stmt. [D.E. 62] ¶ 5). Since 1993, the Parole Commission, now the North Carolina Post-Release and Supervision Parole Commission, has reviewed plaintiff for the possibility of parole 24 times but has not granted him parole release. (Pl. Stmt. [D.E. 53] ¶ 4; Def. Stmt. [D.E. 62] ¶ 6). The parole commission also has never agreed to offer plaintiff a Mutual Agreement Parole Program ("MAPP agreement"). (Pl. Stmt. [D.E. 53] ¶ 5). Plaintiff has had a total of 11 infractions during his over 40 years of imprisonment with the most recent occurring in 2005. (Id. ¶¶ 7–8). In April 2020, plaintiff's case manager at Orange Correctional Center in Hillsborough North Carolina noted that plaintiff held his then-current work release position since 2016, held other work release positions since 2008, completed several educational programs, taken aggression replacement training, been assigned to the "community leave" program, had a sponsor that took him to church, been active in the substance abuse program, and had a supportive family. (Id. ¶ 12).

B.  Parole Commission

The parole commission has four commissioners appointed by the North Carolina governor, and one is designated as the chair. (Id. ¶14). In addition to reviewing and voting on case files of people eligible for parole, commissioners have a number of other responsibilities, including reviewing paperwork from preliminary hearings, attending meetings with the general public on Tuesdays, presiding over revocation hearings of Wednesdays, MAPP negotiations on Thursday mornings, and weekly review requests from probation officers to reduce post-release supervision terms through reintegrative credit. (Id. ¶ 16). For either parole or a MAPP agreement to be

4

granted, three of four commissioners must vote to approve. (Id. ¶ 17). Former Parole Commissioner Chair Fowler testified that a MAPP agreement is "a pathway to parole." (Id. ¶ 93).

C.    Hayden v. Keller

In 2015, the United States District Court for the Eastern District of North Carolina found that the commission's review process for juvenile offenders serving life sentences violated the Eighth Amendment. Hayden, 134 F. Supp. 3d at 1011. In Hayden, the court stated, "If a juvenile offender's life sentence, while ostensibly labeled as one 'with parole,' is the functional equivalent of a life sentence without parole, then the State has denied that offender the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' that the Eighth Amendment demands. Id. at 1009 (quoting Greiman v. Hodges, 79 F. Supp. 3d. 933, 944 (S.D. Iowa 2015). In North Carolina, parole case analysts would research the juvenile offender's record and inmate file, and then prepare a written report and recommendation. Id.

> The most important information found in the summaries [was] noted as: the official crime version (narrative of events of crime of conviction; prison infraction history; gang membership; psychological evaluations; custody level history; visitation history; and a home plan. There is no information about one's status as a juvenile offender. There [was] no specific information about maturity or rehabilitative efforts. There [was] no special process for one convicted as an adult before the age of 18, and the commissioner[s] are unaware of that status. Absolutely no consideration [was] to be given for that status by the commissioners.

Id. The court found it was evident that

> North Carolina has implemented a parole system which wholly fails to provide Hayden with any "meaningful opportunity" to make his case for parole. The commissioners and their case analysts do not distinguish parole reviews for juvenile offenders from adult offenders, and thus fail to consider "children's diminished culpability and heightened capacity for change" in their parole reviews.

Id. (quoting Miller v. Alabama, 567 U.S. 460, 479 (2012). The court specifically noted that, while

5

Hayden's parole file explicitly stated he was 15 when he committed his offense, it was difficult for the court "to believe that a parole commissioner can fully take into consideration [Hayden']s chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences . . . when reading Hayden's case file along with 90 others in a single day." Id. (internal quotation marks and citation omitted).

The court directed the parties to present a plan "for the means and mechanism for compliance with the mandates of [Graham v. Florida, 560 U.S. 48, 75 (2010)] to provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults." Id. at 1011. The court subsequently adopted the commission's proposed plan, the Hayden plan, finding the plan was "narrowly drawn, extend[ed] no further than necessary to correct the violation of a federal right, and [was] the least intrusive means necessary to correct the violation of the federal right." Hayden, No. 5:10-CT-3123-BO, [D.E. 56 at 6] (E.D.N.C. Nov. 2, 2017).

D. Hayden Plan and Implementation

The Parole Commission implemented the Hayden plan in July 2018. See id. (Mar. 19, 2018). The plan included the following: (1) appointing a dedicated Hayden parole case analyst "who would prepare, on a biennial basis, a summary of the offender's file, including a summary of any written materials submitted by or on behalf of the offender"; (2) sending written notice to the juvenile offender at least 180 days in advance of any parole review hearing; (3) affording juvenile offenders a 30 minute "hearing" before a parole commissioner and the Hayden parole case analyst; (4) allowing an attorney, expert witness, advocate, and/or witness on behalf of the juvenile offender to present information to the presiding parole commissioner; and (5) in the event

6

parole is denied, sending a letter to the juvenile offender specifying the reasons for denial, as well as recommended steps for "improv[ing] his or her future chances for parole release. (Pl. Stmt. [D.E. 53] ¶ 23; Def. Stmt. [D.E. 62] ¶ 12).

The commission anticipated the new procedures would significantly increase the workload of commissioners, analysts, and other staff. (Pl. Stmt. [D.E. 53] ¶ 24). Also, at the time of implementation, the commission was working with fewer than its four full time commissioners. (Id. ¶ 25). In order to mitigate the increased workload, the commission asked the North Carolina General Assembly to create several new positions, including creation of a fifth commissioner seat. (Id. ¶ 27). The request was denied. (Id. ¶ 28).

Commissioners currently vote on at least 100 cases a day and now preside over 30-minute "Life Sentence Interviews" and hearings on requests to reduce post-release supervision terms. (Id. ¶ 16, 32).

E. Post-Hayden Case Analyst

Pursuant to the Hayden plan, in 2018, Smith, a part-time case analyst, was designated as the analyst for all juvenile offender cases. (Id. ¶34). Smith had previously worked for the parole commission from 1991 to 2013 as a parole analyst before she retired. (Id. ¶ 35). During that time period, she handled two juvenile offender cases, including plaintiff's. (Id. ¶ 36). Smith returned to the commission on a part-time basis in 2016. (Id. ¶ 35).

The commission did not require particular qualifications for Smith, and she received no training on issues specific to juvenile offenders, such as "brain development and the implications of a youth's brain maturing over time." (Id. ¶¶ 37–28). According to Smith, her role was "just

7

like a regular case analyst, except as part of the parole review process, [they] would have videoconferences at the time of the [juvenile] offender's scheduled parole review." (Id. ¶ 40).

The parole commission's policies were updated in light of Hayden, but Smith testified she is not familiar with the fact that the commission's training and standard operating procedures manual had been updated to include sections or references to Hayden. (Id. ¶¶ 43–45). Smith does not pull together offender files or write them up differently than she did prior to Hayden, and the commission has never asked her to provide any different information. (Id. ¶¶ 41–42). There are no standards with respect to the information Smith includes within a juvenile offender's file. (Id. ¶ 49). The commission does not engage in any annual audit or review of how the Hayden processes are working, and Smith is the only case analyst that does not receive any annual review. (Id. ¶¶ 46-47).

Specifically as to plaintiff, in his 2018 and 2020 parole review processes, Smith included in her summary that, in 1984, plaintiff killed his brother and, "[i]t was said that [plaintiff] locked his brother in [a] camper and set it on fire. Law enforcement were investigating this when [plaintiff] committed the murder that resulted in his prison term. The other case remains 'open.'" (Id. ¶ 52). However, plaintiff's larger parole file indicated plaintiff's brother's death had been ruled an accident by a detective in the Iredell County Sheriff's Office. (Id. ¶ 54). Former commissioner Bryant, who presided over plaintiff's 2018 first post-Hayden review testified that it is a significant factor if someone has an open case against them. (Id. ¶¶ 10, 53). In plaintiff's 2018 summary, Smith also included that, if he were to be paroled, plaintiff would reside with his mother, who lived on the same block as the plaintiff's victim's mother. (Id. ¶56). However, this was not true. (Id. ¶¶ 57–58).

8

Prior to plaintiff's 2020 parole review, plaintiff's lawyer submitted detailed information about plaintiff's background, letters of support, a detailed "home plan," and education and work information. (Id. ¶ 61). None of the information was included in Smith's 2020 summary for plaintiff's case, which former Chairman Willis noted would be a concern. (Id. ¶ 61).

F.  Post-Hayden Notice and "Life Sentence Interview"

As noted above, the Hayden plan calls for providing a juvenile offender 180 days' notice in advice of a parole review and holding a 30-minute videoconference between the juvenile offender and one commissioner ("Life Sentence Interview"). (Id. ¶ 23). The offender, commissioner, and case analyst are present during the interview. (Id. ¶ 68).

While juvenile offenders are provided notice that their cases will be reviewed, they have no access to their own parole records or materials commissioners will be reviewing. (Id. ¶ 63). Thus, they are unaware of what information the commission may or may not have during the review process. (Id.). Smith does not have access to psychological records from the prison system, and juvenile offenders are not informed they may need to request their own prison psychological records and have those submitted to the commission to have them considered. (Id. ¶¶ 62, 64).

According to Smith, the interviews are the only material difference in how the commission reviews juvenile offender cases post-Hayden. (Id. ¶ 66). Regarding the interviews, Fowler testified "[i]f it was the first time [interviewing a juvenile offender,] I would not have reviewed anything. If it was the first time he became eligible, and – and the analyst sent it up for us to vote on it, I would not have reviewed that file," but admitted he would have reviewed a summary of the crime prior to the interview. (Id. ¶ 70).

The commission does not instruct its commissioners to "consider youth and its various characteristics when assessing the nature or brutality of the underlying crime in juvenile offender cases," nor does it identify anywhere in its manuals, or elsewhere, how commissioners might evaluate or consider a juvenile offender's age at the time of the underlying crime. (Id. ¶¶ 71–72). The commission does not use objective measures for whether a juvenile offender has demonstrated rehabilitation or maturation. (Id. ¶ 76). Fowler testified he left it up to the staff psychologists to determine whether juvenile offenders had matured or rehabilitated themselves. (Id. ¶ 77).

G.   Post-Hayden Parole Denial Letters

As noted above, the commission is required to send a letter specifying the reasons for denial and recommendations for steps the individual could take to improve his chances of release at a future parole review. (Id. ¶80). The purpose of such letters is "so that they may one day possibly be paroled." (Id. ¶ 81). At subsequent parole reviews, commissioners expect the juvenile offender's file to include information about whether he has followed through with the recommendations. (Id. ¶82). There are no policies or procedures "that provide a framework for measuring objectively whether a juvenile offender has successfully followed recommendations." (Id. ¶ 84).

In April 2019, the commission denied plaintiff a MAPP agreement or parole. (Id. ¶ 85). In his denial letter, they recommended he engage in psychological counseling and treatment, complete correctional programming to "increase your self-awareness," and continue work release and community volunteer passes. (Id.). Plaintiff pursued counseling with Conley, a psychologist with the North Carolina Department of Public Safety, from May 2, 2019, through June 24, 2020, and Conley's notes indicated plaintiff accomplished his goals to "cover issues related to his

10

emotions and to help develop insight about his crime and past behavior. (Id. ¶¶ 87–88).

When plaintiff came up for review again in 2020, Smith, on behalf of the commission, never saw or requested Conley's records concerning plaintiff. (Id. ¶ 89). Fowler, who presided over plaintiff's Life Sentence Interview and voted in his 2020 review, testified plaintiff's older psychological records played a part in his consideration and admitted he did not have access to Conley's records. (Id. ¶ 91). Fowler confirmed he and the other commissioners were not in a position to review "the full range of psychological assessments of [plaintiff] from the time he was a child, teenager, until 2020 . . . that full spectrum of change in development because of the absence of those records. (Id. ¶ 92).

H.  MAPP Agreements

A MAPP agreement is a pathway to parole, especially for major crimes like murder and first-degree sex offenses. (Id. ¶ 93). In Hayden, the court found that "[t]he MAPP contract is ordinarily a mandatory step toward felony parole." 134 F. Supp. 3d at 1003. Between 2018 and 2022, the commission reviewed 362 juvenile offenders for parole. (Id. ¶ 97). Thirty-four were granted parole, and of those 34 offenders, only two were granted parole without a MAPP. (Id.).

In her summary for plaintiff's 2018 parole review, Smith noted in his file that "[t]here is nothing to be gained from MAPP as [plaintiff] is already doing everything that MAPP would provide." (Id. ¶ 100). During plaintiff's 2020 review process, plaintiff's prison case manager, the warden of Orange Correctional Center, the Central Region Office, and the MAPP Director for Adult Corrections all recommended that plaintiff be afforded a MAPP agreement. (Id. ¶ 102). During the review, Fowler noted a MAPP agreement would not do plaintiff "any good," explaining that plaintiff "had already been out of the institution, and he was on work release and/or home

11

leaves and had access to whatever in the community." (Id. ¶¶ 103, 106). Fowler voted against a MAPP agreement for plaintiff but could not think of anything else plaintiff could have done "to demonstrate his . . . ability to reintegrate." (Id. ¶ 106).

## COURT'S DISCUSSION

A.   Motion to Substitute [D.E. 90]

Pursuant to Federal Rule of Civil Procedure 25(d), plaintiff seeks to substitute the former Chair of the North Carolina Parole Commission, Fowler, for the current Chair, Darren Jackson. (Mot. Sub. [D.E. 90]). Defendant does not oppose the motion. Because defendant is sued in his official capacity, the court grants the motion. See Fed. R. Civ. P. 25(d).

B.   Motions to Seal [D.E. 56, 88]

The parties seek to seal confidential documents pursuant to the protective order. Neither party opposes the other's motion. The public has received adequate notice of the motion to seal. No less drastic alternative to sealing these documents is available because private information appears throughout the filing. Plaintiff's interest in preserving the confidentiality of his private health conditions outweighs any public interest in disclosure. Thus, the court grants the motion to seal.

C.   Motions for Summary Judgment [D.E. 51, 60]

   1.   Legal Standard

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). For cross-motions for summary judgment, the court "consider[s] each motion

12

separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." Defs. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 247–48, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). To determine whether a genuine issue of material fact exists for trial, the court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

2. Analysis

Here, plaintiff asserts defendant violated his Eighth Amendment rights because he failed to provide him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and despite post-Hayden efforts, constitutional infirmities with the process persist. Hayden, 134 F. Supp. 3d at 1011.

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979). And a state is not constitutionally obligated to establish a system of parole. Vann v. Angelone, 73 F.3d 519, 521 (4th Cir.1996). Thus, an offender's limited right to parole is controlled by state law. See Burnette v. Fahey, 687 F.3d 171, 181 (4th Cir.2012). In North Carolina, the Parole Commission has the exclusive discretionary authority to grant or deny parole.

See N.C. Gen. Stat. § 143B–720; N.C. Gen. Stat. § 15A–1371(d). Due process only requires that authorities "furnish to the prisoner a statement of [their] reasons for denial of parole." Vann, 73 F.3d at 522.

As provided above, the Hayden court found North Carolina's parole procedures, as applied to juvenile offenders, violated the Eighth Amendment. 134 F. Supp. 3d at 1011. In so doing, the court relied on Graham v. Florida, which held "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." 560 U.S. 48, 58 (2010). When a state sentences a juvenile and "imposes a sentence of life it must provide [that child] with some realistic opportunity to obtain release before the end of that term." Id. at 82. Such an opportunity must be "meaningful" and "based on demonstrated maturity and rehabilitation." Id. at 75. Thus, Hayden held juvenile offenders applying for parole must be provided "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults." 134 F. Supp. 3d at 1011.

Plaintiff does not dispute that the parole commission has followed all steps of the Hayden plan in his case. Instead, plaintiff argues, while the form of the Hayden plan has been followed, the plan has not been followed substantively. The undisputed evidence demonstrates, along with the Life Sentence Interview, as the juvenile offender case analyst, Smith assembles offender files in the same fashion she did prior to Hayden. (Pl. Stmt. [D.E. 53] ¶¶ 40, 49). Commissioners would necessarily be aware all of Smith's cases involve juvenile offenses, where she is the designated case analyst, all juvenile offenders participate in the Life Sentence Interview, and Smith is present at the interview. (See id. ¶¶ 23, 34, 41–42, 68). However, without adequate relevant

14

information in the files and summaries, commissioners cannot effectively ascertain a juvenile's maturity and rehabilitation. See Hayden, 134 F. Supp. 3d at 1011.

Plaintiff was procedurally provided the constitutional protections afforded by the Hayden plan, but worryingly, incorrect information was included in his post-Hayden parole reviews or relevant information was excluded that commissioners testified would have been relevant to their decision regarding parole. For example, Smith's summary of plaintiff's case indicated that plaintiff was responsible for killing his brother and the case was closed, when, in fact, an Iredell County detective ruled the death an accident. (Id. ¶¶ 52, 54). It was also incorrectly noted that, if paroled, plaintiff would be living with his mother, who lived on the same street and plaintiff's victim's mother. (Id. ¶¶ 56–58). Former commissioner Bryant indicated it is a significant factor in a parole review if someone has an open case against them. (Id. ¶¶ 10, 53). Fowler testified that misinformation in a file could mislead and misinform commissioners. (Id. ¶ 60).

And while commissioners 2018 denial letter to plaintiff recommended he engage in psychological counseling and treatment, complete correctional programming to "increase your self-awareness," and continue work release and community volunteer passes, Smith, on behalf of the commission, never saw or obtained plaintiff's psychology records for his 2020 review. (Id. ¶¶ 85, 89). Fowler testified commissioners were unable to assess plaintiff's "full spectrum of change" because of the absence of the records. (Id. ¶ 92). Such an omission is also concerning where Fowler relied on staff psychologists to determine whether juvenile offenders had matured or rehabilitated themselves. (Id. ¶ 77). Smith also did not include information submitted by plaintiff's attorney submitted prior to the 2020 review that was relevant to plaintiff's maturation

15

and rehabilitation, which Fowler noted was a concern. (Id. ¶ 61). One would assume accurate and comprehensive summaries with relevant information would be essential where commissioners vote on more than 100 cases a day, along with performing other duties. (Id. ¶ 16, 32).

From the evidence of record, it is unclear whether, had the incorrect information not been included and omitted information been in plaintiff's parole file, that commissioners would have granted plaintiff parole. Commissioners note that incorrect information can be significant and misleading, and omitted information is concerning. Yet, there is no record evidence demonstrating that commissioners would have granted plaintiff parole absent the deficiencies in his file. Accordingly, there is a genuine issue of material facts as to this issue.

Defendant argues the commission met the requirements of the Hayden plan and, thus, its actions were constitutional and all other actions in the underlying proceedings are discretionary. (Def. Mem. [D.E. 61] at 10–11). However, it is within this courts purview to review for Eighth Amendment violations. See Hayden, 134 F. Supp. 3d at 1006-10. This court declines to comment on the "correctness" of the commissions 2018 and 2020 parole review decisions, and only addresses the constitutionality of the process itself.

Defendant further argues Hayden does not apply to plaintiff, convicted of a homicidal offense, where the juvenile offenders in Hayden and Graham were convicted of nonhomicidal offenses. (Def. Mem. [D.E. 61] 9–8). However, Hayden makes no such distinction. See Hayden, 134 F. Supp. 3d at 1011 (finding the North Carolina parole review process for juvenile offenders serving a life sentence violates the Eighth Amendment").

16

Defendant notes plaintiff is trying to bring new state claims where plaintiff cites state court cases recognizing state constitutional interests for juvenile offenders. (Def. Mem. [D.E. 61] 23-24). The court does not interpret plaintiff's explanation of recognized state interests as a new claim but merely as an acknowledgment that juvenile offenders also have protected interests under the North Carolina law and constitution. See State v. Connor, 873 S.E. 2d 339, 356 (N.C. 2022) (providing juvenile offenders must have an opportunity for parole "which is realistic, meaningful, and achievable"); State v. Kelliher, 973 S.E. 2d 366, 390 (N.C. 2022).

Lastly, defendant argues the Eleventh Amendment bars plaintiff's claims where they are against defendant solely in his official capacity. (Def. Mem. [D.E. 61] at 26–27). Because plaintiff filed claims against defendant in his official capacity, his claims, in effect, are against the state of North Carolina. Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006). Absent a valid waiver, the Eleventh Amendment bars claims for compensatory or punitive damages against a state. See Eldelman v. Jordan, 415 U.S. 651, 662–63 (1974); see also Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995) (noting compensatory and punitive damages are "unavailable in official capacity suits"). Thus, plaintiff may, as requested in this case, only obtain prospective injunctive relief in this action. See Upshur v. Fowler, No. 5:17-CT-3162-FL, 2019 WL 4670747, at 3 (E.D.N.C. Sept. 24, 2019).

Accordingly, an issue of material fact exists, and plaintiff's motion for summary judgment is denied. For the same reasons stated above, defendant's motion for summary judgment is denied.

17

## CONCLUSION

For the reasons discussed herein, the court GRANTS the parties' motions to seal [D.E. 56, 88]. Plaintiff's motion to substitute party [D.E. 90] is GRANTED. The clerk is DIRECTED to substitute the defendant in this action as provided in footnote one. The parties' cross motions for summary judgment are DENIED WITHOUT PREJUDICE. The parties shall engage in a period of discovery limited to the issue of whether plaintiff would have been granted parole had his parole file not included the deficiencies addressed herein. Such discovery shall be commenced in time to be completed no later than **June 2, 2025**. Renewed dispositive motions shall be filed by **June 23, 2025**.

SO ORDERED, this the 1st day of April, 2025.

RICHARD E. MYERS, II
Chief United States District Judge